

**FILED**

5:06 pm, 6/22/20

**Margaret Botkins
Clerk of Court**

FENNEMORE CRAIG, P.C.
Anthony W. Austin (No. 025351)
Philip L. Brailsford (No. 032074)
2394 East Camelback Road, Suite 600
Phoenix, AZ 85016-3429
Telephone: (602) 916-5000
Email: aaustin@fclaw.com
Email: pbrailsford@fclaw.com

*Attorneys for Plaintiff
HIP Lending Group, LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| HIP Lending Group, LLC, an Arizona limited liability company, | No: 20-MC-99-SWS |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | |
| Goalz Restaurant Group, LLC, a Wyoming limited liability company; Goalz CD Pooler GA, LLC, a Wyoming limited liability company; Goalz Dairy Denver NC, LLC, formerly known as Goalz DQ Denver NC, LLC, a Wyoming limited liability company; Goalz Dairy Ft Pierce FL, LLC, a Florida limited liability company; Goalz DH Springs CO, LLC, a Wyoming limited liability company; Goalz DH Georgetown KY 111, LLC, a Wyoming limited liability company; Goalz DH IL 107, LLC, an Illinois limited liability company; Goalz DH IL 109, LLC, an Illinois limited liability company; Goalz DH Slidell LA 112, LLC, a Wyoming limited liability company; Goalz Restaurant Group COWY, LLC, a Wyoming limited liability company; Goalz Restaurant Group FLA, LLC, a Wyoming limited liability company; Goalz Restaurant Group KTY, LLC, a Wyoming limited liability company; Goalz Restaurant Group NCSC, LLC, a Wyoming limited liability company; and Shawn Eby, a Wyoming resident, | |
| Defendants. | |

Plaintiff HIP Lending Group, LLC ("Plaintiff") for its *Verified Complaint* alleges the following:

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff is an Arizona limited liability company with a principal place of business at 2999 North 44th Street, Suite 400, Phoenix, Arizona 85018.

2.      Defendant Goalz Restaurant Group, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

3.      Defendant Goalz CD Pooler GA, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

4.      Defendant Goalz Dairy Denver NC, LLC, formerly known as Goalz DQ Denver NC, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

5.      Defendant Goalz Dairy Ft Pierce FL, LLC, is a Florida limited liability company with a principal place of business at 2716 U.S. Highway 1, Fort Pierce, Florida 34982.

6.      Defendant Goalz DH Springs CO, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

7.      Defendant Goalz DH Georgetown KY 111, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

8.      Defendant Goalz DH IL 107, LLC, is an Illinois limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

9.      Defendant Goalz DH IL 109, LLC, is an Illinois limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

10.     Defendant Goalz DH Slidell LA 112, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

FENNEMORE CRAIG, P.C.
PHOENIX

- 2 -

15620705

11. Defendant Goalz Restaurant Group COWY, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

12. Defendant Goalz Restaurant Group FLA, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

13. Defendant Goalz Restaurant Group KTY, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

14. Defendant Goalz Restaurant Group NCSC, LLC, is a Wyoming limited liability company with a principal place of business at 9432 Aspen Pointe Lane, Cheyenne, Wyoming 82009.

15. Defendant Shawn Eby is a Wyoming resident.

16. Each and every Defendant is collectively referred to as "Defendants."

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). This is an action between citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

18. Venue is proper in this Court because Plaintiff is a resident of this District and Defendants are subject to personal jurisdiction in this District, having caused (1) a substantial portion of the events or omissions giving rise to the claims in this action to occur in this District, and (2) the harm resulting from Defendants' actions to impact Plaintiff in this District. 28 U.S.C. § 1391(a). Additionally, all parties consented to venue in Arizona. No more suitable venue exists.

## GENERAL ALLEGATIONS

A. **Corporate Structure**

19. Defendants are part of a corporate family of entities that operate quick service restaurants in Wyoming, Colorado, Illinois, Kentucky, Florida, Georgia, North Carolina,

FENNEMORE CRAIG, P.C.
PHOENIX

- 3 -

15620705

South Carolina, and Louisiana. These restaurants are operated pursuant to franchise agreements with Dog Haus, Church's Chicken, Dairy Queen, and Captain D's.

20.     In general, Goalz Restaurant Group, LLC ("GRG") owns membership interests in all of the remaining Defendants either directly or indirectly. A true and correct copy, as provided to Plaintiff, of the corporate structure of Defendants as of February 25, 2020 is attached hereto as **Exhibit A**.

21.     GRG operates as the management company for the remaining Defendants in the operation of the respective quick service restaurant owned by the particular Defendant.

22.     In addition to Defendants, GRG holds majority membership interests in the following entities:

     a.     DH Cheyenne WY, LLC

     b.     CD Lincolnton NC, LLC

     c.     CD Lancaster SC, LLC

     d.     CD Shelbyville KY, LLC

     e.     Dairy Commerce City CO, LLC

     f.     Dairy Fed Highway FL, LLC

     g.     Dairy Traditions FL, LLC

23.     Through its wholly owned holding company GRG COWY, LLC, GRG holds a majority membership interest in CC Cheyenne WY, LLC.

24.     Through its wholly owned holding company GRG FLA, LLC, GRG holds majority membership interests in CC Apopka FL, LLC and CC Melbourne FL, LLC.

25.     GRG KTY, LLC doing business as CC Dixie Hwy is a wholly owned subsidiary of GRG.

26.     GRG NCSC, LLC doing business as CC Huntsville AL is a wholly owned subsidiary of GRG.

27.     Through its wholly owned holding company GRG NCSC LLC, GRG holds majority membership interests in:

     a.     CC Lincolnton NC, LLC

1          b.          CC Lancaster SC, LLC

2   (collectively, these entities are referred to as the "Subsidiary LLCs").

3          28.     Shawn Eby is the Chief Executive Officer for each of Defendants.

4   **B.     Plaintiff's Loans to Defendants**

5          29.     In September 2018, Defendants and Plaintiff entered into a loan agreement

6   through which Plaintiff agreed to, and did, loan $800,000 through multiple advances. A

7   true and correct copy of the Loan, Guaranty and Security Agreement dated September 4,

8   2018 is attached hereto as **Exhibit B** (the "Loan Agreement").

9          30.     In connection with the Loan Agreement, Defendants granted a security

10  interest in the following assets whether then owned or subsequently acquired or created:

11          All Accounts, Chattel Paper, Goods (including all Inventory,
            Equipment and Fixtures), Documents, Instruments, General
12          Intangibles (including Payment Intangibles), Investment
            Property, Letter-of-Credit Rights, Supporting Obligations,
13          Commercial Tort Claims, Other Property, and Borrower's
            limited liability membership interests in its Subsidiaries; all
14          Proceeds and products of all of the foregoing (including
            Proceeds of any insurance policies and claims against third
15          parties for loss or any destruction of any of the foregoing); and
            all Records relating to any of the foregoing.
16

17  (the foregoing assets are collectively referred to as the "Collateral"). *See* Section 5.1 of the

18  Loan Agreement.

19          31.     Plaintiff perfected its security interest in the Collateral by filing UCC-1

20  Financing Statements in the respective states. True and correct copies of the UCC-1

21  Financing Statements are attached hereto as **Exhibit C**.

22          32.     The Subsidiary LLCs guaranteed the obligations under the Loan Agreement

23  and agreed that each is "jointly and severally liable for, and absolutely and unconditionally

24  guarantees to Lender the prompt payment and performance of, all Obligations." *See* Section

25  12.1. of the Loan Agreement.

26          33.     In March 2019, Defendants required additional capital and the Loan

27  Agreement was amended to provide for an additional $1,000,000.00, which was funded by

28  Plaintiff. A true and correct copy of the Amended and Restated Loan, Guaranty and

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

1   Security Agreement dated March 19, 2019 is attached hereto as **Exhibit D** (the "Amended

2   Loan Agreement").

3       34.   In connection with the Amended Loan Agreement, Defendants granted a

4   security in the Collateral, which was perfected by Plaintiff through the filing of UCC-1

5   Financing Statements. *See* Ex. C.

6       35.   As with the Loan Agreement, each Subsidiary LLC unconditionally

7   guaranteed the amounts borrowed. *See* Section 12.1 of the Amended Loan Agreement.

8       36.   One month later, additional funds were required by Defendants and the parties

9   entered into the Second Amended and Restated Loan, Guaranty and Security Agreement,

10  which increased the amount borrowed (and actually loaned) to $3,000,000.00. A true and

11  correct copy of the Second Amended and Restated Loan, Guaranty and Security Agreement

12  dated April 29, 2019 is attached hereto as **Exhibit E** (the "Second Amended Loan

13  Agreement").

14      37.   In connection with the Second Amended Loan Agreement, Defendants

15  granted a security in the Collateral, which was perfected by Plaintiff through the filing of

16  UCC-1 Financing Statements. *See* Ex. C.

17      38.   As with the Loan Agreement and Amended Loan Agreement, each Subsidiary

18  LLC unconditionally guaranteed the amounts borrowed. *See* Section 12.1 of the Second

19  Amended Loan Agreement. Additionally, as GRG created new Subsidiaries (defined as

20  those entities which GRG held 51% or more of the membership interests), those entities

21  became guarantors under the Second Amended Loan Agreement. *See* Section 8.2 of the

22  Second Amended Loan Agreement.

23      39.   Defendant Eby also unconditionally guaranteed the amounts borrowed. *See*

24  Shawn Eby's Continuing Guaranty attached hereto as **Exhibit F**.

25      40.   The Second Amended Loan Agreement was to be repaid through thirty-six

26  (36) monthly payments of accrued interest and principal beginning on January 1,

27  2020. Each monthly payment was due on the first of each month until paid in full. The

28  entire principal balance of the loan was due with all interest, fees, and other charges on

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

1     January 1, 2023, if not otherwise accelerated.

2        41.     Interest accrues on the principal balance at the rate of fifteen percent. After

3     an event of default, interest accrues at the default rate of twenty-five percent.

4     **C.**     **Defendants' Operations Struggle**

5        42.     As hinted at above, Defendants have consistently had cash flow issues that

6     have hampered their operations and ability to repay obligations – including Plaintiff's loan.

7        43.     Despite the $3,000,000.00 loan to Defendants, the operations of Defendants

8     have consistently lost money to the point that Defendants have struggled to make payroll

9     without additional advances from Plaintiff.

10        44.     Subsequent to the Second Amended Loan Agreement, Plaintiff made these

11     additional loans to Defendants.

12        45.     In August 2019, GRG caused GRG NCSC, LLC d/b/a CC Huntsville AL to

13     cease operations and close down the Church's Chicken that it had been operating without

14     notice or consent of the franchisor. GRG was able to avoid a complete termination of the

15     franchise agreement by entering into a promissory note in the amount of $283,093.00 for

16     the damages suffered by the franchisor. A true and correct copy of the promissory note is

17     attached hereto as **Exhibit G**. The note provides that any default thereunder is a default

18     upon all franchise agreements with the franchisor. *Id.* at ¶ 6. In early March 2020, GRG

19     and GRG NCSC, LLC failed to make the requisite payments and a notice of default was

20     sent. A true and correct copy of the notice is attached hereto as **Exhibit H**.

21        46.     On March 5, 2020, in addition to the financial defaults, Defendants received

22     two notices of default for failure to abide by the operational terms of the franchise

23     agreement with Church's Chicken. True and correct copies of the notices are attached

24     hereto as **Exhibit I**. As noted above, these violations threaten the franchise agreements for

25     all Defendants who operate under the Church's Chicken flag.

26        47.     As of February 2020, Defendants had outstanding payables (not including

27     payments to Plaintiff) in excess of $1,000,000.00.

28        48.     Despite these struggles and serious cash flow issues, Defendants have, at Mr.

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

1  Eby's direction, prioritized the payment of Mr. Eby's salary over other creditors – including

2  rent, utilities, and payroll.  True and correct copies of correspondence from Mr. Eby are

3  attached hereto as **Exhibit J**.

4       49.    Further in February 2020, Defendants, at Mr. Eby's direction, increased Mr.

5  Eby's wife's salary from $50,000 to $75,000 despite consistent shortfalls in making payroll

6  and payment of other expenses.

7       50.    At that same time, Defendants also increased the pay of Defendants'

8  marketing person from $50,000 to $65,000 with no explanation.

9       51.    Plaintiff is further informed that in early March 2020, Defendants have

10  received disconnect notices from various utilities for non-payment.  *See* email

11  correspondence between Mr. Eby and Ms. Hartrick dated March 9, 2020, a true and correct

12  copy of which is attached hereto as **Exhibit K**.

13       52.    Additionally, Defendants have received notices of default from landlords of

14  various stores with the threat of lockouts being instituted if payment is not received.  True

15  and correct copies of the notices are attached hereto as **Exhibit L**.

16  **D.**    **Goalz Default**

17       53.    In addition to the financial and managerial issues discussed above,

18  Defendants have failed to make any payment to Plaintiff as required under the Second

19  Amended Loan Agreement.

20       54.    On March 2, 2020, Plaintiff hand delivered a notice of default and opportunity

21  to cure to Mr. Eby as required by the Second Amended Loan Agreement.  A true and correct

22  copy of the notice is attached hereto as **Exhibit M**.  Defendants had five days to cure the

23  defaults set forth therein or an event of default will have been deemed to occur.

24       55.    Upon an event of default, Plaintiff is entitled to exercise a variety of remedies,

25  including acceleration, imposition of default interest rate, and foreclosure. Defendants have

26  also agreed that Plaintiff "may, in its discretion, petition for and obtain the appointment of

27  a receiver to take possession of any or all of the Collateral and to operate any Obligor's

28  business and to exercise such rights and powers as the court appointing such receiver shall

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

1   confer upon such receiver . . . ." *See* Exhibit E Section 9.2.

2       56.     Despite the notice and opportunity to cure, Defendants failed to cure, or make

3   any arrangements to cure, the defaults under the Second Amended Loan Agreement.

4       57.     On March 10, 2020, Plaintiff delivered its notice of acceleration and demand

5   for payment of the amounts due under the Second Amended Loan Agreement. *See*

6   Plaintiff's Notice, a true and correct copy of which is attached hereto as **Exhibit N**. As of

7   March 9, 2020, Defendants were obligated to Plaintiff in the amount of $3,377,869.48,

8   which represents outstanding principal and accrued interest. In addition to these amounts,

9   Plaintiff is entitled to its attorneys' fees and costs.

10      58.     Given the deteriorating nature of Defendants' financial situation, the

11  threatened termination of the franchise agreements, and potential lockouts by landlords, a

12  receiver is necessary to protect Plaintiff's collateral from further deterioration.

13                          **<u>FIRST CAUSE OF ACTION</u>**

14                              **(Breach of Contract)**

15      59.     Plaintiff repeats and realleges the foregoing allegations as if set forth fully

16  herein.

17      60.     The Second Amended Loan Agreement is binding contracts between Plaintiff

18  and Defendants.

19      61.     Plaintiff has met all duties and obligations owed to Defendants under the

20  parties' contracts.

21      62.     Defendants breached the Second Amended Loan Agreement by, among other

22  things, failing to make payments due and owning under the Second Amended Loan

23  Agreement.

24      63.     Defendants' actions further breached the duty of good faith and fair dealing

25  owed to Plaintiff by denying Plaintiff the benefits it expected to earn from the Second

26  Amended Loan Agreement.

27      64.     Defendants' breach of the Second Amended Loan Agreement and breach of

28  the duty of good faith and fair dealing directly and proximately damaged Plaintiff in an

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

1    amount to be proven at trial.

2         65.    Defendants are directly liable to Plaintiff for its damages.

3         66.    The amounts due and owing under the Second Amended Loan Agreement are

4    just, true and owing.   There are no set-offs or defenses to the amounts owing under the

5    Second Amended Loan Agreement.

6         67.    These past and future payments are a liquidated amount; therefore, Plaintiff

7    is entitled to pre-judgment interest.

8         68.    Plaintiff is entitled to recover its attorneys' fees in bringing this action

9    pursuant to the Second Amended Loan Agreement, A.R.S. §§ 12-341 and 12-341.01, and

10    other applicable law.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

13         69.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully

14    herein.

15         70.    Defendants have received funds from Plaintiff as evidenced by the Second

16    Amended Loan Agreement and agreed to repay the loans pursuant to the terms of the

17    Second Amended Loan Agreement.

18         71.    Defendants have failed to repay the amounts borrowed.

19         72.    Plaintiff has conferred a benefit on Defendants by providing the loaned funds

20    to Defendants, which Defendants have not repaid, and in conferring that benefit, Plaintiff

21    has suffered an impoverishment.

22         73.    Defendants have been unjustly enriched and have failed to compensate

23    Plaintiff for the conferral of its benefit to Defendants.

24         74.    Plaintiff has suffered damages in an amount not less than $3,377,869.48 plus

25    accrued and accruing late fees and interest due at the Default Rate from March 9, 2020,

26    until the date of judgment and thereafter until paid in full.

27         75.    Plaintiff is entitled to recover its attorneys' fees in bringing this action

28    pursuant to the Second Amended Loan Agreement, A.R.S. §§ 12-341 and 12-341.01, and

other applicable law.

## **THIRD CAUSE OF ACTION**

### **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

76.     Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

77.     The Second Amended Loan Agreement between Plaintiff and Defendants are valid and binding contracts, and Plaintiff has complied with all material provisions therein.

78.     Arizona law implies a covenant of good faith and fair dealing in every contract.

79.     Defendants have breached the implied covenant of good faith and fair dealing by, among other things, refusing to pay the amounts due under the Second Amended Loan Agreement.

80.     As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount not less than $3,377,869.48 plus accrued and accruing late fees and interest due at the Default Rate from March 9, 2020, until the date of judgment and thereafter until paid in full.

81.     Plaintiff is entitled to recover its attorneys' fees in bringing this action pursuant to the Second Amended Loan Agreement, A.R.S. §§ 12-341 and 12-341.01, and other applicable law.

## **FOURTH CAUSE OF ACTION**

### **(Breach of Guaranty)**

82.     Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

83.     The Second Amended Loan Agreement is a contract between Plaintiff and Defendants.

84.     Plaintiff has fulfilled all duties owed to Defendants under the parties' Second Amended Loan Agreement.

85.     Defendants breached the Second Amended Loan Agreement by failing to

FENNEMORE CRAIG, P.C.

PHOENIX

- 11 -

15620705

1   meet the obligations owed to Plaintiff under the Second Amended Loan Agreement.

2          86.    Defendants further breached the duty of good faith and fair dealing owed to

3   Plaintiff by denying Plaintiff the benefits it expected to receive under the Second Amended

4   Loan Agreement.

5          87.    Defendants' breach of the Second Amended Loan Agreement and breach of

6   the duty of good faith and fair dealing directly and proximately damaged Plaintiff in an

7   amount to be proven at trial.

8          88.    Defendants are directly liable to Plaintiff for its damages.

9          89.    The debts owing under the Second Amended Loan Agreement are just, true

10   and owing.   There are no set-offs or defenses to the amounts owing under the Second

11   Amended Loan Agreement.

12          90.    These past and future amounts owed are a liquidated amount; therefore,

13   Plaintiff is entitled to pre-judgment interest.

14          91.    Plaintiff is entitled to recover its attorneys' fees in bringing this action

15   pursuant to the Second Amended Loan Agreement, A.R.S. §§ 12-341 and 12-341.01, and

16   other applicable law.

17                          **PRAYER FOR RELIEF**

18          WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against

19   Defendants in favor of Plaintiff as follows:

20   A.    Awarding compensatory damages against Defendants in an amount not less

21          than $3,377,869.48, of March 9, 2020, plus accrued and accruing late fees and

22          interest due at the Default Rate from March 9, 2020, until the date of judgment

23          and thereafter until paid in full;

24   B.    Awarding taxable costs pursuant to A.R.S. § 12-341;

25   C.    Awarding reasonable attorneys' fees, pursuant to A.R.S. ¶ 12-341.01; and

26   D.    Granting such additional relief as the Court deems just and proper.

27

28

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

1    DATED this 16th day of March, 2020.

2                                                    FENNEMORE CRAIG, P.C.

3

4                                              By  *s/ Anthony W. Austin*

5                                                  Anthony W. Austin
                                                   Philip L. Brailsford
6                                                  *Attorneys for Plaintiff*
                                                   *HIP Lending Group, LLC*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENNEMORE CRAIG, P.C.
PHOENIX

- 13 -

15620705

1

**VERIFICATION**

2    The undersigned declares under penalty of perjury that he has read the foregoing

3 Complaint and knows the contents thereof; that the same is true to his knowledge, except

4 as to such matters that are stated upon information and belief, and as to said last mentioned

5 matters he believes them to be true.

6        Dated this 13th day of March, 2020

7                                        PLAINTIFF:

8                                        HIP Lending Group, LLC,
                                         an Arizona limited liability company

9                                        By:  Hannay Investment Properties, Inc.,
                                              an Arizona corporation,
10                                            Manager

11                                       By: _____
12                                            R. Craig Hannay, President

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENNEMORE CRAIG, P.C.
PHOENIX

15620705

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

# <u>Civil Cover Sheet</u>

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

Plaintiff(s): HIP Lending Group, LLC

Defendant(s): Goalz Restaurant Group, LLC ; Goalz CD Pooler GA, LLC ; Goalz Dairy Denver NC, LLC ; Goalz Dairy Ft Pierce FL, LLC ; Goalz DH Springs CO, LLC ; Goalz DH Georgetown KY 111, LLC ; Goalz DH IL 107, LLC ; Goalz DH IL 109, LLC ; Goalz DH Slidell LA 112, LLC ; Goalz Restaurant Group COWY, LLC ; Goalz Restaurant Group FLA, LLC ; Goalz Restaurant Group KTY, LLC ; Goalz Restaurant Group NCSC, LLC ; Shawn Eby

County of Residence: Maricopa

County of Residence: Outside the State of Arizona

County Where Claim For Relief Arose: Maricopa

Plaintiff's Atty(s):

Defendant's Atty(s):

II. Basis of Jurisdiction:    **4. Diversity (complete item III)**

III. Citizenship of Principal Parties (Diversity Cases Only)

Plaintiff:- **1 Citizen of This State**

Defendant:- **5 Non AZ corp and Principal place of Business outside AZ**

IV. Origin :    **1. Original Proceeding**

V. Nature of Suit:    **190 Other Contract**

VI. Cause of Action:    **28 U.S.C. § 1332(a) and 28 U.S.C. § 1391(a). Plaintiff loaned $3 million to defendants and defendants failed to repay loan. Receivership being requested.**

VII. Requested in Complaint

Class Action: **No**

Dollar Demand: **$3,377,869.48+**

Jury Demand: **No**

VIII. This case **is not related** to another case.

Signature: <u>s/ Anthony Austin</u>

Date: <u>3/16/2020</u>

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.

Revised: 01/2014

# INDEX OF EXHIBITS
## TO
# VERIFIED COMPLAINT

*HIP Lending Group, LLC v. Goalz Restaurant Group, LLC, et al.*

| | |
|---|---|
| Exhibit A | GOALZ Business Organization Chart |
| Exhibit B | Loan, Guaranty and Security Agreement dated September 4, 2018 |
| Exhibit C | UCC-1 Financing Statements |
| Exhibit D | Amended and Restated Loan, Guaranty and Security Agreement dated March 19, 2019 |
| Exhibit E | Second Amended and Restated Loan, Guaranty and Security Agreement dated April 29, 2019 |
| Exhibit F | Continuing Guaranty (Shawn Eby) entered into August 27, 2018 |
| Exhibit G | Promissory Note dated September 20, 2019 |
| Exhibit H | Notice of Default of Promissory Note dated March 5, 2020 |
| Exhibit I | Notices of Default of Franchise Agreement dated March 5, 2020 |
| Exhibit J | Correspondence from Mr. Eby |
| Exhibit K | Email correspondence between Mr. Eby and Ms. Hartrick dated March 9, 2020 |
| Exhibit L | Landlord Notice of Default dated March 10, 2020 |
| Exhibit M | February 27, 2020 Notice of Default |
| Exhibit N | March 9, 2020, Notice of Acceleration and Demand for Payment |

15633089

# EXHIBIT A

# GOALZ Business Organizational Chart



**Tentative Locations with GL activity**
CD Greer SC
CD Rock Hill SC
DH IL 110 Romeoville IL
DH Slidell LA
DH Springs CO
CC Westminster CO
CC Deland FL
CC Winston Salem  SC

**Other Tentative Locations**
CD Cheyenne WY
Dairy Owasso OK
DH Denver CO
CC Clearwater Farm KY
CC Preston Hwy Louisville KY
CC Fern Valley Louisville KY

# EXHIBIT B

LOAN, GUARANTY AND SECURITY AGREEMENT

with

**GOALZ RESTAURANT GROUP, LLC,**
**as Borrower**

**CERTAIN SUBSIDIARIES OF GOALZ RESTAURANT GROUP, LLC,**
**as Subsidiary Guarantors,**

and

**HIP LENDING GROUP, LLC,**

**as Lender**

**September 4, 2018**

## TABLE OF CONTENTS

Page No.

SECTION 1.      DEFINITIONS AND RULES OF CONSTRUCTION ............................... - 1 -
1.1    Defined Terms. .................................................................................................... - 1 -
1.2    Accounting Terms. .............................................................................................. - 5 -
1.3    UCC Terms. ........................................................................................................ - 5 -
1.4    Rules of Construction. ........................................................................................ - 5 -
SECTION 2.      LOAN ADVANCES .............................................................................. - 6 -
2.1    Advances. ............................................................................................................ - 6 -
2.2    Initial Advance. .................................................................................................. - 6 -
2.3    Second Advance. ................................................................................................. - 6 -
2.4    Third Advance. .................................................................................................... - 6 -
2.5    Disbursement of Advances; Use of Proceeds. .................................................... - 6 -
2.6    Loan Repayment. ................................................................................................ - 6 -
SECTION 3.      CONDITIONS PRECEDENT ............................................................... - 6 -
3.1    Initial Conditions Precedent. .............................................................................. - 6 -
3.2    Ongoing Conditions Precedent. .......................................................................... - 7 -
3.3    Third Advance Conditions Precedent. ................................................................ - 7 -
SECTION 4.      INTEREST, FEES AND EXPENSES; LOAN ACCOUNT ..................... - 8 -
4.1    Interest. ............................................................................................................... - 8 -
4.2    Fees and Expenses. ............................................................................................. - 8 -
4.3    Expense Reimbursement. .................................................................................... - 8 -
4.4    Maximum Interest. .............................................................................................. - 8 -
SECTION 5.      COLLATERAL ..................................................................................... - 8 -
5.1    Grant of Security Interest. .................................................................................. - 8 -
5.2    [Reserved]. .......................................................................................................... - 9 -
5.3    Further Assurances. ............................................................................................ - 9 -
SECTION 6.      LOAN ADMINISTRATION ................................................................. - 9 -
6.1    Payments. ............................................................................................................ - 9 -
SECTION 7.      REPRESENTATIONS AND WARRANTIES. ........................................ - 9 -
7.1    General. ............................................................................................................... - 9 -
SECTION 8.      COVENANTS ..................................................................................... - 11 -
8.1    Affirmative Covenants. ..................................................................................... - 11 -
8.2    Additional Subsidiaries. ................................................................................... - 12 -
8.3    Negative Covenants. ......................................................................................... - 12 -
8.4    [Reserved]. ........................................................................................................ - 13 -
8.5    Reporting Covenants. ........................................................................................ - 13 -
8.6    [Reserved]. ........................................................................................................ - 13 -
SECTION 9.      EVENTS OF DEFAULT AND REMEDIES .......................................... - 13 -
9.1    Events of Default. .............................................................................................. - 13 -
9.2    Remedies. .......................................................................................................... - 14 -
SECTION 10.    INDEMNITY ...................................................................................... - 15 -
10.1   Indemnity. ......................................................................................................... - 15 -
SECTION 11.    TERM AND TERMINATION .............................................................. - 15 -
11.1   Term. ................................................................................................................. - 15 -
11.2   Termination. ...................................................................................................... - 15 -
11.3   Effect of Termination. ...................................................................................... - 15 -
SECTION 12.    GUARANTY ...................................................................................... - 16 -
12.1   Joint and Several Obligations. .......................................................................... - 16 -
12.2   Obligations Absolute. ....................................................................................... - 16 -
12.3   Continuing Obligations; Reinstatement. .......................................................... - 17 -
12.4   Waivers and Acknowledgments. ....................................................................... - 17 -
12.5   Additional Security, Etc. ................................................................................... - 18 -
12.6   Information Concerning Obligors. ..................................................................... - 18 -

12.7     Deferral of Reimbursement and Other Rights. ................................................ - 18 -
12.8     Subordination. ............................................................................................... - 18 -
12.9     Contribution. ................................................................................................. - 19 -
SECTION 13.     NOTICES ............................................................................................ - 19 -
13.1     Notices Generally. ........................................................................................ - 19 -
13.2     Electronic Communications. ......................................................................... - 19 -
SECTION 14.     GENERAL PROVISIONS ................................................................... - 20 -
14.1     Miscellaneous ............................................................................................... - 20 -
14.2     Consent to Forum. ........................................................................................ - 20 -
14.3     Waivers by Obligors. .................................................................................... - 20 -

## SCHEDULES

| | | |
|---|---|---|
| Schedule A | -- | Fee Schedule |
| Schedule B | -- | Terms Schedule |
| Schedule C | -- | [Reserved] |
| Schedule D | -- | Capital Structure |
| Schedule E | -- | Locations and Jurisdictions in Which Each Obligor is Authorized to do Business |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit 1 | -- | Form of Note |
| Exhibit 2 | -- | Subordinated Debt |

14184588/043245.0272

## LOAN, GUARANTY AND SECURITY AGREEMENT

THIS LOAN, GUARANTY AND SECURITY AGREEMENT (as amended, restated, modified or supplemented from time to time, this "*Agreement*") is entered into as of September 4, 2018, among **HIP LENDING GROUP, LLC ("*Lender*")**, having an address at 2999 North 44th Street, Suite 400, Phoenix, Arizona 85018; **GOALZ RESTAURANT GROUP, LLC**, a Wyoming limited liability company ("*Borrower*"); and **CERTAIN SUBSIDIARIES OF COMPANY**, as Subsidiary Guarantors. All Schedules, Riders and exhibits annexed to this Agreement are an integral part of this Agreement and are incorporated herein by reference.

SECTION 1.    **DEFINITIONS AND RULES OF CONSTRUCTION**

1.1    **Defined Terms**. When used in this Agreement or in any schedule, rider or exhibit hereto, the following terms shall have the following meanings:

"*Advance*" means an advance of money by Lender to Borrower pursuant to **Section 2** of this Agreement.

"*Affiliate*" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, such Persons, managers and members. For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of any equity interest, by contract or otherwise.

"*Allocable Amount*" has the meaning ascribed to it in **Section 12.9** of this Agreement.

"*Anniversary Date*" means, for any year after the year in which the Closing Date occurs, the same month and day in such year as corresponds to the month and day of the Closing Date.

"*Applicable Law*" means all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Document in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of governmental bodies; and orders, judgments and decrees of all courts and arbitrators.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.).

"*Borrower*" has the meanings ascribed to such terms in the preamble to this Agreement.

"*Business Day*" means a day other than a Saturday, Sunday or any other day on which Lender or banks in Arizona are authorized to close or are required to be closed.

"*Capitalized Lease*" means any lease of property (whether real, personal or mixed) that, in conformity with GAAP, would be accounted for as a capital lease on the balance sheet of the lessee.

"*Change of Control*" means Shawn Eby and Steve Piascik (or any trust or other estate planning vehicle established by any such member, to the extent the assets thereof are at all times controlled solely by such member), collectively, ceasing to own free and clear of all Liens, more than 50% of the outstanding voting equity interests of Borrower in the aggregate. Any transfer of voting equity interests by any holder to a trust or like entity for estate planning purposes shall not be deemed a transfer of such voting equity interests; provided that one or more holders of Borrower's equity interests set forth in **Schedule D** continue to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower.

"*Closing Date*" means the date appearing on the cover page of this Agreement and in the preamble on the first page.

"*Collateral*" means all property and interests in property in respect of which a Lien is granted in favor of Lender pursuant to this Agreement or the other Loan Documents.

***"Commitments"*** means all commitments and other undertakings of Lender in this Agreement to make Loans or other extensions of credit to or for the benefit of Borrower in accordance with the terms of this Agreement and the other Loan Documents.

***"Default"*** means any event, which with notice or passage of time, or both, would constitute an Event of Default.

***"Dollars"*** mean legal tender of the United States of America.

***"ERISA"*** means the Employee Retirement Income Security Act of 1974.

***"Event of Default"*** has the meaning ascribed to it in **Section 9.1** of this Agreement.

***"Extraordinary Expenses"*** means all costs and expenses (including legal fees) incurred by Lender in connection with the enforcement of any of its rights or remedies under this Agreement, including any costs and expenses incurred in connection with its repossession of any of the Collateral, collection of any of the Collateral, storing or removing any of the Collateral, or advertising for sale or selling any of the Collateral.

***"Fee Schedule"*** means the Fee Schedule attached to this Agreement as **Schedule A**.

***"FLSA"*** means the Fair Labor Standards Act of 1938.

***"Full Payment"*** means, with respect to any of the Obligations, the full, final and indefeasible payment in full, in cash, of such Obligations, including all interest, fees and other charges payable in connection therewith under any of the Loan Documents; termination of the Commitments; and the release by each Obligor (including any representative of such Obligor in an Insolvency Proceeding of such Obligor) of any claims that such Obligor has or claims to have against Lender or any of its Affiliates.

***"GAAP"*** means generally accepted accounting principles as in effect from time to time in the United States of America, consistently applied.

***"Governmental Unit"*** means a subdivision, agency, department, county, parish, municipality, or other unit of the government of the United States, a state or a foreign country.  The term includes an organization having a separate corporate existence if the organization is eligible to issue debt on which interest is exempt from income taxation under the laws of the United States.

***"Guarantor"*** means each Person who at any time guarantees the payment or performance of any Obligations, including each Person listed as a Guarantor on the Terms Schedule, if any.

***"Guaranty"*** means a guaranty of payment or collection of any or all of the Obligations that is executed by a Guarantor in favor of Lender.

***"Indebtedness"*** means, for any Person and without duplication, (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person under conditional sale or other title retention agreements and all obligations of such Person issued or assumed as the deferred purchase price of property or services (other than trade liabilities and intercompany debt maturing within 365 after the incurrence thereof and other operating liabilities not overdue by more than 120 days or being contested in good faith, in each case incurred in the ordinary course of business),  (iv) all guarantees by such Person of any Indebtedness of others, (v) all liabilities and obligations under Capitalized Leases of such Person, and (vi) the principal component of all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit or bankers' acceptances. For the avoidance of doubt, Indebtedness of an Obligor includes all of the Obligations.

***"Indemnitee"*** means Lender, all Affiliates of Lender and all officers, directors, employees, agents and representatives of any of the foregoing (including legal counsel).

- 2 -

*"Insider Subordinated Debt"* has the meaning ascribed to it in **Section 12.8** of this Agreement.

*"Insolvency Proceeding"* means any case or proceeding commenced by or against a Person (i) under the Bankruptcy Code or any other applicable insolvency law; (ii) as an assignment by a Person for the benefit of such Person's creditors; or (iii) for the appointment of a receiver, trustee, or other custodian for a Person or any of such Person's property.

*"Intellectual Property"* means all intellectual and similar intangible property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

*"Interest"* has the meaning ascribed to it in **Section 4.4** of this Agreement.

*"Lender"* has the meaning ascribed to it in the preamble to this Agreement.

*"Lien"* means any security interest in, or common law, statutory or contractual lien or other encumbrance with respect to any property of a Person.

*"Loan Documents"* means this Agreement (including any Schedule or exhibit hereto), the Note, Guaranty Agreement, Subordination Agreement, and all other agreements, documents and instruments now or hereafter executed or delivered by any Obligor or any other Person in connection with, or to evidence or secure or assure the payment or performance of the transactions contemplated by, this Agreement.

*"Loans"* means all monies advanced by Lender to or for the benefit of Borrower pursuant to the terms of this Agreement.

*"Material Adverse Effect"* means any (a) material adverse effect on (i) the business, operations, financial condition, or assets of an Obligor (ii) the ability of any Obligor to perform its respective obligations under any Loan Documents; or (iii) the perfection or priority of any Lien of Lender with respect to any of the Collateral as a result of any action or failure to act by any Obligor; or (b) material impairment on the rights, remedies or benefits available to Lender under any Loan Document as a result of any action or failure to act by any Obligor.

*"Note"* means each promissory note evidencing the Loans.

*"Obligations"* means all present and future Loans, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower or any other Obligor to Lender, whether evidenced by or arising under this Agreement or any other Loan Document, whether arising from an extension of credit, guaranty, indemnification or otherwise, whether direct or indirect (including those acquired by assignment and any participation by Lender in Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due, and whether arising before or after the commencement of a proceeding under the Bankruptcy Code or any similar statute, including all interest, charges, expenses, fees, attorney's fees, expert witness fees, field exam fees, and any other sums chargeable to, or reimbursable by, Borrower under this Agreement or under any other Loan Document, including all Extraordinary Expenses. Without limiting the generality of the foregoing, the term "Obligations" shall include all Indebtedness, liabilities and obligations incurred by any Borrower to Lender in any bankruptcy case of Borrower and any interest, fees or other charges accrued in any such bankruptcy case, whether or not any such interest, fees or other charges are recoverable from one or more Borrowers or their respective estates under Section 506 of the Bankruptcy Code.

*"Obligors"* means, collectively, Borrower, Guarantors, Subsidiary Guarantors and each other Person liable for any of the Obligations.

*"Organizational Documents"* means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended from time to time, and its by-laws, as amended from time to time, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended from time to time, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as

- 3 -

amended from time to time, and (iv) with respect to any limited liability company, its articles of organization, as amended from time to time, and its operating agreement, as amended from time to time. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

*"Other Property"* means any and all other property of any nature whatsoever of Borrower that is now or hereafter in the possession of, or assigned, pledged or hypothecated to, Lender for any purpose, including balances, credits, deposits, accounts, items and monies of Borrower now or hereafter with Lender.

*"Permitted Discretion"* means a determination made in the exercise of reasonable business judgment, from the perspective of a secured asset-based lender.

*"Permitted Indebtedness"* means Indebtedness incurred by Borrower or any of its Subsidiaries following the date of this Agreement, provided that such Indebtedness shall meet the following requirements: (i) all such Indebtedness shall be issued pursuant to the United Stated Small Business Administration's business loan programs or issued by another qualified lender; (ii) the proceeds of such Indebtedness will be used by the Borrower or any of its Subsidiaries to finance the purchase of furniture, fixtures or equipment to be used in equipping and furnishing a franchised restaurant; (iii) the loan to value ratio for each such item of Indebtedness shall not exceed the ratio of 0.8 to 1.0; and (iv) the aggregate number of separate items of Indebtedness outstanding at any time shall not exceed ten (10).

*"Permitted Liens"* means any of the following: (i) Liens at any time granted in favor of Lender; (ii) Liens for taxes that are not yet due or which are the subject of a Permitted Protest; (iii) statutory Liens (excluding any Lien for taxes or Liens imposed under ERISA) arising in the ordinary course of business of a Borrower or Subsidiary, but only so long as payment in respect of such Liens is not at the time required or the liabilities secured by any such Liens are the subject of a Permitted Protest, and such Liens do not materially detract from the value of the affected property and do not materially impair the use thereof in the operation of Borrowers' or such Subsidiary's business; (iv) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially impair the use thereof in the operation of Borrowers' or such Subsidiary's business; (v) deposits to secure the performance of bids, contracts, statutory obligations, surety and appeal bonds, performance bonds and other similar obligations, in each case, in the ordinary course of business; (vi) Liens arising from judgments that do not constitute an Event of Default under Section 9 of this Agreement; (vii) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (viii) normal and customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC on payment items in the course of collections; and (ix) Liens granted in connection with any Permitted Indebtedness.

*"Permitted Protests"* means proceedings conducted diligently and in good faith by a Borrower to challenge any tax, <u>provided</u> that adequate reserves therefor have been established in accordance with GAAP.

*"Permitted Tax Distributions"* means cash dividends or distributions to the holders of equity interests in Borrower no more frequently than once per fiscal year based upon the taxable income of Borrower under the Internal Revenue Code, as amended, for the immediately preceding fiscal year in an amount that does not exceed the amount necessary to pay federal and state income taxes solely attributable to the holders' distributive shares of the taxable income of Borrower, determined assuming each holder is subject to taxation at a rate equal to the highest federal and state income tax rate payable by any direct or indirect holder of equity interests in Borrower for the applicable tax year, provided that (a) such dividend or distribution is permitted under Applicable Law, and (b) at the time of and after giving effect to such dividend or distribution, (i) Borrower is Solvent, (ii) no Default or Event of Default exists, and (ii) not less than five (5) Business Days prior to the payment of any such dividend or distribution, Borrower has delivered to Lender written notice thereof.

*"Person"* means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization or association, or any state, county, municipal, national or foreign government or Governmental Unit.

14184588/043245.0272

**"Post-Petition Interest"** has the meaning ascribed to it in **Section 12.8** of this Agreement.

**"Proceeds"** means, with respect to any Collateral, all cash and non-cash proceeds from a sale, collection, lease or other disposition of such Collateral, and all other "proceeds" (as defined in the UCC) from any such disposition.

**"Records"** means all of each Borrower's books and records relating to its business or assets, including records pertaining to any Collateral. Without limiting the generality of the foregoing, Borrower's books and records include all records (whether paper, computer or electronic) data, tapes, discs, or other media and all programs, files, records and procedure manuals relating thereto wherever located.

**"Schedules"** means the Fee Schedule, the Terms Schedule and any other schedule annexed to this Agreement from time to time.

**"Solvent"** means with respect to any Person is able on such date to pay and does pay all of its debts as they become due in the ordinary course of business, and has working capital on such date that is adequate to meet its reasonably foreseeable business needs and to carry on its business in the ordinary course.

**"Subordinated Creditor"** means each holder of Subordinated Debt, including, at any time of determination, the holder of any of the Subordinated Debt described on **Exhibit 2** hereto.

**"Subordinated Debt"** means, with respect to any Person, debt of such Person the payment of which is subordinated to the payment of the Obligations in a manner satisfactory to Lender.

**"Subordination Agreement"** means each Subordination Agreement between a Subordinated Creditor and Lender pursuant to which debt owed to such Subordinated Creditor is subordinated in right of payment to the Obligations.

**"Subsidiary"** means an entity at least 50% of whose voting securities or other equity interests is owned by a Borrower (including indirect ownership by a Borrower through other entities in which such Borrower directly or indirectly owns 50% of the voting securities or other equity interests).

**"Subsidiary Guarantor"** means each Subsidiary of Borrower a party to the Subsidiary Guaranty as of the date hereof, and subsequent to the date hereof, each Subsidiary of Borrower that becomes a party to the Guaranty pursuant this Agreement.

**"Subsidiary Guaranty"** means the guaranty of each Subsidiary Guarantor set forth in **Section 12**.

**"Term"** has the meaning ascribed to it in **Section 11.1**.

**"Terms Schedule"** means the Terms Schedule attached to this Agreement as **Schedule B**.

**"UCC"** means the Uniform Commercial Code as adopted and in effect at such time in the State of Arizona.

    1.2   **Accounting Terms**. All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with GAAP.

    1.3   **UCC Terms**. The following terms, as used herein, shall have the meanings ascribed to them in the UCC: Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Equipment, General Intangible, Fixture, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Payment Intangible, Securities Account and Supporting Obligation.

    1.4   **Rules of Construction**. The term "including," whenever used in this Agreement, shall mean "including, but not limited to." The singular form of any term shall include the plural form, and *vice versa*, when the context so requires. References to Sections, subsections and Schedules are to Sections and subsections of, and Schedules to, this Agreement. Section titles appear as a matter of convenience only and shall not affect the

interpretation of any Loan Document. References to agreements and statutes shall include all amendments thereto and successor statutes in the case of statutes; to the time of day shall mean the time of day on the day in question in Phoenix, Arizona; to Lender's "discretion" means Lender's sole and absolute discretion unless expressly indicated otherwise herein. A Default or an Event of Default shall be deemed "to continue," "be continuing," "exist" or be "in existence" at all times during the period commencing on the date such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing by Lender or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement.

SECTION 2.    **LOAN ADVANCES**

2.1    **Advances.** Subject to the terms and conditions in this Agreement, at Borrower's request and provided that no Default or Event of Default exists, Lender agrees to make Advances to Borrower as contemplated herein, provided that, immediately after giving effect to each such Advance, the outstanding balance of all Obligations in respect of Advances will not exceed $800,000.00 (the "*Maximum Advance Amount*")

2.2    **Initial Advance.** Lender shall make an initial Advance to Borrower in the amount of $350,000.00 on the Closing Date and upon satisfaction or waiver of the conditions precedent set forth in Section 3.1.

2.3    **Second Advance.** Lender shall make a second Advance to Borrower in the amount of $200,000.00 on or before October 31, 2018 (the date of which will be determined by Lender in its sole discretion), and upon satisfaction or waiver of the conditions precedent set forth in Sections 3.1 and 3.2.

2.4    **Third Advance.** Lender shall make a third Advance to Borrower in the amount of $250,000.00 upon satisfaction or waiver of the conditions precedent set forth in Sections 3.1, 3.2 and 3.3.

2.5    **Disbursement of Advances; Use of Proceeds.** All proceeds of Advances to Borrower may be disbursed by Lender to Borrower, and Borrower shall thereafter promptly make such proceeds available to Borrower one or more Subsidiary Guarantor. The proceeds of each Advance disbursed by Lender to Borrower shall be deemed to be an Advance made by Lender directly to all Borrower and all Subsidiary Guarantors. Borrower shall be authorized to use the proceeds of the Advances solely to pay the Obligations, and to make expenditures for lawful purposes of Borrower to the extent such expenditures are not prohibited by the provisions of this Agreement or Applicable Law; provided that the proceeds of the second Advance shall solely be used to equip and/or furnish one or more restaurants with furniture, fixtures and equipment. Borrower represents and warrants that Loans to Borrower will be used solely for commercial purposes and not for personal, family or household purposes.

2.6    **Loan Repayment.** Principal and interest with respect to Advances shall be paid as stated in the Note made by Borrower to the order of Lender in the form annexed hereto as **Exhibit 1**.

SECTION 3.    **CONDITIONS PRECEDENT**

3.1    **Initial Conditions Precedent.** Lender shall not be obligated to fund any Loan or make any other extension of credit unless, on or before the date hereof (or such later date to which Lender in its sole discretion may consent in writing), each of the following conditions has been satisfied, as determined by Lender in its sole discretion:

(a)    all Loan Documents shall have been duly executed and delivered in a manner satisfactory to Lender;

(b)    Lender shall have received assurances satisfactory to it that its Liens upon all of the Collateral are duly perfected Liens that are senior to all other Liens except as otherwise permitted under any Loan Document;

(c)    Lender shall have received (i) sufficient copies of each Organizational Document executed (if applicable) and delivered by each Obligor, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party; (iii) resolutions of the governing body of each Obligor approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its an authorized member, manager or officer as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable

- 6 -

Governmental Unit of each Obligor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other documents as Lender may reasonably request.

(d)     since December 31, 2017, no event shall have occurred and no condition shall exist that could reasonably be expected to have a Material Adverse Effect;

(e)     Borrowers shall have paid all fees and expenses to be paid to Lender on or before the date of such funding or grant;

(f)     no litigation shall be pending or threatened that would constitute an Event of Default or could reasonably be expected to result in a Material Adverse Effect;

(g)     no Default or Event of Default shall exist at the time of or result from the funding of any Loan or other extension of credit;

(h)     all representations and warranties of each Obligor in any of the Loan Documents are true and correct in all material respects on and after giving effect to such funding or grant; and

(i)     Borrowers shall have satisfied all conditions specified as additional conditions precedent on the Terms Schedule.

3.2     **Ongoing Conditions Precedent.**  Lender shall not be obligated to fund any Loan or make any other extension of credit hereunder (including the initial Loans to be funded on or about the date of this Agreement) unless each of the following conditions is satisfied, as determined by Lender in its sole discretion:

(a)     all the conditions precedent set forth in Section 3.1 shall have been satisfied;

(b)     no Default or Event of Default shall exist at the time of or result from the funding of such Loan or the granting of such extension of credit;

(c)     all representations and warranties made by any Obligor in any Loan Document, or otherwise in writing to Lender, shall be true and correct in all material respects with the same effect as though such representations and warranties have been made on and as of the date of the funding of such Loan or other extension of credit;

(d)     since the date of the initial Advance, no event shall have occurred and no condition shall exist that could reasonably be expected to have a Material Adverse Effect;

(e)     the Lender shall be satisfied with its on-going financial, business, tax, legal and other due diligence review of the Borrower and its properties and assets; and

(f)     the Lender, in its Permitted Discretion, deems itself insecure, even though no Default or Event of Default shall have occurred.

3.3     **Third Advance Conditions Precedent.**  Lender shall not be obligated to fund the third Advance unless each of the following conditions is satisfied, as determined by Lender in its sole discretion:

(a)     all the conditions precedent set forth in Section 3.1 and 3.2 shall have been satisfied;

(b)     either (i) the Borrower and/or its applicable Subsidiaries shall have acquired (via long-term lease) and equipped the eleven (11) Church's Chicken restaurant locations that are in escrow as of the date of this Agreement or (ii) the Borrower and/or its applicable Subsidiaries shall have acquired (via long-term lease) and equipped and are managing and operating at least ten (10) franchised restaurant locations; and

14184588/043245.0272

(c)     all real estate developers engaged by the Borrower and/or its applicable Subsidiaries at any time shall have performed, complied with, satisfied, and/or otherwise be current with, all obligations and commitments of such developers to the Borrower and/or its applicable Subsidiaries.

SECTION 4.     INTEREST, FEES AND EXPENSES; LOAN ACCOUNT

4.1     **Interest.**  Interest shall accrue on the unpaid principal balance of the Advances at the applicable rate set forth in the Terms Schedule, and shall be calculated and repaid in accordance with the Note.  The balance of the Obligations, other than the principal amount of the Loans, shall likewise bear interest at the same rates, and calculated in the same manner, as is applicable to Advances; provided, however, that interest shall not accrue on any past due interest to the extent prohibited by Applicable Law.

4.2     **Fees and Expenses.**  In addition to all interest and other sums payable by Borrower under this Agreement, Borrower shall pay Lender the fees and reimbursements set forth in the Fee Schedule, which shall be deemed earned in full on the date when the same have accrued (whether or not then due and payable hereunder) and shall not be subject to rebate or proration upon termination of this Agreement or otherwise unless and to the extent required by Applicable Law.

4.3     **Expense Reimbursement.**  Borrower shall reimburse Lender for (i) any Extraordinary Expenses incurred by Lender and (ii) all legal, accounting, consulting and other fees and expenses suffered or incurred by Lender in connection with (a) the negotiation and preparation of any of the Loan Documents and any amendment or modification thereto; (b) the administration of the Loan Documents and the transactions contemplated thereby; (c) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral, including any and all Lien search fees, credit inquiry and investigation fees and costs; or (d) any effort by Lender to verify or appraise any of the Collateral, which fees and expenses of subsection (ii) shall not exceed $10,000. If any of the Obligations are collected by or through an attorney at law, then Borrower shall be obligated to pay, in addition to all principal and interest in respect of the Obligations, Lender's attorneys' fees and court costs as provided in **Section 9.2** of this Agreement.  All amounts chargeable to or reimbursable by Borrower under this **Section 4.3** shall constitute Obligations and shall be payable to Lender on demand.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the indemnification or reimbursement by Borrower of claims suffered or incurred by Lender.

4.4     **Maximum Interest.**  Regardless of any provision contained in this Agreement or any other Loan Document, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this Agreement or any other Loan Document and that are deemed interest under Applicable Law exceed the highest rate permissible under any applicable law, which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. No agreements, conditions, provisions or stipulations contained in any of the Loan Documents or the exercise by Lender of the right to accelerate the payment or the maturity of all or any portion of the Obligations or the exercise of any option whatsoever contained in any of the Loan Documents, or the prepayment by Borrowers of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle Lender to charge or receive, in any event, interest or charges, amounts, premiums or fees deemed interest by Applicable Law (such interest, charges, amounts, premiums and fees referred to collectively as "*Interest*") in excess of the maximum rate allowable under Applicable Law and in no event shall any Obligor be obligated to pay Interest exceeding such maximum rate, and all agreements, conditions, or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel any Obligor to pay Interest exceeding the maximum rate allowable under Applicable Law shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over such maximum rate.

SECTION 5.     COLLATERAL

5.1     **Grant of Security Interest.**  To secure the full and timely payment and performance of all of the Obligations, Borrower and each Subsidiary Guarantor hereby grants to Lender a continuing security interest in and Lien upon the following property and interests in property of such Obligor, whether tangible or intangible, now owned or in existence or hereafter created, acquired or arising, and wherever located:  all Accounts, Chattel Paper, Goods (including all Inventory, Equipment and Fixtures), Documents, Instruments, General Intangibles (including Payment Intangibles), Investment Property, Letter-of-Credit Rights, Supporting Obligations, Commercial Tort Claims, Other

- 8 -

Property, and Borrower's limited liability company membership interests in its Subsidiaries; all Proceeds and products of all of the foregoing (including Proceeds of any insurance policies and claims against third parties for loss or any destruction of any of the foregoing); and all Records relating to any of the foregoing.

5.2    **[Reserved]**.

5.3    **Further Assurances**. Borrower and each Subsidiary Guarantor agrees to take such steps as are necessary or appropriate under Applicable Law, and consents to Lender taking any such steps, to perfect and maintain the perfection and priority of Lender's Lien in the Collateral and to execute such documents as Lender may require to effectuate the foregoing and to implement this Agreement. Borrower and each Subsidiary Guarantor irrevocably authorizes Lender to file financing statements, and all amendments and continuations with respect thereto, in order to create, perfect or maintain its Lien in the Collateral as a duly perfected Lien, subject to no other Liens except for Permitted Liens; and ratifies and confirms any and all financing statements (and amendments and continuations with respect thereto) heretofore and hereafter filed by Lender pursuant to the foregoing authorization.

## SECTION 6.    LOAN ADMINISTRATION

6.1    **Payments**. All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in immediately available funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Lender not later than 4:00 p.m. (Phoenix time) on the date due via wire transfer of immediately available funds to account number [          ] maintained by Lender with [          ] (ABA No. [          ]) in Phoenix, Arizona (or at such other location or bank account within the Arizona as may be designated by Lender from time to time); funds received by Lender after that time on such due date shall be deemed to have been paid by Borrower on the next Business Day. All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder. If a Default or an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 9, all payments or proceeds received by Lender hereunder or under any Loan Document in respect of any of the Obligations, including, but not limited to all proceeds received by Lender in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows: <u>first</u>, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to Lender and its agents and counsel, and all other expenses, liabilities and advances made or incurred by Lender in connection therewith, and all amounts for which Lender is entitled to indemnification hereunder or under any Loan Document and all advances made by any Lender under any Loan Document for the account of the applicable Obligor, and to the payment of all costs and expenses paid or incurred by Lender in connection with the exercise of any right or remedy hereunder or under any Loan Document, all in accordance with the terms hereof or thereof; <u>second</u>, to the extent of any excess of such proceeds, to the payment of all other Obligations; and <u>third</u>, to the extent of any excess of such proceeds, to the payment to or upon the order of such Obligor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## SECTION 7.    REPRESENTATIONS AND WARRANTIES

7.1    **General**. To induce Lender to enter into this Agreement, Borrower and each Subsidiary Guarantor, jointly and severally, makes the following representations and warranties (each of which shall be deemed to have been made on the Closing Date and on each date thereafter on which any Advance is made available to Borrower by the Lender):

(a)    such Obligor's legal name and state or incorporation or organization is exactly as set forth on the signature page of this Agreement and on **Schedule** E;

(b)    such Obligor is duly organized and validly existing under the laws of its state of organization and is qualified to do business in each state where such qualification is required (except where the failure to so qualify could not reasonably be expected to result in a Material Adverse Effect), all of which are listed on **Schedule** E;

14184588/043245.0272

(c)      such Obligor is duly authorized to execute, deliver and perform its Loan Documents, the execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action by such Obligor, and the execution, delivery and performance of the Loan Documents by such Obligor do not require any consent or approval of any Person except those already obtained, contravene the articles, by-laws or analogous organizational documents of such Obligor, violate or cause a default under any Applicable Law or material contract, or result in or require imposition of a Lien on such Obligor's property;

(d)      such Obligor has good title to its assets, and each Lien granted by such Obligor to Lender in the Collateral is and will at all times remain a duly perfected, first priority Lien in such Collateral, subject only to Permitted Liens;

(e)      each Loan Document is a legal, valid and binding obligation of such Obligor, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally;

(f)      such Obligor has filed all federal, state and local tax returns and other reports that it is required by law to file, and has paid, or made provision for the payment of, all taxes that are due and payable by such Obligor, except to the extent subject to a Permitted Protest that has been disclosed to Lender in writing;

(g)      each Obligor is Solvent;

(h)      the most recent financial statements provided to Lender accurately reflect such Obligor's financial condition as of that date and since that date no condition exists and no event has occurred that has had or could reasonably be expected to have a Material Adverse Effect, and all projections delivered from time to time to Lender have been prepared in good faith, based on reasonable assumptions in light of the circumstances at such time;

(i)      such Obligor has duly complied, and its properties and business operations are in compliance, in all material respects with, all Applicable Law (including, without limitation, all environmental laws, ERISA, OSHA and FLSA), except where noncompliance could not reasonably be expected to have a Material Adverse Effect, and no Obligor, any Subsidiary of an Obligor or any director, officer, employee, agent, affiliate or representative thereof, is or is owned or controlled by an individual or entity that is currently the subject or target of any sanction or is located, organized or resident in a country, territory or jurisdiction that is the subject of a sanction;

(j)      there are no actions, suits or other legal proceedings of any kind now pending or, to such Obligor's knowledge, threatened against any Obligor that if successful could reasonably be expected to have a Material Adverse Effect;

(k)      no Default or Event of Default exists;

(l)      such Obligor has never carried on business under or used any name other than its legal name and the trade names or trade styles (if any) listed on **Schedule E**;

(m)      such Obligor has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Units and all other Persons as is required or necessary to own its assets and to carry on its business, and such Obligor has not been notified by any such Governmental Unit or other Person that such Governmental Unit or other Person has rescinded or not renewed, or intends to rescind or not renew, any such license, consent, accreditation, approval or authorization;

(n)      such Obligor has unrestricted access to its Records and owns or leases all Equipment in or on which any Records are stored, kept or otherwise maintained (and, in the event that any such Equipment is leased by Obligor, such lease is in full force and effect and no default exists thereunder);

(n)      except as otherwise disclosed to Lender in writing, no Obligor is party to or bound by any collective bargaining agreement, management agreement or consulting agreement, and there are no material existing or (to any Obligor's knowledge) threatened grievances, disputes or controversies with any union or other organization of any Obligor's employees, or, to any Obligor's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining; and

- 10 -

(o)    all information furnished by any Obligor to Lender (including all information contained in the Information Certificate delivered to Lender on or before the Closing Date) is true and correct in all material respects.

Obligors further represent, warrant and acknowledge that, while separately organized, Obligors operate as an integrated unit and in a collective business enterprise that is interdependent; the successful operation and condition of Obligors is dependent on the continued successful performance of the functions of the group of Obligors as a whole and the successful operation of each Obligor is dependent on the successful performance and operation of each other Obligor; and each Obligor will derive significant benefit from the successful operation of each of the other Obligors and the credit extended by Lender to Obligors hereunder, both in their separate capacities and as members of the group of companies.

Each of the foregoing representations and warranties shall be deemed reaffirmed and remade as of the date of funding of each Advance and shall not be affected by any knowledge of, or any investigation by, Lender. The continuing accuracy of each of the foregoing representations and warranties shall be a condition precedent to each Advance.

SECTION 8.    **COVENANTS**

8.1    **Affirmative Covenants.**  Until Full Payment of the Obligations, Borrower shall:

(a)    permit representatives of Lender from time to time, as often as may be reasonably requested, but (when no Default or Event of Default exists) only during normal business hours, to inspect and appraise the Collateral and to inspect, audit, and make extracts from Borrower's Records and to discuss Borrower's financial affairs with such Borrower's independent accountants;

(b)    keep adequate Records with respect to its business activities in accordance with prudent accounting practices;

(c)    reimburse Lender for all costs of inspections and Collateral audits of Borrower, its Records and such other matters as Lender may deem reasonable, and for all appraisals of the Collateral;

(d)    pay and discharge all taxes prior to the date on which such taxes become delinquent or penalties attach thereto unless subject to a Permitted Protest, and pay when due, all wages, salaries and other benefits, together with withholdings relating thereto;

(e)    comply with all Applicable Law and promptly notify Lender of any violation or asserted violation of any Applicable Law if any adverse resolution could reasonably be expected to have a Material Adverse Effect;

(f)    promptly notify Lender in writing of any change in location of any place of business, or the establishment of any new place of business;

(g)    carry property, liability and other insurance, with insurers acceptable to Lender, in such form and amounts, and with such deductibles and other provisions as Lender shall require in its Permitted Discretion, with each such insurance policy naming Lender as lender loss payee or an additional insured, as applicable, pursuant to a form of endorsement acceptable to Lender; and

(h)    promptly notify Lender of (i) the existence of any Default or Event of Default; (ii) the threat or commencement of any proceeding or investigation, whether or not covered by insurance; (iii) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any environmental laws); (iv) the discharge of or any withdrawal or resignation by Borrower's independent accountants; (v) any judgment in an amount exceeding $25,000 (whether or not insured), and any casualty, condemnation, seizure or other loss with respect to any Collateral or other property with a value in excess of $25,000 (whether or not insured); and (vi) any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract, or any other event or circumstance that may reasonably be anticipated to result in the closure, shut-down or cessation of operations for a Borrower or any material portion of its business outside the ordinary course of business.

14184588/043245.0272

8.2    **Additional Subsidiaries.**  In the event that any Person becomes a Subsidiary of Borrower, Borrower shall (a) concurrently with such Person becoming a Subsidiary cause such Subsidiary to become a Subsidiary Guarantor hereunder by executing and delivering to Lender a joinder to this Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1 3.2 and 3.3.  With respect to each such Subsidiary, Borrower shall promptly send to Lender written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Borrower, and (ii) all of the data required to be set forth in **Schedules C** with respect to all Subsidiaries of Borrower.

8.3    **Negative Covenants.**  Until Full Payment of the Obligations, Borrower shall not (and shall not permit any Subsidiary to):

(a)    merge or consolidate with another Person; acquire any assets except in the ordinary course of business as presently conducted or as otherwise permitted by this Agreement or the other Loan Documents;

(b)    enter into any transaction outside the ordinary course of business;

(c)    sell or transfer any Collateral or other assets, except, if no Default or Event of Default exists, Borrowers may sell or otherwise dispose of worn-out or obsolete Equipment, or Equipment that is no longer used or useful in the business of Borrowers, so long as the book value of all such Equipment disposed in any fiscal year does not exceed the amount specified for Equipment Dispositions on the Terms Schedule and the proceeds of any such disposition are remitted to Lender and applied to the Obligations in accordance with the Loan Documents;

(d)    make any loans or other advances of money to any Person;

(e)    incur any Indebtedness other than (i) the Obligations, (ii) the Permitted Indebtedness; (iii) Subordinated Debt in existence on the Closing Date or which is incurred after the Closing Date on terms acceptable to Lender, and (iv) any other Indebtedness to which Lender in its sole discretion consents in writing;

(f)    guarantee or otherwise become liable with respect to any Indebtedness (other than the Obligations) of another Person;

(g)    pay or declare any dividends or other distributions on all or any part of any Borrower's equity interests or make any other special payment to an equity holder (except for Permitted Tax Distributions, if applicable), or redeem, retire, purchase or otherwise acquire, directly or indirectly, any of any Borrower's equity interests;

(h)    dissolve or elect to dissolve or otherwise discontinue its business or engage in any business other than the business conducted on the Closing Date and activities incidental thereto;

(i)    make any payment on or in respect of any Subordinated Debt;

(j)    change its fiscal year or have a fiscal year that is not the same as the fiscal year of all other Borrowers;

(k)    suffer to exist any Lien upon any of its assets other than a Permitted Lien;

(l)    amend, modify or otherwise change its Organizational Documents;

(m)    amend, modify or otherwise change the salaries and other compensation of the Borrower's management team and equity holders;

(n)    pay any bonus to any employee or equity holder of the Borrower or any Subsidiary;

(o)    enter into or be party to any transaction with an Affiliate, except (A) transactions expressly permitted by the Loan Documents; (B) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities; (C) transactions solely among Obligors;

- 12 -

and (D) other transactions with Affiliates in the ordinary course of business, upon fair and reasonable terms fully disclosed to Lender and no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate; or

(p)     amend, supplement or otherwise modify any indenture, instrument or other agreement relating to any Subordinated Debt other than to decrease the amount of scheduled payments thereunder, extend the time for payment of the principal amount thereof, reduce the rate of interest applicable thereto or delete or make less onerous any covenant, event of default or remedy thereunder.

8.4     **[Reserved]**.

8.5     **Reporting Covenants.**  Until Full Payment of the Obligations, Borrower Agent shall provide Lender the reports listed below in a format acceptable to Lender.  All reports, which are to be submitted in Excel format and/or via direct data submission to an online computer system authorized and in form and substance acceptable to Lender, are due as follows:

(a)     annual unaudited financial statements of Borrower and its Subsidiaries, as of the end of each fiscal year, on a consolidated and consolidating basis and without qualification, reviewed by a firm of independent certified public accountants reasonably acceptable to Lender, shall be prepared in accordance with GAAP and furnished to Lender within 120 days after the end of each fiscal year of Borrowers;

(b)     an unaudited balance sheet of Borrowers and its Subsidiaries as of the last day of each month, and related unaudited statements of income and cash flow for such month and for the portion of Borrower's fiscal year then elapsed, on a consolidated and consolidating basis shall be prepared in accordance with GAAP and furnished to Lender within 21 days after the end of each month;

(c)     upon the prior request of Lender, monthly bank statements for all bank accounts of Borrower, as of the last day of the prior calendar month;

(d)     monthly projections for each fiscal year are due no later than 60 days before the end of the immediately preceding fiscal year;

(e)     all tax returns for Borrower and each Subsidiary delivered to Lender no later than five (5) Business Days after such tax returns are filed with the applicable Governmental Unit;

(f)     a personal financial statement for each Guarantor that is a natural Person (if applicable), as of the end of each calendar year, is due no later than thirty (30) days after the end of such year; and

(g)     such other information as Lender may reasonably request form time to time shall be promptly furnished to Lender.

8.6     **[Reserved]**.

SECTION 9.     **EVENTS OF DEFAULT AND REMEDIES**

9.1     **Events of Default.**  The occurrence of any of the following events or conditions shall constitute an "**Event of Default**" under this Agreement; provided, that Lender shall notify Borrower of the occurrence of any such event and Borrower shall have five (5) Business Days following the receipt of such notice of cure such Default:

(a)     Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration, or otherwise);

(b)     any representation, warranty, or other statement to Lender by or on behalf of any Obligor, whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made;

- 13 -

(c)      any Obligor shall fail or neglect to perform, keep or observe any covenant contained in this Agreement or any other Loan Document;

(d)      any Obligor shall cease to be Solvent; or any breach or default of an Obligor occurs under any instrument or agreement to which it is a party or by which it or any of its properties is bound, relating to any Indebtedness (other than the Obligations), if the maturity of or any payment with respect to such Indebtedness may be accelerated or demanded due to such breach;

(e)      any Insolvency Proceeding shall be commenced by or against any Obligor and, if against an Obligor, shall not be dismissed within 60 days after commencement;

(f)      one or more judgments or orders for the payment of money in excess of $25,000 in the aggregate shall be entered against any Obligor and remain undismissed and unpaid for 30 days or more, provided that all Liens securing any such judgment are junior to Lender's Liens in the Collateral;

(g)      any Obligor shall revoke or attempt to revoke or terminate, or fail to confirm such Obligor's liability under, any Guaranty to which such Obligor is a party;

(h)      a Change of Control shall occur;

(i)      any default shall occur under any other agreement or arrangement between one or more Obligors and Lender;

(j)      any failure of any Obligor to furnish Lender current financial information upon request;

(k)      any failure of any Obligor or any pledgor of any security interest in the Collateral to observe or perform any covenant contained in any agreement, instrument or certificate executed in connection with the granting of a security interest in any Collateral;

(l)      any uninsured loss, theft, substantial damage, destruction, sale, foreclosure of or encumbrance (other than a Permitted Lien) on any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon or the rendering of any garnishment or attachment against any Obligor or its property, whether actual or threatened;

(m)      the dissolution or termination of existence of any Obligor; or any Guarantor that is a natural Person shall die, unless Borrowers shall cause a replacement Guarantor with financial wherewithal and liquid assets no less favorable to (and as determined in its sole discretion by) Lender as those of the deceased Guarantor, to execute and deliver to Lender a replacement Guaranty in substantially the same form and substance as the Guaranty of the deceased Guarantor, within sixty (60) days after the death of such Guarantor; or any Guarantor that is a natural Person shall be declared incompetent;

(n)      any amendment or termination of a financing statement naming any Obligor as debtor and Lender as secured party, or any corrective statement with respect thereto, is filed by or on behalf of any Obligor without the prior written consent of Lender;

(o)      any Obligor, any Subsidiary of an Obligor, or any officer or director of an Obligor or Subsidiary thereof, shall be indicted for or convicted of (or plead *nolo contendere* to) any crime punishable under Applicable Law as a felony; or

(p)      any event shall occur or any condition shall exist that has or could reasonably be expected to have a Material Adverse Effect.

9.2     **Remedies.**  Upon or after the occurrence of an Event of Default (and for so long as such Event of Default shall exist), Lender may in its discretion declare the principal of and accrued interest on the Loans and all other outstanding Obligations to be, whereupon the same shall thereupon become without further notice or demand (all of which notice and demand Borrower expressly waives), forthwith due and payable and Borrowers shall forthwith jointly and severally pay to Lender the entire principal of and accrued and unpaid interest on the Loans and other

- 14 -

Obligations, together with reasonable attorneys' fees and court costs if such principal and interest are collected by or through an attorney at law, and Lender may terminate this Agreement. In addition, Lender may, in its discretion, at any time or times exercise all of the rights and remedies of a secured party under the UCC or any other Applicable Law and all other legal and equitable rights to which Lender may be entitled under any of the Loan Documents, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in any of the Loan Documents or available pursuant to Applicable Law, and none of which shall be exclusive. Each Obligor agrees that any requirement of notice to such Obligor of any proposed public or private sale or other disposition of any Collateral by Lender shall be deemed reasonable notice thereof if given at least 10 days prior thereto. Lender may purchase all or any part of the Collateral at a public sale or, if permitted by Applicable Law, at any private sale, and, in lieu of actual payment of such purchase price, Lender may set off the amount of such price against the outstanding Obligations. The proceeds realized from any sale or other disposition of Collateral may be applied first to any Extraordinary Expenses incurred by Lender, second to interest and fees accrued with respect to any of the Obligations, and then to the principal balance of the Obligations. If any deficiency shall arise, Obligors shall remain jointly and severally liable to Lender therefor. Lender may, in its discretion, petition for and obtain the appointment of a receiver to take possession of any or all of the Collateral and to operate any Obligor's business and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver, Obligors hereby consenting thereto and waiving any requirement under Applicable Law that Lender post a bond in connection with the appointment of any such receiver. Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of each Obligor, computer hardware and software, brochures, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral. Each Obligor's rights and interests under Intellectual Property shall inure to Lender's benefit. The failure or delay of Lender to require strict performance by any Obligor of any provision of the Loan Documents or to exercise or enforce any rights, Liens, powers, or remedies under any of the Loan Documents shall not operate as a waiver of such performance, Liens, rights, powers, and remedies, but all such rights, Liens, powers, and remedies shall continue in full force and effect until Full Payment of the Obligations.

SECTION 10.   **INDEMNITY**

     10.1   **Indemnity.** Obligors hereby agree, jointly and severally, to indemnify and defend each Indemnitee and hold such Indemnitee harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every nature, character and description, which such Indemnitee may sustain or incur based upon or arising out of any of the transactions contemplated by this Agreement or the other Loan Documents or any of the Obligations or any other matter, cause or thing whatsoever occurred, done, omitted or suffered to be done by Lender relating to any Obligor, the Loan Documents, or the Obligations except to the extent any such amounts are sustained or incurred as the result of the gross negligence or willful misconduct of such Indemnitee. Notwithstanding any provision in this Agreement to the contrary, this **Section 10.1** shall survive any termination of this Agreement and Full Payment of the Obligations.

SECTION 11.   **TERM AND TERMINATION**

     11.1   **Term.** All Commitments hereunder shall, subject to the satisfaction (or waiver by Lender in its sole discretion) of each condition set forth in **Section 3** hereof, become effective on the date hereof and shall expire at the close of business on the day specified as the maturity date specified in the Terms Schedule (the **"Term"**).

     11.2   **Termination.** Borrower may terminate the Commitments at any time by Borrower giving Lender at least 60 days prior written notice thereof, and all Commitments shall automatically terminate upon the occurrence of an Event of Default resulting from the commencement of an Insolvency Proceeding by or against Borrower. At any time that an Event of Default exists, Lender may terminate the Commitments immediately, without prior notice to Borrower.

     11.3   **Effect of Termination.** On the effective date of any termination of the Commitments, whether by Lender or Borrower, all Obligations shall become immediately due and payable without further notice to or demand upon any Obligor. No termination shall affect or impair any Lien, right or remedy of Lender hereunder or under any of the other Loan Documents (including any right of Lender to indemnification hereunder or under any other Loan

14184588/043245.0272

Document) or relieve any Obligor of any of covenant, duty or liability hereunder or under any other Loan Document until Full Payment of the Obligations.

SECTION 12.   **GUARANTY**

12.1      **Joint and Several Obligations.** Each Obligor agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations. Each Obligor agrees that its liability hereunder shall not be discharged until Full Payment of the Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for any Obligations or any action, or the absence of any action, by Lender in respect thereof (including the release of any security or guaranty); (d) whether any Obligor ceases to be Solvent; (e) any election by Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Obligor, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of Lender against any Obligor for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except Full Payment of the Obligations.

12.2      **Obligations Absolute.** The obligations of each Obligor hereunder are and shall be joint and several and absolute and unconditional, irrespective of the validity, regularity or enforceability of any of the Loan Documents, shall not be subject to any counterclaim, setoff, deduction or defense based upon any claim any Obligor may have against any Obligor or Lender, hereunder or otherwise, and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by, to the fullest extent permitted by Applicable Law, any circumstance or condition whatsoever (whether or not any Obligor shall have any knowledge or notice thereof), including:

(i)      any amendment or modification of or supplement to any of the Loan Documents (including any increase or decrease in the Obligations or rate of interest or amount of fees payable in connection therewith or any extension of the Term or time for payment of any Obligations) or any other instrument referred to herein or therein, or any assignment or transfer of any thereof or of any interest therein, or any furnishing or acceptance of additional security for any of the Obligations;

(ii)      any waiver, consent or extension under any Loan Document or any such other instrument, or any indulgence or other action or inaction under or in respect of, or any extensions or renewals of, any Loan Document, any such other instrument or any Obligation;

(iii)      any failure, omission or delay on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on or available to Lender against any Obligor or subsidiary of a Obligor;

(iv)      the commencement of any Insolvency Proceeding with respect to an Obligor or any subsidiary of a Obligor, any unavailability of assets against which any of the Obligations may be enforced, or any release of Collateral or Liens thereon;

(v)      any merger or consolidation of any Obligor into or with any other Person or any sale, lease or transfer of any or all of the assets of any Obligor or Subsidiary of a Obligor to any Person;

(vi)      any failure on the part of a Obligor or any Subsidiary of a Obligor for any reason to comply with or perform any of the terms of any agreement with any other Obligor;

(vii)      any exercise or non-exercise by Lender of any right, remedy, power or privilege under or in respect of any of the Loan Documents, including under this **Section 12.2;**

- 16 -

(viii)   any default, failure or delay, willful or otherwise, in the performance or payment of any of the Obligations;

(ix)   any furnishing or acceptance of security, or any release, substitution or exchange thereof, for any of the Obligations;

(x)   any failure to give notice to any Obligor of the occurrence of any breach or violation of, or any event of default or any default under or with respect to, any of the Loan Documents or the Obligations;

(xi)   any partial prepayment, or any assignment or transfer, of any of the Obligations; or

(xii)   any other circumstance (other than Full Payment) which might otherwise constitute a legal or equitable discharge or defense of a guarantor or which might in any manner or to any extent vary the risk of any Obligor.

Obligors covenant that their obligations hereunder will not be discharged except by complete performance of the Obligations contained in the Loan Documents and the Full Payment of the Obligations.  Obligors unconditionally waive, to the fullest extent permitted by Applicable Law (A) notice of any of the matters referred to in this **Section 12.2**; (B) any and all rights which any Obligor may now or hereafter have arising under, and any right to claim a discharge of a Obligor's obligations hereunder by reason of the failure or refusal by Lender to take any action pursuant to, any statute permitting a Obligor to request that Lender attempt to collect the Obligations from any Obligor or other Person; (C) presentment to or demand of payment from an Obligor or any of its Subsidiaries with respect to any Loan Document, and notice to any Obligor of default or protest for nonpayment or dishonor; (D) any diligence in collection from or protection of or realization upon all or any portion of the Obligations or any security therefor, any liability hereunder, or any party primarily or secondarily liable for all or any portion of the Obligations; and (E) any duty or obligation of Lender to proceed to collect all or any portion of the Obligations from, or to commence an action against, any Obligor or other Person, or to resort to any Collateral or to any balance of any deposit account or credit on the books of Lender in favor of any Obligor or any other Person, despite any notice or request of any of any Obligor to do so.

12.3   **Continuing Obligations; Reinstatement.**  The obligations of the Obligors under this Agreement are continuing obligations and shall continue in full force and effect until Full Payment of the Obligations.  The obligations of Obligors under this Agreement shall continue to be effective or be automatically reinstated, as the case may be, if any payment made by an Obligor on, under or in respect of any of the Obligations is rescinded or must otherwise be restored or returned by the recipient in any Insolvency Proceeding of an Obligor or its subsidiary or otherwise, all as though such payment had not been made.  If an event permitting the acceleration of all or any portion of the Obligations shall at any time have occurred and be continuing, and such acceleration shall at such time be stayed, enjoined or otherwise prevented for any reason, including because of the pendency of any Insolvency Proceeding of an Obligor or its subsidiary, for purposes of this Agreement and the obligations of the Obligors hereunder, such Obligations shall be deemed to have been accelerated with the same effect as if such Obligations had been accelerated in accordance with the terms of the applicable Loan Documents or of this Agreement.

12.4   **Waivers and Acknowledgments.**  Each Obligor hereby unconditionally and irrevocably waives:

(i)   Promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and any requirement that Lender protect, secure, perfect or insure any Lien or any Property subject thereto or exhaust any right or take any action against any Obligor or any other Person or any Collateral;

(ii)   Any defense based upon an election of remedies by Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution, indemnification or other rights of such Obligor to proceed against any other Obligor, any other Person or any Collateral, and any defense based on any right of setoff or counterclaim against or in respect of the obligations of such Obligor hereunder;

- 17 -

(iii)     Any duty on the part of Lender to disclose to such Obligor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, Property or prospects of any other Obligor or any of its subsidiaries now or hereafter known by Lender;

(iv)     All rights that it may have now or in the future under any Applicable Law to compel Lender to marshal any assets or to proceed against any Person or security for the payment or performance of any of the Obligations before, or as a condition to, proceeding against such Obligor; and

(v)     All other defenses available to a surety, guarantor or accommodation co-obligor other than Full Payment of all of the Obligations.

Each Obligor acknowledges that it will receive substantial direct and indirect benefits from the financing and arrangements contemplated by the Loan Documents and that the waivers set forth herein are knowingly made in contemplation of such benefits.

12.5     **Additional Security, Etc.**  Obligors authorize Lender, without notice to or demand on the Obligors and without affecting their liability hereunder, from time to time (a) to obtain additional or substitute endorsers or guarantors; (b) to exercise or refrain from exercising any rights against, and grant indulgences to, any Obligor or others; and (c) to apply any sums, by whomsoever paid or however realized, to the payment of the principal of, premium, if any, and interest on, and other obligations consisting of, the Obligations. Each Obligor waives any right to require Lender to proceed against any additional or substitute endorsers or guarantors or any other Obligor or any other Person or to pursue any other remedy available to Lender.

12.6     **Information Concerning Obligors.**  Each Obligor assumes full responsibility for being informed of the financial condition and assets of all Obligors and their respective Affiliates, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks which each Obligor assumes hereunder, and agrees that no Lender shall have any duty to advise any Obligor of information known to Lender regarding or in any manner relevant to any of such circumstances or risks.

12.7     **Deferral of Reimbursement and Other Rights.**  Each Obligor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against any Obligor that arise from the existence, payment, performance or enforcement of such Obligor's obligations under or in respect of any Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Lender against any Obligor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Obligor, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right, unless and until Full Payment of all Obligations. If any amount shall be paid to any Obligor in violation of the immediately preceding sentence, such amount shall be received and held in trust for the benefit of Lender, shall be segregated from the property and funds of such Obligor and shall forthwith be paid or delivered to Lender in the same form received (with the addition of any necessary endorsement or assignment) to be credited and applied to the Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents or to be held as collateral security for any Obligations then existing or thereafter arising.

12.8     **Subordination.**  Each Obligor hereby subordinates any and all debts, liabilities and other obligations owed to such Obligor by any other Obligor (the **"Insider Subordinated Debt"**) to the Full Payment of the Obligations, and no Obligor shall demand, accept or take any action to collect any payment on account of any Insider Subordinated Debt at any time. In any Insolvency Proceeding relating to any Obligor, each Obligor agrees that Lender shall be entitled to receive Full Payment of all Obligations (including all interest, fees and expenses accruing after the commencement of such Insolvency Proceeding, whether or not constituting an allowed claim in such Insolvency Proceeding (**"Post-Petition Interest"**)) before such Obligor receives any payment of any Insider Subordinated Debt. At any time a Default or an Event of Default exists, each Obligor shall collect, enforce and receive payments on account of any Insider Subordinated Debt as trustee for Lender and shall deliver such payments to Lender on account of the Obligations, including all Post-Petition Interest and other charges, together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Obligor under this Agreement. At any time an Event of Default exists, Lender is authorized and empowered (but without any obligation to do so), in its discretion, (i) in the name of each Obligor, to collect and enforce, and to submit claims in respect of, any Insider Subordinated Debt and to apply any amounts received thereon to the Obligations (including

- 18 -

any and all Post-Petition Interest), and (ii) to require each Obligor (A) to collect and enforce, and to submit claims in respect of, any Insider Subordinated Debt and (B) to pay any amounts received on such obligations to Lender for application to the Obligations (including any and all Post-Petition Interest).

12.9    **Contribution.** If and to the extent any Obligor shall make a payment under this Agreement (a "*Co-Obligor Payment*") which, taking into account all other Co-Obligor Payments then previously or concurrently made by any other Obligor, exceeds the amount that otherwise would have been paid by or attributable to such Obligor if each Obligor had paid the aggregate Obligations satisfied by such Co-Obligor Payment in the same proportion as such Obligor's "Allocable Amount" (as defined below) (as determined immediately prior to such Co-Obligor Payment) bore to the aggregate Allocable Amounts of each of the Obligors as determined immediately prior to the making of such Co-Obligor Payment, then, following indefeasible Full Payment of the Obligations, such Obligor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Obligor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Co-Obligor Payment. As of any date of determination, the "*Allocable Amount*" of any Obligor shall be equal to the excess of the fair saleable value of the property of such Obligor over the total liabilities of such Obligor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Obligor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Obligors as of such date in a manner to maximize the amount of such contributions. This **Section 12.9** is intended only to define the relative rights of the Obligors, and nothing set forth herein is intended to or shall impair the obligations of Obligors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement. The parties acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Obligor or Obligors to which such contribution and indemnification is owing.

SECTION 13.   **NOTICES**

13.1    **Notices Generally.** Except as provided in **Section 13.2** below, all notices given under this Agreement shall be in writing and shall be given by hand delivery by a reputable overnight courier or private delivery service, by regular first-class mail or certified mail return receipt requested, addressed to Lender or Borrower Agent at the address set forth for notices in the Terms Schedule, or by facsimile transmission to Borrower Agent or Lender at the facsimile number set forth in the Terms Schedule, or such other address or facsimile number as may be designated in writing by one party to the other delivered in accordance with the provisions hereof. In no event shall a voicemail message be effective as a notice, communication or confirmation under any of the Loan Documents. Any written notice, request or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice, request or demand is actually received by the individual to whose attention at the noticed party such notice, request or demand is required to be sent.

13.2    **Electronic Communications.** With respect to electronic communications:

(i)    Borrower authorizes Lender to extend Loans and transfer funds to or on behalf of Borrowers based on instructions sent by electronic mail.

(ii)    Electronic mail may be used for delivery of financial statements and other information required by **Section 8.5** (other than notices), administrative matters and distribution of Loan Documents for execution, pursuant to procedures approved by Lender or as otherwise determined by Lender. Anything herein to the contrary notwithstanding, except as expressly provided **Section 13.2(i)**, notices delivered by electronic mail may not be used as effective notice under the Loan Documents.

(iii)    Unless Lender otherwise requires, communications sent to an electronic mail address of Lender shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgement); provided that if such communication is not sent during the normal business hours of the recipient, such communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(iv)    Lender shall not have any liability for any loss suffered by any Obligor as a result of Lender's acting upon its understanding of electronic mail requests or instructions from a Person believed in

- 19 -

good faith by Lender to be a Person authorized to give such requests or instructions on an Obligor's behalf. Each Obligor shall indemnify, defend and hold harmless each Indemnitee from any claims arising from any electronic communication purportedly given by or on behalf of an Obligor.

(v)     Lender may, in its discretion and upon notice Borrower (A) cease or suspend any actual or implied obligation it may have to act based on such electronic communications and (B) thereafter, disregard any such electronic communications.

(vi)     Notwithstanding the foregoing, no notice to or upon Lender pursuant to **Sections 6.1, 8.1(i)** or **11.2** shall be effective until after actually received by the individual to whose attention at Lender such notice is required to be sent.

## SECTION 14.   GENERAL PROVISIONS

14.1     **Miscellaneous.** This Agreement has been accepted by Lender in the State of Arizona, is a contract that has been made in the State of Arizona and shall be governed by and construed in accordance with the internal laws of the State of Arizona (without giving effect to its conflict of law rules); may not be amended, except by written agreement of Borrower and Lender; expresses the entire understanding of the parties hereto with respect to the subject matter hereof; may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute but one and the same instrument; and shall be binding upon and inure to the benefit of the parties and their respective successors and assigns (provided that no Obligor may assign or transfer any of its rights under this Agreement or other Loan Documents without the prior written consent of Lender). The paragraph and section headings in this Agreement are for convenience of reference only and shall not affect the substantive meaning of any provision of this Agreement. Time is of the essence of this Agreement and all of the other Loan Documents.

14.2     **Consent to Forum.** Each Borrower hereby consents to the non-exclusive jurisdiction of any United States federal court sitting in or with direct or indirect jurisdiction over the District of Arizona or in any Arizona state or superior court sitting in Maricopa County, Arizona, in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents and each Borrower irrevocably agrees that all claims and demands in respect of any such action, suit or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such action, suit or proceeding brought in any such court or that such court is an inconvenient forum. Nothing herein shall limit the right of Lender to bring proceedings against any Obligor with respect to any Collateral in the courts of any other jurisdiction. Any judicial proceeding commenced by any Borrower against Lender involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan Document shall be brought only in a United States federal court sitting in or with direct jurisdiction over the District of Arizona or in any Arizona state or superior court sitting in Maricopa County, Arizona. Nothing in this Agreement shall be deemed to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

14.3     **Waivers by Obligors. To the fullest extent permitted by Applicable Law, each Obligor waives (i) the right to trial by jury (which Lender hereby also waives) in any action, suit, proceeding or counterclaim of any kind arising out of or related to any of the Loan Documents, the Obligations or the Collateral; (ii) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all Accounts, contract rights, Documents, Instruments, Chattel Paper and guaranties at any time held by Lender on which such Obligor may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (iii) notice prior to taking possession or control of the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; (iv) the benefit of all valuation, appraisement and exemption laws; (v) any claim against Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in respect of any claim for breach of contract or any other theory of liability arising out of, or the taking of any enforcement action, or related to any of the Loan Documents, any transaction thereunder or the use of the proceeds of any Loans; and (vi) notice of Lender's acceptance of this Agreement or any other Loan Document. Each Obligor acknowledges that the foregoing waivers are a material inducement to Lender's entering into this Agreement and that Lender is relying upon the foregoing waivers in its future dealings with such Obligor. Each Obligor warrants and represents that it has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily**

- 20 -

waived its jury trial rights following consultation with legal counsel.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

[Remainder of page intentionally left blank;
signatures begin on following page.]

14184588/043245.0272

IN WITNESS WHEREOF, Borrower, the Subsidiary Guarantors and Lender have caused this Agreement to be signed, sealed and delivered by their duly authorized officers or agents as of the date set forth above.

BORROWER:

**GOALZ RESTAURANT GROUP, LLC,**
a Wyoming limited liability company

By: _____
     Shawn Eby, authorized person

SUBSIDIARY GUARANTORS:

**GOALZ CD POOLER GA, LLC**
a Wyoming limited liability company

By: _____
     Shawn Eby, authorized person

**GOALZ DQ DENVER NC, LLC**
a Wyoming limited liability company

By: _____
     Shawn Eby, authorized person

**GOALZ DAIRY FT. PIERCE FL, LLC**
a Florida limited liability company

By: _____
     Shawn Eby, authorized person

**GOALZ DH CO SPRINGS CO, LLC**
a Wyoming limited liability company

By: _____
     Shawn Eby, authorized person

**GOALZ DH GEORGETOWN KY 111, LLC**
a Wyoming limited liability company

By: _____
     Shawn Eby, authorized person

**GOALZ DH IL 107, LLC**
an Illinois limited liability company

By: _____
    Shawn Eby, authorized person

**GOALZ DH IL 109, LLC**
an Illinois limited liability company

By: _____
    Shawn Eby, authorized person

**GOALZ DH SLIDELL LA 112, LLC**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP COWY, LLC**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP FLA, LLC**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP KTY, LLC**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP NCSC, LLC**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

[Signatures continue on following page.]

Accepted by Lender in Phoenix, Arizona:

HIP LENDING GROUP, LLC

By: _____

     Craig Hannay

## SCHEDULE A

### Fee Schedule

This Fee Schedule is an integral part of, and is incorporated into, that certain Loan, Guaranty and Security Agreement dated as of September 4, 2018, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "*Loan Agreement*"), and is the "Fee Schedule" referenced therein. Capitalized terms not otherwise defined in this Fee Schedule have the meanings ascribed to such terms in the Loan Agreement.

1.      The fees and expense reimbursements listed on this Schedule are in addition to any fees listed in the Loan Agreement, any of the Loan Documents or subsequently agreed to by Lender and Obligors, and are not intended to exclude any expenses for which Obligors are required to reimburse Lender under the Loan Agreement or any of the Loan Documents.

2.      Obligors jointly and severally agree to pay to Lender:

(a)      **Lender's Expenses.** Borrower shall reimburse Lender for (i) any Extraordinary Expenses incurred by Lender and (ii) all legal, accounting, consulting and other fees and expenses suffered or incurred by Lender in connection with (a) the negotiation and preparation of any of the Loan Documents and any amendment or modification thereto; (b) the administration of the Loan Documents and the transactions contemplated thereby; (c) action taken to perfect or maintain the perfection or priority of Lender's Liens with respect to any of the Collateral, including any and all Lien search fees, credit inquiry and investigation fees and costs; or (d) any effort by Lender to verify or appraise any of the Collateral which fees and expenses of subsection (ii) shall not exceed $10,000. If any of the Obligations are collected by or through an attorney at law, then Borrower shall be obligated to pay, in addition to all principal and interest in respect of the Obligations, Lender's attorneys' fees and court costs as provided in **Section 9.2** of the Agreement. All such expenses shall be payable to Lender on demand. The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the indemnification or reimbursement by Borrower of claims suffered or incurred by Lender.

All of the foregoing fees shall continue to accrue until Full Payment. Fees that accrue on a monthly or other periodic basis shall be due and payable on the dates set forth above; provided, however, if the Loan Agreement expires or is terminated on a day other than the last day of a month, then any such fee shall be due and payable upon such termination or expiration and shall nevertheless be payable in full on the effective date of such expiration of termination. Fees and expenses shall be due and payable on the dates set forth in the Loan Documents or, if no date is provided, the same shall be payable on demand.

## SCHEDULE B

Terms Schedule

This Terms Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of September 4, 2018, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the ***"Loan Agreement"***), and is the "Terms Schedule" referenced therein.  Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

1.  **Loan Terms:**

    (a)    <u>Maximum Loan Amount</u>: $800,000.00.

    (b)    <u>Maturity Date</u>: January 1, 2021.

    (c)    <u>Loan Payments</u>:  24 equal payments of accrued interest and principal commencing on January 1, 2019.

3.  **Interest (§ 4):**

    (a)    <u>Interest Rate</u>: 15.0% per annum.

    (b)    <u>Default Rate</u>: Ten percentage points (10.0%) in excess of the otherwise applicable rate.

4.  **Guarantors:** All Borrower's Subsidiaries and Shawn Eby, Steve Piascik and Corey Hupp.

5.  **Additional Covenants:** N/A

11. **Additional Events of Default (§ 9):** N/A

12. **Notice Addresses:**

    (a)    <u>If to Borrowers</u>:

    GOALZ RESTAURANT GROUP, LLC
    4470 Cox Road
    Suite 250
    Glen Allen, VA  23060

    Phone number:        804-527-1817
    Facsimile number:   804-527-2048
    E-mail address:   spiascik@goalzllc.com

    with a copy (which shall not constitute notice) to:

    Shawn Eby – shawn@goalzllc.com

(b)   <u>If to Lender</u>:

HIP Lending Group, LLC
2999 N. 44th Street
Suite 400
Phoenix, Arizona 85018
Attn:  Craig Hannay

Phone number:     602-374-2000
Facsimile number:    [ ]
E-mail address: channay@hannayra.com

with a copy (which shall not constitute notice) to:

Fennemore Craig
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
Attn: C.W. Ross, Esq.
Facsimile No.: (602) 916-5503

- 2 -

## SCHEDULE C

[Reserved]

**SCHEDULE D**

Capital Structure

This Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of September 4, 2018, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and is the "Terms Schedule" referenced therein. Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

| Record Owner | Percent of Equity Interests |
|---|---|
| Shawn Eby | 50% |
| Steven M. Piascik | 30% |
| RCH – Goalz Holdings, LLC, an Arizona limited liability company | 15% |
| Corey Hupp | 5% |
|  |  |
|  |  |
| **TOTAL** | 100.0% |

## SCHEDULE E

### Locations and Jurisdictions in which
### each Borrower is Authorized to Do Business

This Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of September 4, 2018, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "*Loan Agreement*"), and is the "Terms Schedule" referenced therein. Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

**Chief Executive Offices**

**Other Locations:**

**Jurisdictions (Include Legal Name and all Trade Names Used in the Last 5 Years)***

| Legal Name | Type of Entity | State | Organization Number |
|---|---|---|---|
| Goalz CD Pooler GA, LLC | LLC | WY | |
| Goalz Dairy Ft. Pierce FL, LLC | LLC | FL | |
| Goalz DQ Denver NC, LLC | LLC | WY | |
| Goalz DH CO Springs CO, LLC | LLC | WY | |
| Goalz DH Georgetown KY 111, LLC | LLC | WY | |
| Goalz DH IL107, LLC | LLC | IL | |
| Goalz DH IL 109, LLC | LLC | IL | |
| Goalz DH Slidell LA 112, LLC | LLC | WY | |
| Goalz Restaurant Group, LLC | LLC | WY | |
| Goalz Restaurant Group COWY, LLC | LLC | WY | |
| Goalz Restaurant Group FLA, LLC | LLC | WY | |
| Goalz Restaurant Group KTY, LLC | LLC | WY | |
| | | | |
| | | | |

**EXHIBIT 1**

Form of Note

(See attached)

## SECURED PROMISSORY NOTE

$800,000.00

September 4, 2018
Phoenix, Arizona

FOR VALUE RECEIVED, the undersigned, **GOALZ RESTAURANT GROUP, LLC**, a Wyoming limited liability company ("Borrower"), hereby promises to pay to the order of **HIP LENDING GROUP, LLC** ("Lender"), at Lender's main office in Phoenix, Arizona, or at such other place as Lender may designate, the principal sum of EIGHT HUNDRED THOUSAND AND NO/100 DOLLARS ($800,000.00) or so much thereof as may from time to time be outstanding as Advances under that certain Loan, Guaranty and Security Agreement dated September 4, 2018 by and among Borrower, Borrower's Subsidiaries and Lender (as at any time amended, restated, modified or supplemented, the "Loan Agreement"), together with interest thereon, at the times and on the terms set forth herein and in the Loan Agreement. Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

Interest shall accrue on the unpaid principal balance of this Secured Promissory Note (this "Note") at a variable rate per annum equal to the "Interest Rate" set forth in the Terms Schedule.

Interest on this Note shall accrue daily from the date of any Advance, and commencing on January 1, 2019 shall be due and payable monthly, in arrears, on the first day of each month until the full principal amount and accrued interest in respect of this Note are paid in full. Upon and after the occurrence of any Event of Default and during the continuance thereof, interest shall accrue and be payable at a per annum rate described as the "Default Rate" in the Terms Schedule plus the otherwise applicable rate of interest. Interest shall be calculated on the basis of actual days elapsed in a year of 360 days. All payments received in respect of this Note may be applied by Lender first to accrued interest and other charges due and owing to Lender and any remaining amount may be applied to the principal balance hereof. Borrower may prepay all or part of this Note without penalty.

If not sooner repaid, accrued interest and the principal balance of this Note shall be paid in twenty-four equal monthly installments commencing on January 1, 2019 and payable on the first day of each month thereafter until paid in full. The entire principal balance of this Note shall be due and payable in full, together with all interest, fees and other charges hereunder, on January 1, 2021 and as otherwise provided in **Section 9.2** of the Loan Agreement.

This Note is the Note referred to in the Loan Agreement, evidences the unpaid balance of Advances from time to time under the Loan Agreement, is secured by the Collateral, and is entitled to all the benefits of the Loan Agreement. Lender, from time to time will make Advances as contemplated by the Loan Agreement and accept payments in accordance with and subject to the provisions of the Loan Agreement, and therefore the amount outstanding under this Note may vary.

It is the intention of Lender and Borrower to conform strictly to Applicable Law relating to maximum interest charges. Accordingly, if any provision of this Note would violate any Applicable Law governing the Highest Lawful Rate (as defined below), then, in that event, notwithstanding anything to the contrary in this Note, the following will apply: the aggregate of all payments that constitute interest under Applicable Law that are contracted for, taken, reserved, charged, or received by Lender under this Note shall under no circumstances be in an amount or at a rate that would otherwise cause a violation of such law or exceed the Highest Lawful Rate (as defined below), and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of Lender, be credited by Lender on the principal amount of any Obligations or refunded by Lender to Borrower. The term "Highest Lawful Rate" means the maximum interest rate that at any time or from time to time may be lawfully contracted for, taken, reserved, charged, or received on amounts due to Lender, under laws applicable to Borrower or Lender with regard to this Note that are presently in effect or, to the extent allowed by law, under such Applicable Law that then allows a higher maximum lawful rate than Applicable Law now allows.

The occurrence of an Event of Default shall entitle Lender, at any time and without notice to or demand upon any Borrower or any Obligor, to declare the entire unpaid principal balance hereof and all accrued interest hereon to be, and the same shall thereupon become, immediately due and payable.

14184588/043245.0272

Upon termination of the Loan Agreement pursuant to **Section 11.2** of the Loan Agreement, all Obligations (including, without limitation, those evidenced by this Note) shall become immediately due and payable without further notice to or demand upon any Obligor.

Time is of the essence of this Note.

Borrower hereby waives demand, presentment, notice, protest and notice of dishonor and diligence in collection or bringing suit and agrees that Lender may accept partial payment, or release or exchange security or Collateral, without discharging or releasing any unreleased Collateral or the Obligations evidenced hereby. Lender shall not be deemed to waive or have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by an authorized agent of Lender, and no failure, delay or omission by Lender in exercising any of its rights or remedies shall operate as a waiver of such rights or remedies. A waiver by Lender in writing on one occasion shall not be construed as a consent to or a waiver of any right or remedy on any future occasion.

If this Note is collected by or through an attorney at law, Borrower shall be obligated to pay, in addition to the unpaid principal balance and accrued interest, reasonable attorneys' fees plus court costs.

This Note has been delivered in the State of Arizona, is intended to take effect as a contract under seal under the laws of the State of Arizona, and shall be governed in all respects by and construed in accordance with the internal laws of the State of Arizona. This Note shall be binding upon Borrower and its respective successors and assigns.

BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS NOTE, THE OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY LENDER WHICH MAY IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISE OUT OF OR RELATE TO THE RELATIONSHIP BETWEEN SUCH BORROWER AND LENDER.

[Remainder of page intentionally left blank;
signatures begin on following page.]

14184588/043245.0272

IN WITNESS WHEREOF, Borrower has caused this Note to be executed by its duly authorized person and has delivered this Note to Lender, on the day and year first above written.

BORROWERS:

**GOALZ RESTAURANT GROUP, LLC,**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

**EXHIBIT 2**

Subordinated Debt

# EXHIBIT C

a Wolters Kluwer Business

## Filing Results

**CHARLENE SARICH**
**Fennemore Craig P C**
**2394 E. CAMELBACK RD.**
**SUITE 600**
**Phoenix, AZ 85016**

| | |
|---|---|
| **Date:** | **09/13/2018** |
| **Order #:** | **66380579** |
| **Customer #:** | **505218** |
| **Reference 1:** | 043245.0272 |
| **Reference 2:** | -- |

**Target Name: GOALZ RESTARUANT GROUP, LLC**

**Jurisdiction: Secretary of State, Wyoming**

| | | |
|---|---|---|
| **Filing Type:** | UCC Financing Statement | **Searched Through:** -- |
| **Results:** | See attached filing acknowledgement | |

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701616 | 09/10/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

## STATE OF WYOMING * SECRETARY OF STATE
### EDWARD A. BUCHANAN
### BUSINESS DIVISION
2020 Carey Avenue Suite 700, Cheyenne, WY 82002-0020

Phone: 307-777-7311

Email: UCC@wyo.gov

FENNEMORE CRAIG, P C
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ 85016

September 10, 2018

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11701616 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482362 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ RESTAURANT GROUP, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

*Edward A. Buchanan*

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures: Original Documents

Page 1 of 1

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**

FILED: 09/10/2018 11:07 AM

ID: 2018-11701616

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GOALZ RESTAURANT GROUP, LLC | | | |
| OR  1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS  4470 Cox Road, Suite 250 | CITY  Glen Allen | STATE VA | POSTAL CODE 23060 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HIP Lending Group, LLC | | | |
| OR  3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS  2999 North 44th Street, Suite 400 | CITY  Phoenix | STATE AZ | POSTAL CODE 85018 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)   International Association of Commercial Administrators (IACA)

*copy*



**Filing Results**

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

Date: 09/13/2018
Order #: 66380579
Customer #: 505218
Reference 1: 043245.0272
Reference 2: --

**Target Name: GOALZ CD POOLER GA, LLC**

**Jurisdiction: Secretary of State, Wyoming**

Filing Type: UCC Financing Statement          Searched Through: --
Results: See attached filing acknowledgement

**Document Listing:**

| File # | File Date | Type of Filing |
|--------|-----------|----------------|
| 2018-11701010 | 09/10/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

1 of 1

## STATE OF WYOMING * SECRETARY OF STATE
### EDWARD A. BUCHANAN
### BUSINESS DIVISION
2020 Carey Avenue Suite 700, Cheyenne, WY 82002-0020

Phone: 307-777-7311

Email: UCC@wyo.gov

FENNEMORE CRAIG, P C
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ 85016

September 10, 2018

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11701010 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482325 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | For filing in Wyoming |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ CD POOLER GA, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

Edward A. Buchanan

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures:  Original Documents

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**
**FILED: 09/10/2018 10:30 AM**
**ID: 2018-11701010**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GOALZ CD POOLER GA, LLC | | | |

| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HIP Lending Group, LLC | | | |

| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

copy



## Filing Results

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

| | |
|---|---|
| Date: | 09/13/2018 |
| Order #: | 66380579 |
| Customer #: | 505218 |
| Reference 1: | 043245.0272 |
| Reference 2: | -- |

**Target Name: GOALZ DAIRY DENVER NC, LLC**

**Jurisdiction: Secretary of State, Wyoming**

Filing Type: **UCC Financing Statement**          Searched Through: —

Results:     See attached filing acknowledgement

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701212 | 09/10/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

**STATE OF WYOMING • SECRETARY OF STATE**

## EDWARD A. BUCHANAN
### BUSINESS DIVISION
2020 Carey Avenue Suite 700, Cheyenne, WY 82002-0020
Phone: 307-777-7311
Email: UCC@wyo.gov

FENNEMORE CRAIG, P C                                            September 10, 2018
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ 85016

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11701212 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482345 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ DAIRY DENVER NC, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures: Original Documents

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**
**FILED: 09/10/2018 10:52 AM**
**ID: 2018-11701212**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GOALZ DAIRY DENVER NC, LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HIP Lending Group, LLC | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

copy

## Filing Results

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

| | |
|---|---|
| **Date:** | **09/13/2018** |
| **Order #:** | **66380579** |
| **Customer #:** | **505218** |
| **Reference 1:** | **043245.0272** |
| **Reference 2:** | **--** |

**Target Name: GOALZ DAIRY FT PIERCE FL, LLC**

**Jurisdiction: Department of State, Florida**

| Filing Type: | UCC Financing Statement | Searched Through: -- |
|---|---|---|
| Results: | See attached filing acknowledgement | |

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 201806447035 | 09/07/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

FLORIDA SECURED TRANSACTION REGISTRY

## FILED

2018 Sep 07 PM 04:15

**** 201806447035 ****

***D * 2001000018-35.00***35.00***

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
C.W. Ross (602.916.5303)

**B. E-MAIL CONTACT AT FILER (optional)**
cwross@fclaw.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of this Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GOALZ DAIRY FT PIERCE FL, LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HIP Lending Group, LLC | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

The documentary stamp tax is not required.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
For filing in Florida

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**Filing Results**

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

**Date:** 09/13/2018
**Order #:** 66380579
**Customer #:** 505218
**Reference 1:** 043245.0272
**Reference 2:** --

---

Target Name: **GOALZ DH GEORGETOWN KY 111, LLC**

---

Jurisdiction: **Secretary of State, Wyoming**

---

Filing Type: **UCC Financing Statement**          Searched Through: --

Results:     See attached filing acknowledgement

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701414 | 09/10/2018 | Original Financing Statement |

---

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

## STATE OF WYOMING * SECRETARY OF STATE
## EDWARD A. BUCHANAN
## BUSINESS DIVISION

2020 Carey Avenue Suite 700, Cheyenne, WY 82002-0020
Phone: 307-777-7311
Email: UCC@wyo.gov

FENNEMORE CRAIG, P C
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ 85016

September 10, 2018

## UCC Financing Statement Acknowledgement

### FILING INFORMATION

| | |
|---|---|
| Document #: | 2018-11701414 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482352 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

### DEBTOR INFORMATION

| | |
|---|---|
| Debtor Name: | GOALZ DH GEORGETOWN KY 111, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

### SECURED PARTY INFORMATION

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures: Original Documents

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**
**FILED: 09/10/2018 11:00 AM**
**ID: 2018-11701414**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| GOALZ DH GEORGETOWN KY 111, LLC |||||
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| HIP Lending Group, LLC |||||
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

copy

**Filing Results**

CHARLENE SARICH
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

Date:         09/13/2018
Order #:      66380579
Customer #:   505218
Reference 1:  043245.0272
Reference 2:  --

Target Name: **GOALZ DH IL 107, LLC**

Jurisdiction: **Secretary of State, Illinois**

| | | |
|---|---|---|
| Filing Type: | UCC Financing Statement | Searched Through: -- |
| Results: | See attached filing acknowledgement | |

Document Listing:

| File # | File Date | Type of Filing |
|---|---|---|
| 23717018 | 09/07/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

RECEIVED
SECRETARY OF STATE
UNIFORM CO...

**2018 SEP -7 AM 9: 16**

## UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
C.W. Ross (602.916.5303)

**B. E-MAIL CONTACT AT FILER (optional)**
cwross@fclaw.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

UCU1 09/07/18 :01 : 3967:
20.00 MU
SOSIL 09:20   23717018 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GOALZ DH IL 107, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HIP Lending Group, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility   ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Illinois                     66380579.1

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)       International Association of Commercial Administrators (IACA)

## Filing Results

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

| | |
|---|---|
| **Date:** | **09/13/2018** |
| **Order #:** | **66380579** |
| **Customer #:** | **505218** |
| **Reference 1:** | **043245.0272** |
| **Reference 2:** | **--** |

Target Name: **GOALZ DH IL 109, LLC**

Jurisdiction: **Secretary of State, Illinois**

| Filing Type: | **UCC Financing Statement** | Searched Through: -- |
|---|---|---|
| Results: | See attached filing acknowledgement | |

Document Listing:

| File # | File Date | Type of Filing |
|---|---|---|
| 23717026 | 09/07/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

RECEIVED
SECRETARY OF STATE
UNIFORM COM.... CODE FI

2018 SEP -7 AH 9: 15

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
C.W. Ross (602.916.5303)

**B. E-MAIL CONTACT AT FILER (optional)**
cwross@fclaw.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

UCU109/07/18:01:3968:
20.00 MU
SOSIL 09:20 23717026 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** GOALZ DH IL 109, LLC | | | | |
| **1b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** | |
| **1c. MAILING ADDRESS** 4470 Cox Road, Suite 250 | **CITY** Glen Allen | **STATE** VA | **POSTAL CODE** 23060 | **COUNTRY** USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | |
| **2b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** H1P Lending Group, LLC | | | | |
| **3b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** | |
| **3c. MAILING ADDRESS** 2999 North 44th Street, Suite 400 | **CITY** Phoenix | **STATE** AZ | **POSTAL CODE** 85018 | **COUNTRY** USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

| | | |
|---|---|---|
| **5. Check only** if applicable and check **only** one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative | |
| **6a. Check only** if applicable and check **only** one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | **6b. Check only** if applicable and check **only** one box: ☐ Agricultural Lien ☐ Non-UCC Filing | |
| **7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer | ☐ Bailee/Bailor ☐ Licensee/Licensor | |

**8. OPTIONAL FILER REFERENCE DATA:**
For filing in Illinois                                                                66380579.2

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrations (IACA)

## Filing Results

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

| | |
|---|---|
| **Date:** | **09/13/2018** |
| **Order #:** | **66380579** |
| **Customer #:** | **505218** |
| **Reference 1:** | **043245.0272** |
| **Reference 2:** | **--** |

---

Target Name: **GOALZ DH SLIDELL LA 112, LLC**

---

Jurisdiction: **Secretary of State, Wyoming**

---

| Filing Type: | **UCC Financing Statement** | Searched Through: -- |
|---|---|---|
| Results: | See attached filing acknowledgement | |

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701515 | 09/10/2018 | Original Financing Statement |

---

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

**STATE OF WYOMING * SECRETARY OF STATE**

## EDWARD A. BUCHANAN
## BUSINESS DIVISION

2020 Carey Avenue Suite 700, Cheyenne, WY  82002-0020

Phone: 307-777-7311

Email: UCC@wyo.gov

FENNEMORE CRAIG, P C                                              September 10, 2018
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ  85016

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11701515 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482359 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ DH SLIDELL LA 112, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document.  If we may be of any further service to you, please contact us at the number noted above.

*Edward A. Buchanan*

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures:  Original Documents

Page 1 of 1

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**
FILED: 09/10/2018 11:03 AM
ID: 2018-11701515

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GOALZ DH SLIDELL LA 112, LLC** | | | |

| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **HIP Lending Group, LLC** | | | |

| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL:  This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☒ Licensee/Licensor | | | |
| 8. OPTIONAL FILER REFERENCE DATA: For filing in Wyoming | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

*copy*


## Filing Results

**CHARLENE SARICH**
**Fennemore Craig P C**
**2394 E. CAMELBACK RD.**
**SUITE 600**
**Phoenix, AZ 85016**

| | |
|---|---|
| **Date:** | **09/13/2018** |
| **Order #:** | **66380579** |
| **Customer #:** | **505218** |
| **Reference 1:** | **043245.0272** |
| **Reference 2:** | **--** |

---

Target Name: **GOALZ DH SPRINGS CO, LLC**

---

Jurisdiction: **Secretary of State, Wyoming**

---

| | | |
|---|---|---|
| Filing Type: | **UCC Financing Statement** | Searched Through: -- |
| Results: | See attached filing acknowledgement | |

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701313 | 09/10/2018 | Original Financing Statement |

---

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

## STATE OF WYOMING ∗ SECRETARY OF STATE
### EDWARD A. BUCHANAN
### BUSINESS DIVISION
2020 Carey Avenue Suite 700, Cheyenne, WY  82002-0020

Phone: 307-777-7311

Email: UCC@wyo.gov

September 10, 2018

FENNEMORE CRAIG, P C
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ  85016

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11701313 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482348 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ DH SPRINGS CO, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document.  If we may be of any further service to you, please contact us at the number noted above.

*Edward A. Buchanan*

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures:  Original Documents

Page 1 of 1

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**
**FILED: 09/10/2018 10:57 AM**
**ID: 2018-11701313**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GOALZ DH SPRINGS CO, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HIP Lending Group, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

## Filing Results

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

| | |
|---|---|
| **Date:** | **09/13/2018** |
| **Order #:** | **66380579** |
| **Customer #:** | **505218** |
| **Reference 1:** | **043245.0272** |
| **Reference 2:** | **--** |

Target Name: **GOALZ RESTARUANT GROUP COWY, LLC**

Jurisdiction: **Secretary of State, Wyoming**

**Filing Type:** UCC Financing Statement      Searched Through: --

**Results:** See attached filing acknowledgement

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701717 | 09/10/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

**STATE OF WYOMING * SECRETARY OF STATE**
## EDWARD A. BUCHANAN
### BUSINESS DIVISION
2020 Carey Avenue Suite 700, Cheyenne, WY 82002-0020
Phone: 307-777-7311
Email: UCC@wyo.gov

FENNEMORE CRAIG, P C                                          September 10, 2018
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ 85016

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11701717 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482367 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ RESTAURANT GROUP COWY, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

*Edward A. Buchanan*
EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures: Original Documents

Page 1 of 1

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**

**FILED: 09/10/2018 11:12 AM**

**ID: 2018-11701717**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **GOALZ RESTAURANT GROUP COWY, LLC** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **4470 Cox Road, Suite 250** | **Glen Allen** | **VA** | **23060** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **HIP Lending Group, LLC** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **2999 North 44th Street, Suite 400** | **Phoenix** | **AZ** | **85018** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | being administered by a Decedent's Personal Representative | | |
|---|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | | | |

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

*copy*

## Filing Results

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

**Date:** 09/13/2018
**Order #:** 66380579
**Customer #:** 505218
**Reference 1:** 043245.0272
**Reference 2:** --

**Target Name: GOALZ RESTARUANT GROUP FLA, LLC**

**Jurisdiction: Secretary of State, Wyoming**

**Filing Type:** UCC Financing Statement          **Searched Through:** --
**Results:** See attached filing acknowledgement

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701818 | 09/10/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

## STATE OF WYOMING * SECRETARY OF STATE
### EDWARD A. BUCHANAN
### BUSINESS DIVISION

2020 Carey Avenue Suite 700, Cheyenne, WY 82002-0020

Phone: 307-777-7311

Email: UCC@wyo.gov

FENNEMORE CRAIG, P C                                September 10, 2018
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ 85016

## UCC Financing Statement Acknowledgement

### FILING INFORMATION

| | |
|---|---|
| Document #: | 2018-11701818 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482371 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

### DEBTOR INFORMATION

| | |
|---|---|
| Debtor Name: | GOALZ RESTAURANT GROUP FLA, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

### SECURED PARTY INFORMATION

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures: Original Documents

Page 1 of 1

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016 ⌐

**WY Secretary of State**
**FILED: 09/10/2018 11:15 AM**
**ID: 2018-11701818**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank; check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | GOALZ RESTAURANT GROUP FLA, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank; check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | HIP Lending Group, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)   International Association of Commercial Administrators (IACA)

*copy*

## Filing Results

**CHARLENE SARICH**
Fennemore Craig P C
2394 E. CAMELBACK RD.
SUITE 600
Phoenix, AZ 85016

| | |
|---|---|
| Date: | 09/13/2018 |
| Order #: | 66380579 |
| Customer #: | 505218 |
| Reference 1: | 043245.0272 |
| Reference 2: | -- |

Target Name: **GOALZ RESTARUANT GROUP KTY, LLC**

Jurisdiction: **Secretary of State, Wyoming**

Filing Type: **UCC Financing Statement**          Searched Through: --

Results: See attached filing acknowledgement

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11701919 | 09/10/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

**STATE OF WYOMING * SECRETARY OF STATE**

# EDWARD A. BUCHANAN
## BUSINESS DIVISION
2020 Carey Avenue Suite 700, Cheyenne, WY 82002-0020
Phone: 307-777-7311
Email: UCC@wyo.gov

FENNEMORE CRAIG, P C
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ 85016

September 10, 2018

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11701919 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482374 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ RESTAURANT GROUP KTY, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

*Edward A. Buchanan*

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures: Original Documents

Page 1 of 1

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**C.W. Ross** (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
**cwross@fclaw.com**

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐
 C.W. Ross
 Fennemore Craig, P.C.
 2394 E. Camelback Rd., Ste. 600
 Phoenix, Arizona 85016
 ⌐

**WY Secretary of State**

**FILED: 09/10/2018 11:19 AM**

**ID: 2018-11701919**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GOALZ RESTAURANT GROUP KTY, LLC** | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **4470 Cox Road, Suite 250** | **Glen Allen** | **VA** | **23060** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **HIP Lending Group, LLC** | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **2999 North 44th Street, Suite 400** | **Phoenix** | **AZ** | **85018** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**For filing in Wyoming**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

*copy*

**Filing Results**

**CHARLENE SARICH**
**Fennemore Craig P C**
**2394 E. CAMELBACK RD.**
**SUITE 600**
**Phoenix, AZ 85016**

| | |
|---|---|
| Date: | 09/13/2018 |
| Order #: | 66380579 |
| Customer #: | 505218 |
| Reference 1: | 043245.0272 |
| Reference 2: | -- |

**Target Name: GOALZ RESTARUANT GROUP NCSC, LLC**

**Jurisdiction: Secretary of State, Wyoming**

| | | |
|---|---|---|
| Filing Type: | UCC Financing Statement | Searched Through: -- |
| Results: | See attached filing acknowledgement | |

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11702012 | 09/10/2018 | Original Financing Statement |

**LINDSAY WILHITE**
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

## STATE OF WYOMING * SECRETARY OF STATE
## EDWARD A. BUCHANAN
## BUSINESS DIVISION

2020 Carey Avenue Suite 700, Cheyenne, WY  82002-0020
Phone: 307-777-7311
Email: UCC@wyo.gov

FENNEMORE CRAIG, P C                                          September 10, 2018
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ  85016

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11702012 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482388 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | GOALZ RESTAURANT GROUP NCSC, LLC |
| Address: | 4470 COX ROAD, SUITE 250 |
| | GLEN ALLEN, VA 23060 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document.  If we may be of any further service to you, please contact us at the number noted above.

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures:  Original Documents

Page 1 of 1

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**
**FILED: 09/10/2018 11:24 AM**
**ID: 2018-11702012**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GOALZ RESTAURANT GROUP NCSC, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4470 Cox Road, Suite 250 | Glen Allen | VA | 23060 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HIP Lending Group, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest in and to the assets of the Debtor, and all proceeds and products thereof, including without limitation all general intangibles, inventory, equipment, documents, instruments, certificates of deposit, treasury obligations and other securities, motor vehicles, chattel paper, rights under contracts, licenses, leases and accounts receivable relating to the Debtor.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

copy

## Filing Results

**CHARLENE SARICH**
**Fennemore Craig P C**
**2394 E. CAMELBACK RD.**
**SUITE 600**
**Phoenix, AZ 85016**

| | |
|---|---|
| **Date:** | **09/13/2018** |
| **Order #:** | **66380579** |
| **Customer #:** | **505218** |
| **Reference 1:** | **043245.0272** |
| **Reference 2:** | **--** |

Target Name: **EBY, SHAWN**

Jurisdiction: **Secretary of State, Wyoming**

| Filing Type: | **UCC Financing Statement** | Searched Through: -- |
|---|---|---|
| Results: | See attached filing acknowledgement | |

**Document Listing:**

| File # | File Date | Type of Filing |
|---|---|---|
| 2018-11702113 | 09/10/2018 | Original Financing Statement |

LINDSAY WILHITE
Sacramento Team 1
555 Capitol Mall
Suite 1000
Sacramento, CA 95814
8008478820
lindsay.wilhite@wolterskluwer.com

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

# STATE OF WYOMING * SECRETARY OF STATE
## EDWARD A. BUCHANAN
## BUSINESS DIVISION
2020 Carey Avenue Suite 700, Cheyenne, WY  82002-0020

Phone: 307-777-7311

Email: UCC@wyo.gov

FENNEMORE CRAIG, P C                                   September 10, 2018
C W ROSS
2394 E CAMELBACK RD STE 600
PHOENIX, AZ  85016

## UCC Financing Statement Acknowledgement

**FILING INFORMATION**

| | |
|---|---|
| Document #: | 2018-11702113 |
| Filing Date: | 09/10/2018 |
| Lapse Date: | 09/10/2028 |
| Record Type: | UCC |
| Receipt #: | 001482396 |
| Alternate Designation: | Debtor / Secured Party |
| Optional Filer Ref Data: | FOR FILING IN WYOMING |

**DEBTOR INFORMATION**

| | |
|---|---|
| Debtor Name: | EBY, SHAWN |
| Address: | 9432 ASPEN POINTE LANE |
| | CHEYENNE, WY 82009 |

**SECURED PARTY INFORMATION**

| | |
|---|---|
| Secured Party Name: | HIP LENDING GROUP, LLC |
| Address: | 2999 NORTH 44TH STREET, SUITE 400 |
| | PHOENIX, AZ 85018 |

This acknowledges the filing of the attached document. If we may be of any further service to you, please contact us at the number noted above.

EDWARD A. BUCHANAN
SECRETARY OF STATE
State of Wyoming

Enclosures:  Original Documents

Page 1 of 1

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
C.W. Ross (602.916.5303)

B. E-MAIL CONTACT AT FILER (optional)
cwross@fclaw.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

C.W. Ross
Fennemore Craig, P.C.
2394 E. Camelback Rd., Ste. 600
Phoenix, Arizona 85016

**WY Secretary of State**
**FILED: 09/10/2018 11:28 AM**
**ID: 2018-11702113**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| EBY | SHAWN | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9432 Aspen Pointe Lane | Cheyenne | WY | 82009 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HIP Lending Group, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2999 North 44th Street, Suite 400 | Phoenix | AZ | 85018 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

Debtor's entire membership interest (the "Membership Interest") in Goalz Restaurant Group, LLC, a Wyoming limited liabilty company (the "Company"), and all proceeds, products and accessions of or to the Membership Interest, including without limitation all rights, titles, interests, claims and demands accruing and appurtenant thereto and all of Debtor's right to return of capital and distribution of profit with respect to the Company.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
For filing in Wyoming

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# EXHIBIT D

AMENDED AND RESTATED
LOAN, GUARANTY AND SECURITY AGREEMENT

with

**32BGOALZ RESTAURANT GROUP1B, LLC,**
as Borrower

**CERTAIN SUBSIDIARIES OF GOALZ RESTAURANT GROUP, LLC,**
as Subsidiary Guarantors,

and

**HIP LENDING GROUP, LLC,**

as Lender

**March 14, 2019**

**TABLE OF CONTENTS**

Page No.

SECTION 1.    DEFINITIONS AND RULES OF CONSTRUCTION......................................... - 1 -
  1.1   Defined Terms........................................................................................................... - 1 -
  1.2   Accounting Terms...................................................................................................... - 6 -
  1.3   UCC Terms................................................................................................................ - 6 -
  1.4   Rules of Construction................................................................................................ - 6 -
SECTION 2.    LOAN ADVANCES.................................................................................... - 6 -
  2.1   Advances.................................................................................................................... - 6 -
  2.2   First Advance............................................................................................................. - 6 -
  2.3   Second Advance......................................................................................................... - 6 -
  2.4   Existing Member Notes.............................................................................................. - 6 -
  2.5   Disbursement of Advances; Use of Proceeds............................................................ - 6 -
  2.6   Loan Repayment........................................................................................................ - 7 -
SECTION 3.    CONDITIONS PRECEDENT....................................................................... - 7 -
  3.1   Initial Conditions Precedent...................................................................................... - 7 -
  3.2   Ongoing Conditions Precedent.................................................................................. - 8 -
SECTION 4.    INTEREST, FEES AND EXPENSES; LOAN ACCOUNT................................. - 8 -
  4.1   Interest....................................................................................................................... - 8 -
  4.2   Fees and Expenses..................................................................................................... - 8 -
  4.3   Expense Reimbursement............................................................................................ - 8 -
  4.4   Maximum Interest...................................................................................................... - 9 -
SECTION 5.    COLLATERAL.......................................................................................... - 9 -
  5.1   Grant of Security Interest.......................................................................................... - 9 -
  5.2   [Reserved]................................................................................................................. - 9 -
  5.3   Further Assurances.................................................................................................... - 9 -
SECTION 6.    LOAN ADMINISTRATION........................................................................ - 9 -
  6.1   Payments.................................................................................................................... - 9 -
SECTION 7.    REPRESENTATIONS AND WARRANTIES................................................. - 10 -
  7.1   General..................................................................................................................... - 10 -
SECTION 8.    COVENANTS........................................................................................... - 11 -
  8.1   Affirmative Covenants............................................................................................. - 11 -
  8.2   Additional Subsidiaries........................................................................................... - 12 -
  8.3   Negative Covenants................................................................................................. - 12 -
  8.4   [Reserved]............................................................................................................... - 13 -
  8.5   Reporting Covenants................................................................................................ - 13 -
  8.6   [Reserved]............................................................................................................... - 14 -
SECTION 9.    EVENTS OF DEFAULT AND REMEDIES.................................................... - 14 -
  9.1   Events of Default...................................................................................................... - 14 -
  9.2   Remedies.................................................................................................................. - 15 -
SECTION 10.   INDEMNITY............................................................................................ - 16 -
  10.1  Indemnity................................................................................................................. - 16 -
SECTION 11.   TERM AND TERMINATION...................................................................... - 16 -
  11.1  Term......................................................................................................................... - 16 -
  11.2  Termination.............................................................................................................. - 16 -
  11.3  Effect of Termination............................................................................................... - 16 -
SECTION 12.   GUARANTY............................................................................................. - 17 -
  12.1  Joint and Several Obligations.................................................................................. - 17 -
  12.2  Obligations Absolute............................................................................................... - 17 -
  12.3  Continuing Obligations; Reinstatement................................................................... - 18 -
  12.4  Waivers and Acknowledgments............................................................................... - 18 -
  12.5  Additional Security, Etc.......................................................................................... - 19 -
  12.6  Information Concerning Obligors............................................................................ - 19 -
  12.7  Deferral of Reimbursement and Other Rights......................................................... - 19 -

| 12.8 | Subordination. | - 19 - |
| 12.9 | Contribution. | - 20 - |
| **SECTION 13.** | **NOTICES** | **- 20 -** |
| 13.1 | Notices Generally. | - 20 - |
| 13.2 | Electronic Communications. | - 20 - |
| **SECTION 14.** | **conversion option** | **- 21 -** |
| 14.1 | Grant of Option. | - 21 - |
| 14.2 | Exercise Price. | - 21 - |
| 14.3 | Option Term. | - 21 - |
| 14.4 | Exercise of Option. | - 22 - |
| 14.5 | Change in Control. | - 22 - |
| **SECTION 15.** | **GENERAL PROVISIONS** | **- 22 -** |
| 15.1 | Miscellaneous. | - 22 - |
| 15.2 | Assignment by Lender. | - 22 - |
| 15.3 | Consent to Forum. | - 22 - |
| 15.4 | Waivers by Obligors. | - 23 - |
| 15.5 | Amended and Restated Agreement. | - 23 - |

## SCHEDULES

| | | |
|---|---|---|
| Schedule A | -- | Fee Schedule |
| Schedule B | -- | Terms Schedule |
| Schedule C | -- | [Reserved] |
| Schedule D | -- | Capital Structure |
| Schedule E | -- | Locations and Jurisdictions in Which Each Obligor is Authorized to do Business |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit 1 | -- | Form of Amended and Restated First Advance Note |
| Exhibit 2 | -- | Form of Second Advance Note |
| Exhibit 3 | -- | Subordinated Debt |
| Exhibit 4 | -- | Amendment to Operating Agreement |

14612211/043245.0272

**AMENDED AND RESTATED**
**LOAN, GUARANTY AND SECURITY AGREEMENT**

THIS AMENDED AND RESTATED LOAN, GUARANTY AND SECURITY AGREEMENT (as amended, restated, modified or supplemented from time to time, this "*Agreement*") is entered into as of March 14, 2019, among **HIP LENDING GROUP, LLC** ("*Lender*"), having an address at 2999 North 44th Street, Suite 400, Phoenix, Arizona 85018; **32BGOALZ RESTAURANT GROUP1B, LLC**, a Wyoming limited liability company ("*Borrower*"); and **CERTAIN SUBSIDIARIES OF COMPANY**, as Subsidiary Guarantors. All Schedules, Riders and exhibits annexed to this Agreement are an integral part of this Agreement and are incorporated herein by reference.

SECTION 1.   **DEFINITIONS AND RULES OF CONSTRUCTION**

1.1   **Defined Terms.**

When used in this Agreement or in any schedule, rider or exhibit hereto, the following terms shall have the following meanings:

"*Advance*" means an advance of money by Lender to Borrower pursuant to **Section 2** of this Agreement.

"*Affiliate*" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, such Persons, managers and members. For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of any equity interest, by contract or otherwise.

"*Allocable Amount*" has the meaning ascribed to it in **Section 12.9** of this Agreement.

"*Anniversary Date*" means, for any year after the year in which the Closing Date occurs, the same month and day in such year as corresponds to the month and day of the Closing Date.

"*Applicable Law*" means all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Document in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of governmental bodies; and orders, judgments and decrees of all courts and arbitrators.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.).

"*Borrower*" has the meanings ascribed to such terms in the preamble to this Agreement.

"*Business Day*" means a day other than a Saturday, Sunday or any other day on which Lender or banks in Arizona are authorized to close or are required to be closed.

"*Capitalized Lease*" means any lease of property (whether real, personal or mixed) that, in conformity with GAAP, would be accounted for as a capital lease on the balance sheet of the lessee.

"*Change of Control*" means Shawn Eby, RCH – Goalz Holdings, LLC, and Corey Hupp (or any trust or other estate planning vehicle established by any such member, to the extent the assets thereof are at all times controlled solely by such member), collectively, ceasing to own free and clear of all Liens, more than 50% of the outstanding voting equity interests of Borrower in the aggregate. Any transfer of voting equity interests by any holder to a trust or like entity for estate planning purposes shall not be deemed a transfer of such voting equity interests; provided that one or more holders of Borrower's equity interests set forth in **Schedule D** continue to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower.

"*Closing Date*" means the date appearing on the cover page of this Agreement and in the preamble on the first page.

*"Collateral"* means all property and interests in property in respect of which a Lien is granted in favor of Lender pursuant to this Agreement or the other Loan Documents.

*"Commitments"* means all commitments and other undertakings of Lender in this Agreement to make Loans or other extensions of credit to or for the benefit of Borrower in accordance with the terms of this Agreement and the other Loan Documents.

*"Default"* means any event, which with notice or passage of time, or both, would constitute an Event of Default.

*"Dollars"* mean legal tender of the United States of America.

*"ERISA"* means the Employee Retirement Income Security Act of 1974.

*"Event of Default"* has the meaning ascribed to it in **Section 9.1** of this Agreement.

*"Existing Loan Agreements"* means the Loan, Guaranty and Security Agreement by and between Lender and Borrower, dated September 4, 2018, as amended from time to time.

*"Existing Member Notes"* means, collectively, (1) the Demand Promissory Note dated February 3, 2019, in the amount of $30,000 made by Steve Piascik, (2) the Demand Promissory Note dated February 3, 2019, in the amount of $50,000 made by Shawn Eby, (3) the Demand Promissory Note dated February 19, 2019 in the amount of $50,000 made by Shawn Eby, (4) the Demand Promissory Note dated February 3, 2019, in the amount of $5,000 made by Corey Hupp, (5) the Demand Promissory Note dated February 19, 2019, in the amount of $5,000 made by Corey Hupp, and (6) the Demand Promissory Note dated March 4, 2019, in the amount of $80,000 made by Shawn Eby.

*"Extraordinary Expenses"* means all costs and expenses (including legal fees) incurred by Lender in connection with the enforcement of any of its rights or remedies under this Agreement, including any costs and expenses incurred in connection with its repossession of any of the Collateral, collection of any of the Collateral, storing or removing any of the Collateral, or advertising for sale or selling any of the Collateral.

*"Fee Schedule"* means the Fee Schedule attached to this Agreement as **Schedule A**.

*"FLSA"* means the Fair Labor Standards Act of 1938.

*"Full Payment"* means, with respect to any of the Obligations, the full, final and indefeasible payment in full, in cash, of such Obligations, including all interest, fees and other charges payable in connection therewith under any of the Loan Documents; termination of the Commitments; and the release by each Obligor (including any representative of such Obligor in an Insolvency Proceeding of such Obligor) of any claims that such Obligor has or claims to have against Lender or any of its Affiliates.

*"GAAP"* means generally accepted accounting principles as in effect from time to time in the United States of America, consistently applied.

*"Governmental Unit"* means a subdivision, agency, department, county, parish, municipality, or other unit of the government of the United States, a state or a foreign country. The term includes an organization having a separate corporate existence if the organization is eligible to issue debt on which interest is exempt from income taxation under the laws of the United States.

*"Guarantor"* means each Person who at any time guarantees the payment or performance of any Obligations, including each Person listed as a Guarantor on the Terms Schedule, if any.

*"Guaranty"* means a guaranty of payment or collection of any or all of the Obligations that is executed by a Guarantor in favor of Lender.

- 2 -

"*Indebtedness*" means, for any Person and without duplication, (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person under conditional sale or other title retention agreements and all obligations of such Person issued or assumed as the deferred purchase price of property or services (other than trade liabilities and intercompany debt maturing within 365 after the incurrence thereof and other operating liabilities not overdue by more than 120 days or being contested in good faith, in each case incurred in the ordinary course of business), (iv) all guarantees by such Person of any Indebtedness of others, (v) all liabilities and obligations under Capitalized Leases of such Person, and (vi) the principal component of all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit or bankers' acceptances. For the avoidance of doubt, Indebtedness of an Obligor includes all of the Obligations.

"*Indemnitee*" means Lender, all Affiliates of Lender and all officers, directors, employees, agents and representatives of any of the foregoing (including legal counsel).

"*Insider Subordinated Debt*" has the meaning ascribed to it in **Section 12.8** of this Agreement.

"*Insolvency Proceeding*" means any case or proceeding commenced by or against a Person (i) under the Bankruptcy Code or any other applicable insolvency law; (ii) as an assignment by a Person for the benefit of such Person's creditors; or (iii) for the appointment of a receiver, trustee, or other custodian for a Person or any of such Person's property.

"*Intellectual Property*" means all intellectual and similar intangible property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"*Interest*" has the meaning ascribed to it in **Section 4.4** of this Agreement.

"*Lender*" has the meaning ascribed to it in the preamble to this Agreement.

"*Lien*" means any security interest in, or common law, statutory or contractual lien or other encumbrance with respect to any property of a Person.

"*Loan Documents*" means this Agreement (including any Schedule or exhibit hereto), the Note, Guaranty Agreement, Subordination Agreement, and all other agreements, documents and instruments now or hereafter executed or delivered by any Obligor or any other Person in connection with, or to evidence or secure or assure the payment or performance of the transactions contemplated by, this Agreement.

"*Loans*" means all monies advanced by Lender to or for the benefit of Borrower pursuant to the terms of this Agreement.

"*Material Adverse Effect*" means any (a) material adverse effect on (i) the business, operations, financial condition, or assets of an Obligor (ii) the ability of any Obligor to perform its respective obligations under any Loan Documents; or (iii) the perfection or priority of any Lien of Lender with respect to any of the Collateral as a result of any action or failure to act by any Obligor; or (b) material impairment on the rights, remedies or benefits available to Lender under any Loan Document as a result of any action or failure to act by any Obligor.

"*Note*" means each promissory note evidencing the Loans and will include the Note evidencing the First Advance (the "*First Advance Note*") and the Note evidencing the Second Advance (the "*Second Advance Note*").

"*Obligations*" means all present and future Loans, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower or any other Obligor to Lender, whether evidenced by or arising under this Agreement or any other Loan Document, whether arising from an extension of credit, guaranty, indemnification or otherwise, whether direct or indirect (including those acquired by assignment and any participation by Lender in Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due, and whether arising before or after the commencement of a proceeding under the Bankruptcy Code or any similar

- 3 -

statute, including all interest, charges, expenses, fees, attorney's fees, expert witness fees, field exam fees, and any other sums chargeable to, or reimbursable by, Borrower under this Agreement or under any other Loan Document, including all Extraordinary Expenses. Without limiting the generality of the foregoing, the term "Obligations" shall include all Indebtedness, liabilities and obligations incurred by any Borrower to Lender in any bankruptcy case of Borrower and any interest, fees or other charges accrued in any such bankruptcy case, whether or not any such interest, fees or other charges are recoverable from one or more Borrowers or their respective estates under Section 506 of the Bankruptcy Code.

*"Obligors"* means, collectively, Borrower, Guarantors, Subsidiary Guarantors and each other Person liable for any of the Obligations.

*"Organizational Documents"* means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended from time to time, and its by-laws, as amended from time to time, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended from time to time, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended from time to time, and (iv) with respect to any limited liability company, its articles of organization, as amended from time to time, and its operating agreement, as amended from time to time. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

*"Other Property"* means any and all other property of any nature whatsoever of Borrower that is now or hereafter in the possession of, or assigned, pledged or hypothecated to, Lender for any purpose, including balances, credits, deposits, accounts, items and monies of Borrower now or hereafter with Lender.

*"Permitted Discretion"* means a determination made in the exercise of reasonable business judgment, from the perspective of a secured asset-based lender.

*"Permitted Indebtedness"* means Indebtedness incurred by Borrower or any of its Subsidiaries following the date of this Agreement, provided that such Indebtedness shall meet the following requirements: (i) all such Indebtedness shall be issued pursuant to the United Stated Small Business Administration's business loan programs or issued by another qualified lender; (ii) the proceeds of such Indebtedness will be used by the Borrower or any of its Subsidiaries to finance the purchase of furniture, fixtures or equipment to be used in equipping and furnishing a franchised restaurant; (iii) the loan to value ratio for each such item of Indebtedness shall not exceed the ratio of 0.8 to 1.0; and (iv) the aggregate number of separate items of Indebtedness outstanding at any time shall not exceed ten (10).

*"Permitted Liens"* means any of the following: (i) Liens at any time granted in favor of Lender; (ii) Liens for taxes that are not yet due or which are the subject of a Permitted Protest; (iii) statutory Liens (excluding any Lien for taxes or Liens imposed under ERISA) arising in the ordinary course of business of a Borrower or Subsidiary, but only so long as payment in respect of such Liens is not at the time required or the liabilities secured by any such Liens are the subject of a Permitted Protest, and such Liens do not materially detract from the value of the affected property and do not materially impair the use thereof in the operation of Borrowers' or such Subsidiary's business; (iv) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially impair the use thereof in the operation of Borrowers' or such Subsidiary's business; (v) deposits to secure the performance of bids, contracts, statutory obligations, surety and appeal bonds, performance bonds and other similar obligations, in each case, in the ordinary course of business; (vi) Liens arising from judgments that do not constitute an Event of Default under Section 9 of this Agreement; (vii) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (viii) normal and customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC on payment items in the course of collections; and (ix) Liens granted in connection with any Permitted Indebtedness.

*"Permitted Protests"* means proceedings conducted diligently and in good faith by a Borrower to challenge any tax, provided that adequate reserves therefor have been established in accordance with GAAP.

- 4 -

*"Permitted Tax Distributions"* means cash dividends or distributions to the holders of equity interests in Borrower no more frequently than once per fiscal year based upon the taxable income of Borrower under the Internal Revenue Code, as amended, for the immediately preceding fiscal year in an amount that does not exceed the amount necessary to pay federal and state income taxes solely attributable to the holders' distributive shares of the taxable income of Borrower, determined assuming each holder is subject to taxation at a rate equal to the highest federal and state income tax rate payable by any direct or indirect holder of equity interests in Borrower for the applicable tax year, <u>provided</u> that (a) such dividend or distribution is permitted under Applicable Law, and (b) at the time of and after giving effect to such dividend or distribution, (i) Borrower is Solvent, (ii) no Default or Event of Default exists, and (ii) not less than five (5) Business Days prior to the payment of any such dividend or distribution, Borrower has delivered to Lender written notice thereof.

*"Person"* means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization or association, or any state, county, municipal, national or foreign government or Governmental Unit.

*"Post-Petition Interest"* has the meaning ascribed to it in **Section 12.8** of this Agreement.

*"Proceeds"* means, with respect to any Collateral, all cash and non-cash proceeds from a sale, collection, lease or other disposition of such Collateral, and all other "proceeds" (as defined in the UCC) from any such disposition.

*"Records"* means all of each Borrower's books and records relating to its business or assets, including records pertaining to any Collateral. Without limiting the generality of the foregoing, Borrower's books and records include all records (whether paper, computer or electronic) data, tapes, discs, or other media and all programs, files, records and procedure manuals relating thereto wherever located.

*"Schedules"* means the Fee Schedule, the Terms Schedule and any other schedule annexed to this Agreement from time to time.

*"Solvent"* means with respect to any Person is able on such date to pay and does pay all of its debts as they become due in the ordinary course of business, and has working capital on such date that is adequate to meet its reasonably foreseeable business needs and to carry on its business in the ordinary course.

*"Subordinated Creditor"* means each holder of Subordinated Debt, including, at any time of determination, the holder of any of the Subordinated Debt described on **Exhibit 3** hereto.

*"Subordinated Debt"* means, with respect to any Person, debt of such Person the payment of which is subordinated to the payment of the Obligations in a manner satisfactory to Lender.

*"Subordination Agreement"* means each Subordination Agreement between a Subordinated Creditor and Lender pursuant to which debt owed to such Subordinated Creditor is subordinated in right of payment to the Obligations.

*"Subsidiary"* means an entity at least 50% of whose voting securities or other equity interests is owned by a Borrower (including indirect ownership by a Borrower through other entities in which such Borrower directly or indirectly owns 50% of the voting securities or other equity interests).

*"Subsidiary Guarantor"* means each Subsidiary of Borrower a party to the Subsidiary Guaranty as of the date hereof, and subsequent to the date hereof, each Subsidiary of Borrower that becomes a party to the Guaranty pursuant this Agreement.

*"Subsidiary Guaranty"* means the guaranty of each Subsidiary Guarantor set forth in **Section 12**.

*"Term"* has the meaning ascribed to it in **Section 11.1**.

*"Terms Schedule"* means the Terms Schedule attached to this Agreement as **Schedule B**.

- 5 -

"*UCC*" means the Uniform Commercial Code as adopted and in effect at such time in the State of Arizona.

### 1.2   Accounting Terms.

All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with GAAP.

### 1.3   UCC Terms.

The following terms, as used herein, shall have the meanings ascribed to them in the UCC:  Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Equipment, General Intangible, Fixture, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Payment Intangible, Securities Account and Supporting Obligation.

### 1.4   Rules of Construction.

The term "including," whenever used in this Agreement, shall mean "including, but not limited to."  The singular form of any term shall include the plural form, and *vice versa*, when the context so requires.  References to Sections, subsections and Schedules are to Sections and subsections of, and Schedules to, this Agreement.  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  References to agreements and statutes shall include all amendments thereto and successor statutes in the case of statutes; to the time of day shall mean the time of day on the day in question in Phoenix, Arizona; to Lender's "discretion" means Lender's sole and absolute discretion unless expressly indicated otherwise herein.  A Default or an Event of Default shall be deemed "to continue," "be continuing," "exist" or be "in existence" at all times during the period commencing on the date such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing by Lender or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement.

SECTION 2.   **LOAN ADVANCES**

### 2.1   Advances.

Subject to the terms and conditions in this Agreement, at Borrower's request and provided that no Default or Event of Default exists, Lender agrees to make Advances to Borrower as contemplated herein, underlined provided that, immediately after giving effect to each such Advance, the outstanding balance of all Obligations in respect of Advances will not exceed $1,800,000.00 (the "*Maximum Advance Amount*")

### 2.2   First Advance.

Lender made an initial Advance (the "*First Advance*") to Borrower in the amount of $800,000.00 represented by the Amended and Restated First Advance Note.

### 2.3   Second Advance.

Lender shall make a second Advance (the "*Second Advance*") to Borrower in the amount of $1,000,000.00 upon satisfaction or waiver of the conditions precedent set forth in Sections 3.1 and 3.2.  The Second Advance shall be represented by the Second Advance Note.

### 2.4   Existing Member Notes.

The Existing Member Notes are hereby assigned to and assumed by the Borrower, with the Borrower becoming the maker and debtor under the Existing Member Notes.  For purposes of this Agreement, the Existing Member Notes shall be deemed to be part of the Second Advance made by Lender to Borrower.  Upon execution of this Agreement and funding of the Second Advance by Lender, the Existing Member Notes shall be cancelled and the indebtedness represented thereby shall be part of the indebtedness represented by the Second Advance Note.

### 2.5   Disbursement of Advances; Use of Proceeds.

- 6 -

All proceeds of Advances to Borrower may be disbursed by Lender to Borrower, and Borrower shall thereafter promptly make such proceeds available to Borrower one or more Subsidiary Guarantor. The proceeds of each Advance disbursed by Lender to Borrower shall be deemed to be an Advance made by Lender directly to all Borrower and all Subsidiary Guarantors. Borrower shall be authorized to use the proceeds of the Advances solely to pay the Obligations, and to make expenditures for lawful purposes of Borrower to the extent such expenditures are not prohibited by the provisions of this Agreement or Applicable Law. Borrower represents and warrants that Loans to Borrower will be used solely for commercial purposes and not for personal, family or household purposes.

2.6      **Loan Repayment.**

Principal and interest with respect to Advances shall be paid as stated in the Notes made by Borrower to the order of Lender in the forms annexed hereto as **Exhibit 1** and **Exhibit 2**.

SECTION 3.      **CONDITIONS PRECEDENT**

3.1      **Initial Conditions Precedent.**

Lender shall not be obligated to fund any Loan or make any other extension of credit unless, on or before the date hereof (or such later date to which Lender in its sole discretion may consent in writing), each of the following conditions has been satisfied, as determined by Lender in its sole discretion:

(a)      all Loan Documents shall have been duly executed and delivered in a manner satisfactory to Lender;

(b)      Lender shall have received assurances satisfactory to it that its Liens upon all of the Collateral are duly perfected Liens that are senior to all other Liens except as otherwise permitted under any Loan Document;

(c)      Lender shall have received (i) sufficient copies of each Organizational Document executed (if applicable) and delivered by each Obligor, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party; (iii) resolutions of the governing body of each Obligor approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its an authorized member, manager or officer as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Unit of each Obligor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other documents as Lender may reasonably request.

(d)      since December 31, 2018, no event shall have occurred and no condition shall exist that could reasonably be expected to have a Material Adverse Effect;

(e)      Borrowers shall have paid all fees and expenses to be paid to Lender on or before the date of such funding or grant;

(f)      no litigation shall be pending or threatened that would constitute an Event of Default or could reasonably be expected to result in a Material Adverse Effect;

(g)      no Default or Event of Default shall exist at the time of or result from the funding of any Loan or other extension of credit;

(h)      all representations and warranties of each Obligor in any of the Loan Documents are true and correct in all material respects on and after giving effect to such funding or grant; and

(i)      Borrowers shall have satisfied all conditions specified as additional conditions precedent on the Terms Schedule.

14612211/043245.0272

3.2    **Ongoing Conditions Precedent**.

Lender shall not be obligated to fund any Loan or make any other extension of credit hereunder (including the initial Loans to be funded on or about the date of this Agreement) unless each of the following conditions is satisfied, as determined by Lender in its sole discretion:

(a)    all the conditions precedent set forth in Section 3.1 shall have been satisfied;

(b)    no Default or Event of Default shall exist at the time of or result from the funding of such Loan or the granting of such extension of credit;

(c)    all representations and warranties made by any Obligor in any Loan Document, or otherwise in writing to Lender, shall be true and correct in all material respects with the same effect as though such representations and warranties have been made on and as of the date of the funding of such Loan or other extension of credit;

(d)    no event shall have occurred and no condition shall exist that could reasonably be expected to have a Material Adverse Effect;

(e)    the Lender shall be satisfied with its on-going financial, business, tax, legal and other due diligence review of the Borrower and its properties and assets; and

(f)    the Lender, in its Permitted Discretion, deems itself insecure, even though no Default or Event of Default shall have occurred.

SECTION  4.    **INTEREST, FEES AND EXPENSES; LOAN ACCOUNT**

4.1    **Interest**.

Interest shall accrue on the unpaid principal balance of the Advances at the applicable rate set forth in the Terms Schedule, and shall be calculated and repaid in accordance with the Note.  The balance of the Obligations, other than the principal amount of the Loans, shall likewise bear interest at the same rates, and calculated in the same manner, as is applicable to Advances; provided, however, that interest shall not accrue on any past due interest to the extent prohibited by Applicable Law.

4.2    **Fees and Expenses**.

In addition to all interest and other sums payable by Borrower under this Agreement, Borrower shall pay Lender the fees and reimbursements set forth in the Fee Schedule, which shall be deemed earned in full on the date when the same have accrued (whether or not then due and payable hereunder) and shall not be subject to rebate or proration upon termination of this Agreement or otherwise unless and to the extent required by Applicable Law.

4.3    **Expense Reimbursement**.

Borrower shall reimburse Lender for (i) any Extraordinary Expenses incurred by Lender and (ii) all legal, accounting, consulting and other fees and expenses suffered or incurred by Lender in connection with (a) the negotiation and preparation of any of the Loan Documents and any amendment or modification thereto; (b) the administration of the Loan Documents and the transactions contemplated thereby; (c) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral, including any and all Lien search fees, credit inquiry and investigation fees and costs; or (d) any effort by Lender to verify or appraise any of the Collateral, which fees and expenses of subsection (ii) shall not exceed $10,000.  If any of the Obligations are collected by or through an attorney at law, then Borrower shall be obligated to pay, in addition to all principal and interest in respect of the Obligations, Lender's attorneys' fees and court costs as provided in **Section 9.2** of this Agreement.  All amounts chargeable to or reimbursable by Borrower under this **Section 4.3** shall constitute Obligations and shall be payable to Lender on demand.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the indemnification or reimbursement by Borrower of claims suffered or incurred by Lender.

4.4     **Maximum Interest**.

Regardless of any provision contained in this Agreement or any other Loan Document, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this Agreement or any other Loan Document and that are deemed interest under Applicable Law exceed the highest rate permissible under any applicable law, which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. No agreements, conditions, provisions or stipulations contained in any of the Loan Documents or the exercise by Lender of the right to accelerate the payment or the maturity of all or any portion of the Obligations or the exercise of any option whatsoever contained in any of the Loan Documents, or the prepayment by Borrowers of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle Lender to charge or receive, in any event, interest or charges, amounts, premiums or fees deemed interest by Applicable Law (such interest, charges, amounts, premiums and fees referred to collectively as "*Interest*") in excess of the maximum rate allowable under Applicable Law and in no event shall any Obligor be obligated to pay Interest exceeding such maximum rate, and all agreements, conditions, or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel any Obligor to pay Interest exceeding the maximum rate allowable under Applicable Law shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over such maximum rate.

SECTION 5.     **COLLATERAL**

5.1     **Grant of Security Interest**.

To secure the full and timely payment and performance of all of the Obligations, Borrower and each Subsidiary Guarantor hereby grants to Lender a continuing security interest in and Lien upon the following property and interests in property of such Obligor, whether tangible or intangible, now owned or in existence or hereafter created, acquired or arising, and wherever located:  all Accounts, Chattel Paper, Goods (including all Inventory, Equipment and Fixtures), Documents, Instruments, General Intangibles (including Payment Intangibles), Investment Property, Letter-of-Credit Rights, Supporting Obligations, Commercial Tort Claims, Other Property, and Borrower's limited liability company membership interests in its Subsidiaries; all Proceeds and products of all of the foregoing (including Proceeds of any insurance policies and claims against third parties for loss or any destruction of any of the foregoing); and all Records relating to any of the foregoing.

5.2     **[Reserved]**.

5.3     **Further Assurances**.

Borrower and each Subsidiary Guarantor agrees to take such steps as are necessary or appropriate under Applicable Law, and consents to Lender taking any such steps, to perfect and maintain the perfection and priority of Lender's Lien in the Collateral and to execute such documents as Lender may require to effectuate the foregoing and to implement this Agreement.  Borrower and each Subsidiary Guarantor irrevocably authorizes Lender to file financing statements, and all amendments and continuations with respect thereto, in order to create, perfect or maintain its Lien in the Collateral as a duly perfected Lien, subject to no other Liens except for Permitted Liens; and ratifies and confirms any and all financing statements (and amendments and continuations with respect thereto) heretofore and hereafter filed by Lender pursuant to the foregoing authorization.

SECTION 6.     **LOAN ADMINISTRATION**

6.1     **Payments**.

All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in immediately available funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Lender not later than 4:00 p.m. (Phoenix time) on the date due via wire transfer of immediately available funds to a location or bank account within the Arizona as may be designated by Lender from time to time; funds received by Lender after that time on such due date shall be deemed to have been paid by Borrower on the next Business Day.  All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the

principal amount being repaid or prepaid.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder. If a Default or an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 9, all payments or proceeds received by Lender hereunder or under any Loan Document in respect of any of the Obligations, including, but not limited to all proceeds received by Lender in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows:  first, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to Lender and its agents and counsel, and all other expenses, liabilities and advances made or incurred by Lender in connection therewith, and all amounts for which Lender is entitled to indemnification hereunder or under any Loan Document and all advances made by any Lender under any Loan Document for the account of the applicable Obligor, and to the payment of all costs and expenses paid or incurred by Lender in connection with the exercise of any right or remedy hereunder or under any Loan Document, all in accordance with the terms hereof or thereof; second, to the extent of any excess of such proceeds, to the payment of all other Obligations; and third, to the extent of any excess of such proceeds, to the payment to or upon the order of such Obligor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

SECTION 7.    **REPRESENTATIONS AND WARRANTIES**

7.1    **General.**

To induce Lender to enter into this Agreement, Borrower and each Subsidiary Guarantor, jointly and severally, makes the following representations and warranties (each of which shall be deemed to have been made on the Closing Date and on each date thereafter on which any Advance is made available to Borrower by the Lender):

(a)    such Obligor's legal name and state or incorporation or organization is exactly as set forth on the signature page of this Agreement and on **Schedule E**;

(b)    such Obligor is duly organized and validly existing under the laws of its state of organization and is qualified to do business in each state where such qualification is required (except where the failure to so qualify could not reasonably be expected to result in a Material Adverse Effect), all of which are listed on **Schedule E**;

(c)    such Obligor is duly authorized to execute, deliver and perform its Loan Documents, the execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action by such Obligor, and the execution, delivery and performance of the Loan Documents by such Obligor do not require any consent or approval of any Person except those already obtained, contravene the articles, by-laws or analogous organizational documents of such Obligor, violate or cause a default under any Applicable Law or material contract, or result in or require imposition of a Lien on such Obligor's property;

(d)    such Obligor has good title to its assets, and each Lien granted by such Obligor to Lender in the Collateral is and will at all times remain a duly perfected, first priority Lien in such Collateral, subject only to Permitted Liens;

(e)    each Loan Document is a legal, valid and binding obligation of such Obligor, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally;

(f)    such Obligor has filed all federal, state and local tax returns and other reports that it is required by law to file, and has paid, or made provision for the payment of, all taxes that are due and payable by such Obligor, except to the extent subject to a Permitted Protest that has been disclosed to Lender in writing;

(g)    each Obligor is Solvent;

(h)    the most recent financial statements provided to Lender accurately reflect such Obligor's financial condition as of that date and since that date no condition exists and no event has occurred that has had or could

- 10 -

reasonably be expected to have a Material Adverse Effect, and all projections delivered from time to time to Lender have been prepared in good faith, based on reasonable assumptions in light of the circumstances at such time;

(i)     such Obligor has duly complied, and its properties and business operations are in compliance, in all material respects with, all Applicable Law (including, without limitation, all environmental laws, ERISA, OSHA and FLSA), except where noncompliance could not reasonably be expected to have a Material Adverse Effect, and no Obligor, any Subsidiary of an Obligor or any director, officer, employee, agent, affiliate or representative thereof, is or is owned or controlled by an individual or entity that is currently the subject or target of any sanction or is located, organized or resident in a country, territory or jurisdiction that is the subject of a sanction;

(j)     there are no actions, suits or other legal proceedings of any kind now pending or, to such Obligor's knowledge, threatened against any Obligor that if successful could reasonably be expected to have a Material Adverse Effect;

(k)     no Default or Event of Default exists;

(l)     such Obligor has never carried on business under or used any name other than its legal name and the trade names or trade styles (if any) listed on **Schedule E**;

(m)     such Obligor has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Units and all other Persons as is required or necessary to own its assets and to carry on its business, and such Obligor has not been notified by any such Governmental Unit or other Person that such Governmental Unit or other Person has rescinded or not renewed, or intends to rescind or not renew, any such license, consent, accreditation, approval or authorization;

(n)     such Obligor has unrestricted access to its Records and owns or leases all Equipment in or on which any Records are stored, kept or otherwise maintained (and, in the event that any such Equipment is leased by Obligor, such lease is in full force and effect and no default exists thereunder);

(n)     except as otherwise disclosed to Lender in writing, no Obligor is party to or bound by any collective bargaining agreement, management agreement or consulting agreement, and there are no material existing or (to any Obligor's knowledge) threatened grievances, disputes or controversies with any union or other organization of any Obligor's employees, or, to any Obligor's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining; and

(o)     all information furnished by any Obligor to Lender (including all information contained in the Information Certificate delivered to Lender on or before the Closing Date) is true and correct in all material respects.

Obligors further represent, warrant and acknowledge that, while separately organized, Obligors operate as an integrated unit and in a collective business enterprise that is interdependent; the successful operation and condition of Obligors is dependent on the continued successful performance of the functions of the group of Obligors as a whole and the successful operation of each Obligor is dependent on the successful performance and operation of each other Obligor; and each Obligor will derive significant benefit from the successful operation of each of the other Obligors and the credit extended by Lender to Obligors hereunder, both in their separate capacities and as members of the group of companies.

Each of the foregoing representations and warranties shall be deemed reaffirmed and remade as of the date of funding of each Advance and shall not be affected by any knowledge of, or any investigation by, Lender. The continuing accuracy of each of the foregoing representations and warranties shall be a condition precedent to each Advance.

SECTION 8.     **COVENANTS**

8.1     <u>**Affirmative Covenants.**</u>

Until Full Payment of the Obligations, Borrower shall:

- 11 -

14612211/043245.0272

(a)     permit representatives of Lender from time to time, as often as may be reasonably requested, but (when no Default or Event of Default exists) only during normal business hours, to inspect and appraise the Collateral and to inspect, audit, and make extracts from Borrower's Records and to discuss Borrower's financial affairs with such Borrower's independent accountants;

(b)     keep adequate Records with respect to its business activities in accordance with prudent accounting practices;

(c)     reimburse Lender for all costs of inspections and Collateral audits of Borrower, its Records and such other matters as Lender may deem reasonable, and for all appraisals of the Collateral;

(d)     pay and discharge all taxes prior to the date on which such taxes become delinquent or penalties attach thereto unless subject to a Permitted Protest, and pay when due, all wages, salaries and other benefits, together with withholdings relating thereto;

(e)     comply with all Applicable Law and promptly notify Lender of any violation or asserted violation of any Applicable Law if any adverse resolution could reasonably be expected to have a Material Adverse Effect;

(f)     promptly notify Lender in writing of any change in location of any place of business, or the establishment of any new place of business;

(g)     carry property, liability and other insurance, with insurers acceptable to Lender, in such form and amounts, and with such deductibles and other provisions as Lender shall require in its Permitted Discretion, with each such insurance policy naming Lender as lender loss payee or an additional insured, as applicable, pursuant to a form of endorsement acceptable to Lender; and

(h)     promptly notify Lender of (i) the existence of any Default or Event of Default; (ii) the threat or commencement of any proceeding or investigation, whether or not covered by insurance; (iii) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any environmental laws); (iv) the discharge of or any withdrawal or resignation by Borrower's independent accountants; (v) any judgment in an amount exceeding $25,000 (whether or not insured), and any casualty, condemnation, seizure or other loss with respect to any Collateral or other property with a value in excess of $25,000 (whether or not insured); and (vi) any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract, or any other event or circumstance that may reasonably be anticipated to result in the closure, shut-down or cessation of operations for a Borrower or any material portion of its business outside the ordinary course of business.

8.2     **Additional Subsidiaries.**

In the event that any Person becomes a Subsidiary of Borrower, Borrower shall (a) concurrently with such Person becoming a Subsidiary cause such Subsidiary to become a Subsidiary Guarantor hereunder by executing and delivering to Lender a joinder to this Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1 3.2 and 3.3. With respect to each such Subsidiary, Borrower shall promptly send to Lender written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Borrower, and (ii) all of the data required to be set forth in **Schedules C** with respect to all Subsidiaries of Borrower.

8.3     **Negative Covenants.**

Until Full Payment of the Obligations, Borrower shall not (and shall not permit any Subsidiary to):

(a)     merge or consolidate with another Person; acquire any assets except in the ordinary course of business as presently conducted or as otherwise permitted by this Agreement or the other Loan Documents;

(b)     enter into any transaction outside the ordinary course of business;

(c)      sell or transfer any Collateral or other assets, except, if no Default or Event of Default exists, Borrowers may sell or otherwise dispose of worn-out or obsolete Equipment, or Equipment that is no longer used or useful in the business of Borrowers, so long as the book value of all such Equipment disposed in any fiscal year does not exceed the amount specified for Equipment Dispositions on the Terms Schedule and the proceeds of any such disposition are remitted to Lender and applied to the Obligations in accordance with the Loan Documents;

(d)      make any loans or other advances of money to any Person;

(e)      incur any Indebtedness other than (i) the Obligations, (ii) the Permitted Indebtedness; (iii) Subordinated Debt in existence on the Closing Date or which is incurred after the Closing Date on terms acceptable to Lender, and (iv) any other Indebtedness to which Lender in its sole discretion consents in writing;

(f)      guarantee or otherwise become liable with respect to any Indebtedness (other than the Obligations) of another Person;

(g)      pay or declare any dividends or other distributions on all or any part of any Borrower's equity interests or make any other special payment to an equity holder (except for Permitted Tax Distributions, if applicable), or redeem, retire, purchase or otherwise acquire, directly or indirectly, any of any Borrower's equity interests;

(h)      dissolve or elect to dissolve or otherwise discontinue its business or engage in any business other than the business conducted on the Closing Date and activities incidental thereto;

(i)      make any payment on or in respect of any Subordinated Debt;

(j)      change its fiscal year or have a fiscal year that is not the same as the fiscal year of all other Borrowers;

(k)      suffer to exist any Lien upon any of its assets other than a Permitted Lien;

(l)      amend, modify or otherwise change its Organizational Documents;

(m)      amend, modify or otherwise change the salaries and other compensation of the Borrower's management team and equity holders;

(n)      pay any bonus to any employee or equity holder of the Borrower or any Subsidiary;

(o)      enter into or be party to any transaction with an Affiliate, except (A) transactions expressly permitted by the Loan Documents; (B) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities; (C) transactions solely among Obligors; and (D) other transactions with Affiliates in the ordinary course of business, upon fair and reasonable terms fully disclosed to Lender and no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate; or

(p)      amend, supplement or otherwise modify any indenture, instrument or other agreement relating to any Subordinated Debt other than to decrease the amount of scheduled payments thereunder, extend the time for payment of the principal amount thereof, reduce the rate of interest applicable thereto or delete or make less onerous any covenant, event of default or remedy thereunder.

8.4      **[Reserved].**

8.5      **Reporting Covenants.**

14612211/043245.0272

Until Full Payment of the Obligations, Borrower Agent shall provide Lender the reports listed below in a format acceptable to Lender. All reports, which are to be submitted in Excel format and/or via direct data submission to an online computer system authorized and in form and substance acceptable to Lender, are due as follows:

(a)       annual unaudited financial statements of Borrower and its Subsidiaries, as of the end of each fiscal year, on a consolidated and consolidating basis and without qualification, reviewed by a firm of independent certified public accountants reasonably acceptable to Lender, shall be prepared in accordance with GAAP and furnished to Lender within 120 days after the end of each fiscal year of Borrowers;

(b)       an unaudited balance sheet of Borrowers and its Subsidiaries as of the last day of each month, and related unaudited statements of income and cash flow for such month and for the portion of Borrower's fiscal year then elapsed, on a consolidated and consolidating basis shall be prepared in accordance with GAAP and furnished to Lender within 21 days after the end of each month;

(c)       upon the prior request of Lender, monthly bank statements for all bank accounts of Borrower, as of the last day of the prior calendar month;

(d)       monthly projections for each fiscal year are due no later than 60 days before the end of the immediately preceding fiscal year;

(e)       all tax returns for Borrower and each Subsidiary delivered to Lender no later than five (5) Business Days after such tax returns are filed with the applicable Governmental Unit;

(f)       a personal financial statement for each Guarantor that is a natural Person (if applicable), as of the end of each calendar year, is due no later than thirty (30) days after the end of such year; and

(g)       such other information as Lender may reasonably request form time to time shall be promptly furnished to Lender.

8.6       **[Reserved]**.


SECTION 9.       **EVENTS OF DEFAULT AND REMEDIES**

9.1       **Events of Default**.

The occurrence of any of the following events or conditions shall constitute an *"Event of Default"* under this Agreement; provided, that Lender shall notify Borrower of the occurrence of any such event and Borrower shall have five (5) Business Days following the receipt of such notice of cure such Default:

(a)       Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration, or otherwise);

(b)       any representation, warranty, or other statement to Lender by or on behalf of any Obligor, whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made;

(c)       any Obligor shall fail or neglect to perform, keep or observe any covenant contained in this Agreement or any other Loan Document;

(d)       any Obligor shall cease to be Solvent; or any breach or default of an Obligor occurs under any instrument or agreement to which it is a party or by which it or any of its properties is bound, relating to any Indebtedness (other than the Obligations), if the maturity of or any payment with respect to such Indebtedness may be accelerated or demanded due to such breach;

- 14 -

(e)        any Insolvency Proceeding shall be commenced by or against any Obligor and, if against an Obligor, shall not be dismissed within 60 days after commencement;

(f)        one or more judgments or orders for the payment of money in excess of $25,000 in the aggregate shall be entered against any Obligor and remain undismissed and unpaid for 30 days or more, provided that all Liens securing any such judgment are junior to Lender's Liens in the Collateral;

(g)        any Obligor shall revoke or attempt to revoke or terminate, or fail to confirm such Obligor's liability under, any Guaranty to which such Obligor is a party;

(h)        a Change of Control shall occur;

(i)        Shawn Eby shall cease, for any reason, to be engaged on a full-time basis in the management and day-to-day operations of the Borrower;

(j)        any default shall occur under any other agreement or arrangement between one or more Obligors and Lender;

(k)        any failure of any Obligor to furnish Lender current financial information upon request;

(l)        any failure of any Obligor or any pledgor of any security interest in the Collateral to observe or perform any covenant contained in any agreement, instrument or certificate executed in connection with the granting of a security interest in any Collateral;

(m)        any uninsured loss, theft, substantial damage, destruction, sale, foreclosure of or encumbrance (other than a Permitted Lien) on any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon or the rendering of any garnishment or attachment against any Obligor or its property, whether actual or threatened;

(n)        the dissolution or termination of existence of any Obligor; or any Guarantor that is a natural Person shall die, unless Borrowers shall cause a replacement Guarantor with financial wherewithal and liquid assets no less favorable to (and as determined in its sole discretion by) Lender as those of the deceased Guarantor, to execute and deliver to Lender a replacement Guaranty in substantially the same form and substance as the Guaranty of the deceased Guarantor, within sixty (60) days after the death of such Guarantor; or any Guarantor that is a natural Person shall be declared incompetent;

(o)        any amendment or termination of a financing statement naming any Obligor as debtor and Lender as secured party, or any corrective statement with respect thereto, is filed by or on behalf of any Obligor without the prior written consent of Lender;

(p)        any Obligor, any Subsidiary of an Obligor, or any officer or director of an Obligor or Subsidiary thereof, shall be indicted for or convicted of (or plead *nolo contendere* to) any crime punishable under Applicable Law as a felony; or

(q)        any event shall occur or any condition shall exist that has or could reasonably be expected to have a Material Adverse Effect.

9.2        **Remedies.**

Upon or after the occurrence of an Event of Default (and for so long as such Event of Default shall exist), Lender may in its discretion declare the principal of and accrued interest on the Loans and all other outstanding Obligations to be, whereupon the same shall thereupon become without further notice or demand (all of which notice and demand Borrower expressly waives), forthwith due and payable and Borrowers shall forthwith jointly and severally pay to Lender the entire principal of and accrued and unpaid interest on the Loans and other Obligations, together with reasonable attorneys' fees and court costs if such principal and interest are collected by or through an attorney at law, and Lender may terminate this Agreement. In addition, Lender may, in its discretion, at any time or times exercise all of the rights and remedies of a secured party under the UCC or any other Applicable Law and all other legal and

- 15 -

equitable rights to which Lender may be entitled under any of the Loan Documents, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in any of the Loan Documents or available pursuant to Applicable Law, and none of which shall be exclusive. Each Obligor agrees that any requirement of notice to such Obligor of any proposed public or private sale or other disposition of any Collateral by Lender shall be deemed reasonable notice thereof if given at least 10 days prior thereto. Lender may purchase all or any part of the Collateral at a public sale or, if permitted by Applicable Law, at any private sale, and, in lieu of actual payment of such purchase price, Lender may set off the amount of such price against the outstanding Obligations. The proceeds realized from any sale or other disposition of Collateral may be applied first to any Extraordinary Expenses incurred by Lender, second to interest and fees accrued with respect to any of the Obligations, and then to the principal balance of the Obligations. If any deficiency shall arise, Obligors shall remain jointly and severally liable to Lender therefor. Lender may, in its discretion, petition for and obtain the appointment of a receiver to take possession of any or all of the Collateral and to operate any Obligor's business and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver, Obligors hereby consenting thereto and waiving any requirement under Applicable Law that Lender post a bond in connection with the appointment of any such receiver. Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of each Obligor, computer hardware and software, brochures, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral. Each Obligor's rights and interests under Intellectual Property shall inure to Lender's benefit. The failure or delay of Lender to require strict performance by any Obligor of any provision of the Loan Documents or to exercise or enforce any rights, Liens, powers, or remedies under any of the Loan Documents shall not operate as a waiver of such performance, Liens, rights, powers, and remedies, but all such rights, Liens, powers, and remedies shall continue in full force and effect until Full Payment of the Obligations.

SECTION 10.   **INDEMNITY**

    10.1   **Indemnity**.

  Obligors hereby agree, jointly and severally, to indemnify and defend each Indemnitee and hold such Indemnitee harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every nature, character and description, which such Indemnitee may sustain or incur based upon or arising out of any of the transactions contemplated by this Agreement or the other Loan Documents or any of the Obligations or any other matter, cause or thing whatsoever occurred, done, omitted or suffered to be done by Lender relating to any Obligor, the Loan Documents, or the Obligations except to the extent any such amounts are sustained or incurred as the result of the gross negligence or willful misconduct of such Indemnitee. Notwithstanding any provision in this Agreement to the contrary, this **Section 10.1** shall survive any termination of this Agreement and Full Payment of the Obligations.

SECTION 11.   **TERM AND TERMINATION**

    11.1   **Term**.

  All Commitments hereunder shall, subject to the satisfaction (or waiver by Lender in its sole discretion) of each condition set forth in **Section 3** hereof, become effective on the date hereof and shall expire at the close of business on the day specified as the maturity date specified in the Terms Schedule (the **"Term"**).

    11.2   **Termination**.

  Borrower may terminate the Commitments at any time by Borrower giving Lender at least 60 days prior written notice thereof, and all Commitments shall automatically terminate upon the occurrence of an Event of Default resulting from the commencement of an Insolvency Proceeding by or against Borrower. At any time that an Event of Default exists, Lender may terminate the Commitments immediately, without prior notice to Borrower.

    11.3   **Effect of Termination**.

  On the effective date of any termination of the Commitments, whether by Lender or Borrower, all Obligations shall become immediately due and payable without further notice to or demand upon any Obligor. No termination shall

affect or impair any Lien, right or remedy of Lender hereunder or under any of the other Loan Documents (including any right of Lender to indemnification hereunder or under any other Loan Document) or relieve any Obligor of any of covenant, duty or liability hereunder or under any other Loan Document until Full Payment of the Obligations.

## SECTION 12.   **GUARANTY**

### 12.1    <u>**Joint and Several Obligations**</u>.

Each Obligor agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations.  Each Obligor agrees that its liability hereunder shall not be discharged until Full Payment of the Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for any Obligations or any action, or the absence of any action, by Lender in respect thereof (including the release of any security or guaranty); (d) whether any Obligor ceases to be Solvent; (e) any election by Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Obligor, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of Lender against any Obligor for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except Full Payment of the Obligations.

### 12.2    <u>**Obligations Absolute**</u>.

The obligations of each Obligor hereunder are and shall be joint and several and absolute and unconditional, irrespective of the validity, regularity or enforceability of any of the Loan Documents, shall not be subject to any counterclaim, setoff, deduction or defense based upon any claim any Obligor may have against any Obligor or Lender, hereunder or otherwise, and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by, to the fullest extent permitted by Applicable Law, any circumstance or condition whatsoever (whether or not any Obligor shall have any knowledge or notice thereof), including:

(i)    any amendment or modification of or supplement to any of the Loan Documents (including any increase or decrease in the Obligations or rate of interest or amount of fees payable in connection therewith or any extension of the Term or time for payment of any Obligations) or any other instrument referred to herein or therein, or any assignment or transfer of any thereof or of any interest therein, or any furnishing or acceptance of additional security for any of the Obligations;

(ii)    any waiver, consent or extension under any Loan Document or any such other instrument, or any indulgence or other action or inaction under or in respect of, or any extensions or renewals of, any Loan Document, any such other instrument or any Obligation;

(iii)    any failure, omission or delay on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on or available to Lender against any Obligor or subsidiary of a Obligor;

(iv)    the commencement of any Insolvency Proceeding with respect to an Obligor or any subsidiary of a Obligor, any unavailability of assets against which any of the Obligations may be enforced, or any release of Collateral or Liens thereon;

(v)    any merger or consolidation of any Obligor into or with any other Person or any sale, lease or transfer of any or all of the assets of any Obligor or Subsidiary of a Obligor to any Person;

(vi)    any failure on the part of a Obligor or any Subsidiary of a Obligor for any reason to comply with or perform any of the terms of any agreement with any other Obligor;

- 17 -

(vii)    any exercise or non-exercise by Lender of any right, remedy, power or privilege under or in respect of any of the Loan Documents, including under this **Section 12.2**;

(viii)    any default, failure or delay, willful or otherwise, in the performance or payment of any of the Obligations;

(ix)    any furnishing or acceptance of security, or any release, substitution or exchange thereof, for any of the Obligations;

(x)    any failure to give notice to any Obligor of the occurrence of any breach or violation of, or any event of default or any default under or with respect to, any of the Loan Documents or the Obligations;

(xi)    any partial prepayment, or any assignment or transfer, of any of the Obligations; or

(xii)    any other circumstance (other than Full Payment) which might otherwise constitute a legal or equitable discharge or defense of a guarantor or which might in any manner or to any extent vary the risk of any Obligor.

Obligors covenant that their obligations hereunder will not be discharged except by complete performance of the Obligations contained in the Loan Documents and the Full Payment of the Obligations. Obligors unconditionally waive, to the fullest extent permitted by Applicable Law (A) notice of any of the matters referred to in this **Section 12.2**; (B) any and all rights which any Obligor may now or hereafter have arising under, and any right to claim a discharge of a Obligor's obligations hereunder by reason of the failure or refusal by Lender to take any action pursuant to, any statute permitting a Obligor to request that Lender attempt to collect the Obligations from any Obligor or other Person; (C) presentment to or demand of payment from an Obligor or any of its Subsidiaries with respect to any Loan Document, and notice to any Obligor of default or protest for nonpayment or dishonor; (D) any diligence in collection from or protection of or realization upon all or any portion of the Obligations or any security therefor, any liability hereunder, or any party primarily or secondarily liable for all or any portion of the Obligations; and (E) any duty or obligation of Lender to proceed to collect all or any portion of the Obligations from, or to commence an action against, any Obligor or other Person, or to resort to any Collateral or to any balance of any deposit account or credit on the books of Lender in favor of any Obligor or any other Person, despite any notice or request of any of any Obligor to do so.

12.3    **Continuing Obligations; Reinstatement.**

The obligations of the Obligors under this Agreement are continuing obligations and shall continue in full force and effect until Full Payment of the Obligations. The obligations of Obligors under this Agreement shall continue to be effective or be automatically reinstated, as the case may be, if any payment made by an Obligor on, under or in respect of any of the Obligations is rescinded or must otherwise be restored or returned by the recipient in any Insolvency Proceeding of an Obligor or its subsidiary or otherwise, all as though such payment had not been made. If an event permitting the acceleration of all or any portion of the Obligations shall at any time have occurred and be continuing, and such acceleration shall at such time be stayed, enjoined or otherwise prevented for any reason, including because of the pendency of any Insolvency Proceeding of an Obligor or its subsidiary, for purposes of this Agreement and the obligations of the Obligors hereunder, such Obligations shall be deemed to have been accelerated with the same effect as if such Obligations had been accelerated in accordance with the terms of the applicable Loan Documents or of this Agreement.

12.4    **Waivers and Acknowledgments.**

Each Obligor hereby unconditionally and irrevocably waives:

(i)    Promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and any requirement that Lender protect, secure, perfect or insure any Lien or any Property subject thereto or exhaust any right or take any action against any Obligor or any other Person or any Collateral;

- 18 -

     (ii)    Any defense based upon an election of remedies by Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution, indemnification or other rights of such Obligor to proceed against any other Obligor, any other Person or any Collateral, and any defense based on any right of setoff or counterclaim against or in respect of the obligations of such Obligor hereunder;

     (iii)    Any duty on the part of Lender to disclose to such Obligor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, Property or prospects of any other Obligor or any of its subsidiaries now or hereafter known by Lender;

     (iv)    All rights that it may have now or in the future under any Applicable Law to compel Lender to marshal any assets or to proceed against any Person or security for the payment or performance of any of the Obligations before, or as a condition to, proceeding against such Obligor; and

     (v)    All other defenses available to a surety, guarantor or accommodation co-obligor other than Full Payment of all of the Obligations.

Each Obligor acknowledges that it will receive substantial direct and indirect benefits from the financing and arrangements contemplated by the Loan Documents and that the waivers set forth herein are knowingly made in contemplation of such benefits.

12.5    **Additional Security, Etc.**

  Obligors authorize Lender, without notice to or demand on the Obligors and without affecting their liability hereunder, from time to time (a) to obtain additional or substitute endorsers or guarantors; (b) to exercise or refrain from exercising any rights against, and grant indulgences to, any Obligor or others; and (c) to apply any sums, by whomsoever paid or however realized, to the payment of the principal of, premium, if any, and interest on, and other obligations consisting of, the Obligations.  Each Obligor waives any right to require Lender to proceed against any additional or substitute endorsers or guarantors or any other Obligor or any other Person or to pursue any other remedy available to Lender.

12.6    **Information Concerning Obligors.**

  Each Obligor assumes full responsibility for being informed of the financial condition and assets of all Obligors and their respective Affiliates, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks which each Obligor assumes hereunder, and agrees that no Lender shall have any duty to advise any Obligor of information known to Lender regarding or in any manner relevant to any of such circumstances or risks.

12.7    **Deferral of Reimbursement and Other Rights.**

  Each Obligor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against any Obligor that arise from the existence, payment, performance or enforcement of such Obligor's obligations under or in respect of any Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Lender against any Obligor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Obligor, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right, unless and until Full Payment of all Obligations.  If any amount shall be paid to any Obligor in violation of the immediately preceding sentence, such amount shall be received and held in trust for the benefit of Lender, shall be segregated from the property and funds of such Obligor and shall forthwith be paid or delivered to Lender in the same form received (with the addition of any necessary endorsement or assignment) to be credited and applied to the Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents or to be held as collateral security for any Obligations then existing or thereafter arising.

12.8    **Subordination.**

14612211/043245.0272

Each Obligor hereby subordinates any and all debts, liabilities and other obligations owed to such Obligor by any other Obligor (the "***Insider Subordinated Debt***") to the Full Payment of the Obligations, and no Obligor shall demand, accept or take any action to collect any payment on account of any Insider Subordinated Debt at any time. In any Insolvency Proceeding relating to any Obligor, each Obligor agrees that Lender shall be entitled to receive Full Payment of all Obligations (including all interest, fees and expenses accruing after the commencement of such Insolvency Proceeding, whether or not constituting an allowed claim in such Insolvency Proceeding ("***Post-Petition Interest***")) before such Obligor receives any payment of any Insider Subordinated Debt. At any time a Default or an Event of Default exists, each Obligor shall collect, enforce and receive payments on account of any Insider Subordinated Debt as trustee for Lender and shall deliver such payments to Lender on account of the Obligations, including all Post-Petition Interest and other charges, together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Obligor under this Agreement. At any time an Event of Default exists, Lender is authorized and empowered (but without any obligation to do so), in its discretion, (i) in the name of each Obligor, to collect and enforce, and to submit claims in respect of, any Insider Subordinated Debt and to apply any amounts received thereon to the Obligations (including any and all Post-Petition Interest), and (ii) to require each Obligor (A) to collect and enforce, and to submit claims in respect of, any Insider Subordinated Debt and (B) to pay any amounts received on such obligations to Lender for application to the Obligations (including any and all Post-Petition Interest).

      12.9    <u>**Contribution.**</u>

If and to the extent any Obligor shall make a payment under this Agreement (a "***Co-Obligor Payment***") which, taking into account all other Co-Obligor Payments then previously or concurrently made by any other Obligor, exceeds the amount that otherwise would have been paid by or attributable to such Obligor if each Obligor had paid the aggregate Obligations satisfied by such Co-Obligor Payment in the same proportion as such Obligor's "Allocable Amount" (as defined below) (as determined immediately prior to such Co-Obligor Payment) bore to the aggregate Allocable Amounts of each of the Obligors as determined immediately prior to the making of such Co-Obligor Payment, then, following indefeasible Full Payment of the Obligations, such Obligor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Obligor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Co-Obligor Payment. As of any date of determination, the "***Allocable Amount***" of any Obligor shall be equal to the excess of the fair saleable value of the property of such Obligor over the total liabilities of such Obligor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Obligor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Obligors as of such date in a manner to maximize the amount of such contributions. This **Section 12.9** is intended only to define the relative rights of the Obligors, and nothing set forth herein is intended to or shall impair the obligations of Obligors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement. The parties acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Obligor or Obligors to which such contribution and indemnification is owing.

SECTION 13.    **NOTICES**

      13.1    <u>**Notices Generally.**</u>

Except as provided in **Section 13.2** below, all notices given under this Agreement shall be in writing and shall be given by hand delivery by a reputable overnight courier or private delivery service, by regular first-class mail or certified mail return receipt requested, addressed to Lender or Borrower Agent at the address set forth for notices in the Terms Schedule, or by facsimile transmission to Borrower Agent or Lender at the facsimile number set forth in the Terms Schedule, or such other address or facsimile number as may be designated in writing by one party to the other delivered in accordance with the provisions hereof. In no event shall a voicemail message be effective as a notice, communication or confirmation under any of the Loan Documents. Any written notice, request or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice, request or demand is actually received by the individual to whose attention at the noticed party such notice, request or demand is required to be sent.

      13.2    <u>**Electronic Communications.**</u>

14612211/043245.0272

With respect to electronic communications:

(i)     Borrower authorizes Lender to extend Loans and transfer funds to or on behalf of Borrowers based on instructions sent by electronic mail.

(ii)     Electronic mail may be used for delivery of financial statements and other information required by **Section 8.5** (other than notices), administrative matters and distribution of Loan Documents for execution, pursuant to procedures approved by Lender or as otherwise determined by Lender. Anything herein to the contrary notwithstanding, except as expressly provided **Section 13.2(i)**, notices delivered by electronic mail may not be used as effective notice under the Loan Documents.

(iii)     Unless Lender otherwise requires, communications sent to an electronic mail address of Lender shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgement); provided that if such communication is not sent during the normal business hours of the recipient, such communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(iv)     Lender shall not have any liability for any loss suffered by any Obligor as a result of Lender's acting upon its understanding of electronic mail requests or instructions from a Person believed in good faith by Lender to be a Person authorized to give such requests or instructions on an Obligor's behalf. Each Obligor shall indemnify, defend and hold harmless each Indemnitee from any claims arising from any electronic communication purportedly given by or on behalf of an Obligor.

(v)     Lender may, in its discretion and upon notice Borrower (A) cease or suspend any actual or implied obligation it may have to act based on such electronic communications and (B) thereafter, disregard any such electronic communications.

(vi)     Notwithstanding the foregoing, no notice to or upon Lender pursuant to **Sections 6.1, 8.1(i)** or **11.2** shall be effective until after actually received by the individual to whose attention at Lender such notice is required to be sent.

SECTION 14.    **CONVERSION OPTION**

14.1    <u>**Grant of Option.**</u>

Borrower hereby irrevocably grants to Lender the right and option (the "***Option Right***") to purchase thirty percent (30.00%) (measured at the time the Option Right is exercised) of Borrower's issued and outstanding limited liability company membership interests on a fully diluted, as-converted basis, including all equity securities issued by Borrower or convertible into equity securities issued by Borrower (the "***Option Interest***"). The Option Right and the Option Interest shall apply to and be enforceable against Borrower and any and all of Borrower's successors and assigns whether by assignment, merger, or operation of applicable law. In the event that at the time the Option Right is exercised, Borrower has issued more than one class of equity securities, the Option Interest shall be *pari passu* with Borrower's most senior voting securities with the most senior voting, preferential and liquidation rights.

14.2    <u>**Exercise Price.**</u>

The exercise price for the Option Interest shall equal $400,000.00 and shall be paid by Lender to Borrower by offset against Borrower's Obligations under the Second Advance Note on the date the Option Interest is acquired by Lender (the "***Option Acquisition Date***"). No other consideration shall be paid by Lender to Borrower in exchange for the Option Interest.

14.3    <u>**Option Term.**</u>

Lender may, in accordance with the terms of this Agreement, exercise the Option Right at any time on or before the Obligations are paid in full (the "***Expiration Date***"); provided that should Borrower elect to prepay all or any portion of the Obligations prior to January 1, 2023, Lender may, in lieu of accepting such prepayment, exercise its Option

- 21 -

Right.  If the Option Right is not exercised prior to the Expiration Date it shall automatically terminate, and Lender shall have no further rights whatsoever with respect to Borrower or any ownership interest therein.

### 14.4    Exercise of Option.

The Option Right may be exercised by written notice to Borrower (the "*Option Notice*").  The Option Notice shall state the election to exercise the Option Right, and shall be signed by Lender.  Lender shall include with the Option Notice a payoff letter addressed to Borrower and signed by Lender indicating that upon issuance of the Option Interest to Lender, Borrower shall have been deemed to have made a $400,000.00 payment on the Second Advance Note. Upon issuance of the Option Interest to Lender pursuant to its exercise of the Option Right, Lender and the other members of Borrower shall enter into an amendment to the Second Amended and Restated Operating Agreement of Borrower in the form attached to the Agreement as **Exhibit 4** (the "*Operating Agreement Amendment*").  Execution of the Operating Agreement Amendment by Lender and the other members of Borrower shall be a condition precedent to the exercise of the Option Right and the issuance of the Option Interest.  If the members of Borrower refuse to execute the Operating Agreement Amendment in connection with Lender's exercise of the Option Right, such refusal shall be deemed an Event of Default. In addition, in connection with Lender's exercise of the Option Right, at Lender's reasonable request, Borrower shall execute and deliver to Lender such instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Lender may reasonably request in order to fully consummate the issuance of the Option Interest to Lender.

### 14.5    Change in Control.

If Borrower engages in any transaction that results in a Change in Control, Borrower shall provide Lender with written notice of such Change in Control and Lender may immediately exercise all or any part of the Option Right.

## SECTION 15.    GENERAL PROVISIONS

### 15.1    Miscellaneous.

This Agreement has been accepted by Lender in the State of Arizona, is a contract that has been made in the State of Arizona and shall be governed by and construed in accordance with the internal laws of the State of Arizona (without giving effect to its conflict of law rules); may not be amended, except by written agreement of Borrower and Lender; expresses the entire understanding of the parties hereto with respect to the subject matter hereof; may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute but one and the same instrument; and shall be binding upon and inure to the benefit of the parties and their respective successors and assigns (provided that no Obligor may assign or transfer any of its rights under this Agreement or other Loan Documents without the prior written consent of Lender).  The paragraph and section headings in this Agreement are for convenience of reference only and shall not affect the substantive meaning of any provision of this Agreement. Time is of the essence of this Agreement and all of the other Loan Documents.

### 15.2    Assignment by Lender.

Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement and the Notes (including all or a portion of the Loans at the time owing to it and all or a portion of the Option Right).

### 15.3    Consent to Forum.

Each Borrower hereby consents to the non-exclusive jurisdiction of any United States federal court sitting in or with direct or indirect jurisdiction over the District of Arizona or in any Arizona state or superior court sitting in Maricopa County, Arizona, in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents and each Borrower irrevocably agrees that all claims and demands in respect of any such action, suit or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such action, suit or proceeding brought in any such court or that such court is an inconvenient forum.  Nothing herein shall limit the right of Lender to bring proceedings against any Obligor or with respect to any Collateral in the courts of any other jurisdiction.  Any judicial proceeding commenced by any Borrower against Lender involving, directly or indirectly, any matter in any way arising out of, related to or connected with any

- 22 -

Loan Document shall be brought only in a United States federal court sitting in or with direct jurisdiction over the District of Arizona or in any Arizona state or superior court sitting in Maricopa County, Arizona. Nothing in this Agreement shall be deemed to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

15.4 **Waivers by Obligors.**

**To the fullest extent permitted by Applicable Law, each Obligor waives (i) the right to trial by jury (which Lender hereby also waives) in any action, suit, proceeding or counterclaim of any kind arising out of or related to any of the Loan Documents, the Obligations or the Collateral; (ii) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all Accounts, contract rights, Documents, Instruments, Chattel Paper and guaranties at any time held by Lender on which such Obligor may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (iii) notice prior to taking possession or control of the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; (iv) the benefit of all valuation, appraisement and exemption laws; (v) any claim against Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in respect of any claim for breach of contract or any other theory of liability arising out of, or the taking of any enforcement action, or related to any of the Loan Documents, any transaction thereunder or the use of the proceeds of any Loans; and (vi) notice of Lender's acceptance of this Agreement or any other Loan Document. Each Obligor acknowledges that the foregoing waivers are a material inducement to Lender's entering into this Agreement and that Lender is relying upon the foregoing waivers in its future dealings with such Obligor. Each Obligor warrants and represents that it has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.**

15.5 **Amended and Restated Agreement.**

This Agreement amends and restates in its entirety the Existing Loan Agreement. All outstanding advances and all accrued and unpaid interest under the Existing Loan Agreement shall automatically be outstanding Advances and accrued and unpaid interest under this Agreement. Borrower has no claims, counterclaims, defenses, or set-offs with respect to the Existing Loan Agreement or the loans or the loan documents described therein. Borrower fully, finally, and absolutely and forever releases and discharges Lender and its present and former managers, members, directors, officers, employees, agents, representatives, successors and assigns, and their separate and respective heirs, personal representatives, successors and assigns, from any and all actions, causes of action, claims, debts, damages, demands, liabilities, obligations, and suits, of whatever kind or nature, in law or equity of Borrower, whether now known or unknown to Borrower, and whether contingent or matured, (i) in respect of the Existing Loan Agreement, or the actions or omissions of Lender in respect of the loans or the loan documents described therein, and (ii) arising from events occurring prior to the date of this Agreement.

[Remainder of page intentionally left blank;
signatures begin on following page.]

14612211/043245.0272

IN WITNESS WHEREOF, Borrower, the Subsidiary Guarantors and Lender have caused this Agreement to be signed, sealed and delivered by their duly authorized officers or agents as of the date set forth above.

BORROWER:

**32BGOALZ RESTAURANT GROUP, LLC,**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

SUBSIDIARY GUARANTORS:

**GOALZ CD POOLER GA, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DQ DENVER NC, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DAIRY FT. PIERCE FL, LLC**
a Florida limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DH CO SPRINGS CO, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DH GEORGETOWN KY 111, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

14612211/043245.0272

**GOALZ DH IL 107, LLC**
an Illinois limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DH IL 109, LLC**
an Illinois limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DH SLIDELL LA 112, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP COWY, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP FLA, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP KTY, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP NCSC, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

[Signatures continue on following page.]

14612211/043245.0272

Accepted by Lender in Phoenix, Arizona:

**HIP LENDING GROUP, LLC**

By: _____

    **Craig Hannay**

14612211/043245.0272

## SCHEDULE A

### Fee Schedule

This Fee Schedule is an integral part of, and is incorporated into, that certain Loan, Guaranty and Security Agreement dated as of March 14, 2019, among **32BGOALZ RESTAURANT GROUP1B, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "*Loan Agreement*"), and is the "Fee Schedule" referenced therein.  Capitalized terms not otherwise defined in this Fee Schedule have the meanings ascribed to such terms in the Loan Agreement.

1.      The fees and expense reimbursements listed on this Schedule are in addition to any fees listed in the Loan Agreement, any of the Loan Documents or subsequently agreed to by Lender and Obligors, and are not intended to exclude any expenses for which Obligors are required to reimburse Lender under the Loan Agreement or any of the Loan Documents.

2.      Obligors jointly and severally agree to pay to Lender:

(a)      **Lender's Expenses**.  Borrower shall reimburse Lender for (i) any Extraordinary Expenses incurred by Lender and (ii) all legal, accounting, consulting and other fees and expenses suffered or incurred by Lender in connection with (a) the negotiation and preparation of any of the Loan Documents and any amendment or modification thereto; (b) the administration of the Loan Documents and the transactions contemplated thereby; (c) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral, including any and all Lien search fees, credit inquiry and investigation fees and costs; or (d) any effort by Lender to verify or appraise any of the Collateral which fees and expenses of subsection (ii) shall not exceed $10,000.  If any of the Obligations are collected by or through an attorney at law, then Borrower shall be obligated to pay, in addition to all principal and interest in respect of the Obligations, Lender's attorneys' fees and court costs as provided in **Section 9.2** of the Agreement.  All such expenses shall be payable to Lender on demand.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the indemnification or reimbursement by Borrower of claims suffered or incurred by Lender.

All of the foregoing fees shall continue to accrue until Full Payment.  Fees that accrue on a monthly or other periodic basis shall be due and payable on the dates set forth above; provided, however, if the Loan Agreement expires or is terminated on a day other than the last day of a month, then any such fee shall be due and payable upon such termination or expiration and shall nevertheless be payable in full on the effective date of such expiration of termination.  Fees and expenses shall be due and payable on the dates set forth in the Loan Documents or, if no date is provided, the same shall be payable on demand.

## SCHEDULE B

### Terms Schedule

This Terms Schedule is an integral part of, and is incorporated into, that certain Loan and Security **Agreement** dated as of March 14, 2019, among **32BGOALZ RESTAURANT GROUP1B, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "*Loan Agreement*"), and is the "Terms Schedule" referenced therein. Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

1.   **Loan Terms:**

    (a)   Maximum Loan Amount: $1,800,000.00.

    (b)   Maturity Date: January 1, 2023.

    (c)   Loan Payments for First Advance: 36 equal payments of accrued interest and principal commencing on January 1, 2020.

    (d)   Loan Payments for Second Advance: Interest only payments monthly commencing on January 1, 2020.

3.   **Interest (§ 4):**

    (a)   Interest Rate: 15.0% per annum.

    (b)   Default Rate: Ten percentage points (10.0%) in excess of the otherwise applicable rate.

4.   **Guarantors:** All Borrower's Subsidiaries and Shawn Eby and Corey Hupp.

5.   **Additional Covenants:** N/A

11.   **Additional Events of Default (§ 9):** N/A

12.   **Notice Addresses:**

    (a)   If to Borrowers:

        32BGOALZ RESTAURANT GROUP1B, LLC
        9432 Aspen Pointe Lane
        Cheyenne, WY  82009

        Phone number:     307-630-2277
        E-mail address:  shawn@goalzllc.com

(b)     If to Lender:

HIP Lending Group, LLC
2999 N. 44th Street
Suite 400
Phoenix, Arizona 85018
Attn:  Craig Hannay

Phone number:          602-374-2000
E-mail address: channay@hannayra.com

with a copy (which shall not constitute notice) to:

Fennemore Craig
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
Attn: C.W. Ross, Esq.
Facsimile No.: (602) 916-5503

14612211/043245.0272

## SCHEDULE C

[Reserved]

## SCHEDULE D

<u>Capital Structure</u>

This Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of March 14, 2019, among **32BGOALZ RESTAURANT GROUP1B, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and is the "Terms Schedule" referenced therein. Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

| Record Owner | Percent of Equity Interests |
|---|---|
| Shawn Eby | 55% |
| RCH – Goalz Holdings, LLC, an Arizona limited liability company | 15% |
| Corey Hupp | 30% |
| | |
| | |
| **TOTAL** | **100.0%** |

## SCHEDULE E

Locations and Jurisdictions in which
each Borrower is Authorized to Do Business

This Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of March 14, 2019, among **32BGOALZ RESTAURANT GROUP1B, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and is the "Terms Schedule" referenced therein. Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

**Chief Executive Offices**

9432 Aspen Pointe Lane
Cheyenne, WY 82009

**Other Locations:**

None.

**Jurisdictions (Include Legal Name and all Trade Names Used in the Last 5 Years)***

| Legal Name | Type of Entity | State | Organization Number |
|---|---|---|---|
| Goalz CD Pooler GA, LLC | LLC | WY | |
| Goalz Dairy Ft. Pierce FL, LLC | LLC | FL | |
| Goalz DQ Denver NC, LLC | LLC | WY | |
| Goalz DH CO Springs CO, LLC | LLC | WY | |
| Goalz DH Georgetown KY 111, LLC | LLC | WY | |
| Goalz DH IL107, LLC | LLC | IL | |
| Goalz DH IL 109, LLC | LLC | IL | |
| Goalz DH Slidell LA 112, LLC | LLC | WY | |
| Goalz Restaurant Group, LLC | LLC | WY | |
| Goalz Restaurant Group COWY, LLC | LLC | WY | |
| Goalz Restaurant Group FLA, LLC | LLC | WY | |
| Goalz Restaurant Group KTY, LLC | LLC | WY | |
| | | | |
| | | | |

**EXHIBIT 1**

Form of Amended and Restated First Advance Note

(See attached)

## AMENDED AND RESTATED
## SECURED PROMISSORY NOTE

**$800,000.00**                                          **March 14, 2019**
                                                         **Phoenix, Arizona**

FOR VALUE RECEIVED, the undersigned, **32BGOALZ RESTAURANT GROUP1B, LLC**, a Wyoming limited liability company ("Borrower"), hereby promises to pay to the order of **HIP LENDING GROUP, LLC** ("Lender"), at Lender's main office in Phoenix, Arizona, or at such other place as Lender may designate, the principal sum of EIGHT HUNDRED THOUSAND AND NO/100 DOLLARS ($800,000.00) or so much thereof as may from time to time be outstanding as Advances under that certain Amended and Restated Loan, Guaranty and Security Agreement dated March 14, 2019 by and among Borrower, Borrower's Subsidiaries and Lender (as at any time amended, restated, modified or supplemented, the "Loan Agreement"), together with interest thereon, at the times and on the terms set forth herein and in the Loan Agreement. Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

Interest shall accrue on the unpaid principal balance of this Amended and Restated Secured Promissory Note (this "Note") at a fixed rate per annum equal to the "Interest Rate" set forth in the Terms Schedule.

Interest on this Note shall accrue daily from the date of the First Advance, and commencing on January 1, 2020 shall be due and payable monthly, in arrears, on the first day of each month until the full principal amount and accrued interest in respect of this Note are paid in full. Upon and after the occurrence of any Event of Default and during the continuance thereof, interest shall accrue and be payable at a per annum rate described as the "Default Rate" in the Terms Schedule plus the otherwise applicable rate of interest. Interest shall be calculated on the basis of actual days elapsed in a year of 360 days. All payments received in respect of this Note may be applied by Lender first to accrued interest and other charges due and owing to Lender and any remaining amount may be applied to the principal balance hereof. Borrower may prepay all or part of this Note without penalty.

If not sooner repaid, accrued interest and the principal balance of this Note shall be paid in 36 equal monthly installments commencing on January 1, 2020 and payable on the first day of each month thereafter until paid in full. The entire principal balance of this Note shall be due and payable in full, together with all interest, fees and other charges hereunder, on January 1, 2023 and as otherwise provided in **Section 9.2** of the Loan Agreement.

This Note is the First Advance Note referred to in the Loan Agreement, evidences the unpaid balance of First Advance under the Loan Agreement, is secured by the Collateral, and is entitled to all the benefits of the Loan Agreement. Lender, from time to time will make Advances as contemplated by the Loan Agreement and accept payments in accordance with and subject to the provisions of the Loan Agreement, and therefore the amount outstanding under this Note may vary.

It is the intention of Lender and Borrower to conform strictly to Applicable Law relating to maximum interest charges. Accordingly, if any provision of this Note would violate any Applicable Law governing the Highest Lawful Rate (as defined below), then, in that event, notwithstanding anything to the contrary in this Note, the following will apply: the aggregate of all payments that constitute interest under Applicable Law that are contracted for, taken, reserved, charged, or received by Lender under this Note shall under no circumstances be in an amount or at a rate that would otherwise cause a violation of such law or exceed the Highest Lawful Rate (as defined below), and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of Lender, be credited by Lender on the principal amount of any Obligations or refunded by Lender to Borrower. The term "Highest Lawful Rate" means the maximum interest rate that at any time or from time to time may be lawfully contracted for, taken, reserved, charged, or received on amounts due to Lender, under laws applicable to Borrower or Lender with regard to this Note that are presently in effect or, to the extent allowed by law, under such Applicable Law that then allows a higher maximum lawful rate than Applicable Law now allows.

The occurrence of an Event of Default shall entitle Lender, at any time and without notice to or demand upon any Borrower or any Obligor, to declare the entire unpaid principal balance hereof and all accrued interest hereon to be, and the same shall thereupon become, immediately due and payable.

Upon termination of the Loan Agreement pursuant to **Section 11.2** of the Loan Agreement, all Obligations (including, without limitation, those evidenced by this Note) shall become immediately due and payable without further notice to or demand upon any Obligor.

Time is of the essence of this Note.

Borrower hereby waives demand, presentment, notice, protest and notice of dishonor and diligence in collection or bringing suit and agrees that Lender may accept partial payment, or release or exchange security or Collateral, without discharging or releasing any unreleased Collateral or the Obligations evidenced hereby. Lender shall not be deemed to waive or have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by an authorized agent of Lender, and no failure, delay or omission by Lender in exercising any of its rights or remedies shall operate as a waiver of such rights or remedies. A waiver by Lender in writing on one occasion shall not be construed as a consent to or a waiver of any right or remedy on any future occasion.

If this Note is collected by or through an attorney at law, Borrower shall be obligated to pay, in addition to the unpaid principal balance and accrued interest, reasonable attorneys' fees plus court costs.

This Note has been delivered in the State of Arizona, is intended to take effect as a contract under seal under the laws of the State of Arizona, and shall be governed in all respects by and construed in accordance with the internal laws of the State of Arizona. This Note shall be binding upon Borrower and its respective successors and assigns.

BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS NOTE, THE OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY LENDER WHICH MAY IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISE OUT OF OR RELATE TO THE RELATIONSHIP BETWEEN SUCH BORROWER AND LENDER.

[Remainder of page intentionally left blank;
signatures begin on following page.]

14612211/043245.0272

IN WITNESS WHEREOF, Borrower has caused this Note to be executed by its duly authorized person and has delivered this Note to Lender, on the day and year first above written.

BORROWERS:

**32BGOALZ RESTAURANT GROUP1B, LLC,**
a Wyoming limited liability company


By: _____
Shawn Eby, authorized person

14612211/043245.0272

**EXHIBIT 2**

Form of Second Advance Note

(See attached)

## SECURED PROMISSORY NOTE

**$1,000,000.00**
                                                                    **March 14, 2019**
                                                                    **Phoenix, Arizona**

FOR VALUE RECEIVED, the undersigned, **32BGOALZ RESTAURANT GROUP1B, LLC**, a Wyoming limited liability company ("Borrower"), hereby promises to pay to the order of **HIP LENDING GROUP, LLC** ("Lender"), at Lender's main office in Phoenix, Arizona, or at such other place as Lender may designate, the principal sum of ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) or so much thereof as may from time to time be outstanding as Advances under that certain Amended and Restated Loan, Guaranty and Security Agreement dated March 14, 2019 by and among Borrower, Borrower's Subsidiaries and Lender (as at any time amended, restated, modified or supplemented, the "Loan Agreement"), together with interest thereon, at the times and on the terms set forth herein and in the Loan Agreement. Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

Interest shall accrue on the unpaid principal balance of this Secured Promissory Note (this "Note") at a fixed rate per annum equal to the "Interest Rate" set forth in the Terms Schedule.

Interest on this Note shall accrue daily from the date of the First Advance, and commencing on January 1, 2020 shall be due and payable monthly, in arrears, on the first day of each month until the full principal amount and accrued interest in respect of this Note are paid in full. Upon and after the occurrence of any Event of Default and during the continuance thereof, interest shall accrue and be payable at a per annum rate described as the "Default Rate" in the Terms Schedule plus the otherwise applicable rate of interest. Interest shall be calculated on the basis of actual days elapsed in a year of 360 days. All payments received in respect of this Note may be applied by Lender first to accrued interest and other charges due and owing to Lender and any remaining amount may be applied to the principal balance hereof. Borrower may prepay all or part of this Note without penalty; provided that should Borrower elect to prepay all or any portion of the amount owned hereunder, Lender may, in lieu of accepting such prepayment, exercise its option contemplated by **Section 14** of the Loan Agreement.

If not sooner repaid, accrued and unpaid interest and the entire principal balance of this Note shall be due and payable in full, together with all interest, fees and other charges hereunder, on January 1, 2023 and as otherwise provided in **Section 9.2** of the Loan Agreement; provided that should Borrower elect to prepay all or any portion of the amount owned hereunder, Lender may, in lieu of accepting such prepayment, exercise its option contemplated by **Section 14** of the Loan Agreement.

This Note is the Second Advance Note referred to in the Loan Agreement, evidences the unpaid balance of the Second Advance under the Loan Agreement, is secured by the Collateral, and is entitled to all the benefits of the Loan Agreement. Lender, from time to time will make Advances as contemplated by the Loan Agreement and accept payments in accordance with and subject to the provisions of the Loan Agreement, and therefore the amount outstanding under this Note may vary.

It is the intention of Lender and Borrower to conform strictly to Applicable Law relating to maximum interest charges. Accordingly, if any provision of this Note would violate any Applicable Law governing the Highest Lawful Rate (as defined below), then, in that event, notwithstanding anything to the contrary in this Note, the following will apply: the aggregate of all payments that constitute interest under Applicable Law that are contracted for, taken, reserved, charged, or received by Lender under this Note shall under no circumstances be in an amount or at a rate that would otherwise cause a violation of such law or exceed the Highest Lawful Rate (as defined below), and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of Lender, be credited by Lender on the principal amount of any Obligations or refunded by Lender to Borrower. The term "Highest Lawful Rate" means the maximum interest rate that at any time or from time to time may be lawfully contracted for, taken, reserved, charged, or received on amounts due to Lender, under laws applicable to Borrower or Lender with regard to this Note that are presently in effect or, to the extent allowed by law, under such Applicable Law that then allows a higher maximum lawful rate than Applicable Law now allows.

14612211/043245.0272

The occurrence of an Event of Default shall entitle Lender, at any time and without notice to or demand upon any Borrower or any Obligor, to declare the entire unpaid principal balance hereof and all accrued interest hereon to be, and the same shall thereupon become, immediately due and payable.

Upon termination of the Loan Agreement pursuant to **Section 11.2** of the Loan Agreement, all Obligations (including, without limitation, those evidenced by this Note) shall become immediately due and payable without further notice to or demand upon any Obligor.

Time is of the essence of this Note.

Borrower hereby waives demand, presentment, notice, protest and notice of dishonor and diligence in collection or bringing suit and agrees that Lender may accept partial payment, or release or exchange security or Collateral, without discharging or releasing any unreleased Collateral or the Obligations evidenced hereby.  Lender shall not be deemed to waive or have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by an authorized agent of Lender, and no failure, delay or omission by Lender in exercising any of its rights or remedies shall operate as a waiver of such rights or remedies.  A waiver by Lender in writing on one occasion shall not be construed as a consent to or a waiver of any right or remedy on any future occasion.

If this Note is collected by or through an attorney at law, Borrower shall be obligated to pay, in addition to the unpaid principal balance and accrued interest, reasonable attorneys' fees plus court costs.

This Note has been delivered in the State of Arizona, is intended to take effect as a contract under seal under the laws of the State of Arizona, and shall be governed in all respects by and construed in accordance with the internal laws of the State of Arizona.  This Note shall be binding upon Borrower and its respective successors and assigns.

BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS NOTE, THE OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY LENDER WHICH MAY IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISE OUT OF OR RELATE TO THE RELATIONSHIP BETWEEN SUCH BORROWER AND LENDER.

[Remainder of page intentionally left blank;
signatures begin on following page.]

14612211/043245.0272

IN WITNESS WHEREOF, Borrower has caused this Note to be executed by its duly authorized person and has delivered this Note to Lender, on the day and year first above written.

BORROWERS:

**32BGOALZ RESTAURANT GROUP1B, LLC,**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

**EXHIBIT 3**

<u>Subordinated Debt</u>

None.

**EXHIBIT 4**

<u>Operating Agreement Amendment</u>

(see attached)

# EXHIBIT E

**SECOND AMENDED AND RESTATED
LOAN, GUARANTY AND SECURITY AGREEMENT**

with

**GOALZ RESTAURANT GROUP, LLC,**
as Borrower

**CERTAIN SUBSIDIARIES OF GOALZ RESTAURANT GROUP, LLC,**
as Subsidiary Guarantors,

and

**HIP LENDING GROUP, LLC,**

as Lender

**April 29, 2019**

15369874.1/043245.0272

# TABLE OF CONTENTS

Page No.

**SECTION 1.    DEFINITIONS AND RULES OF CONSTRUCTION** ........ - 1 -
  1.1  Defined Terms. ........ - 1 -
  1.2  Accounting Terms. ........ - 6 -
  1.3  UCC Terms. ........ - 6 -
  1.4  Rules of Construction. ........ - 6 -
**SECTION 2.    LOAN ADVANCES** ........ - 6 -
  2.1  Advances. ........ - 6 -
  2.2  First Advance. ........ - 6 -
  2.3  Second Advance. ........ - 6 -
  2.4  Existing Member Notes. ........ - 6 -
  2.5  Disbursement of Advances; Use of Proceeds. ........ - 6 -
  2.6  Loan Repayment. ........ - 6 -
**SECTION 3.    CONDITIONS PRECEDENT** ........ - 7 -
  3.1  Initial Conditions Precedent. ........ - 7 -
  3.2  Ongoing Conditions Precedent. ........ - 7 -
**SECTION 4.    INTEREST, FEES AND EXPENSES; LOAN ACCOUNT** ........ - 8 -
  4.1  Interest. ........ - 8 -
  4.2  Fees and Expenses. ........ - 8 -
  4.3  Expense Reimbursement. ........ - 8 -
  4.4  Maximum Interest. ........ - 8 -
**SECTION 5.    COLLATERAL** ........ - 8 -
  5.1  Grant of Security Interest. ........ - 8 -
  5.2  [Reserved]. ........ - 9 -
  5.3  Further Assurances. ........ - 9 -
**SECTION 6.    LOAN ADMINISTRATION** ........ - 9 -
  6.1  Payments. ........ - 9 -
**SECTION 7.    REPRESENTATIONS AND WARRANTIES** ........ - 9 -
  7.1  General. ........ - 9 -
**SECTION 8.    COVENANTS** ........ - 11 -
  8.1  Affirmative Covenants. ........ - 11 -
  8.2  Additional Subsidiaries. ........ - 12 -
  8.3  Negative Covenants. ........ - 12 -
  8.4  [Reserved]. ........ - 13 -
  8.5  Reporting Covenants. ........ - 13 -
  8.6  [Reserved]. ........ - 13 -
**SECTION 9.    EVENTS OF DEFAULT AND REMEDIES** ........ - 13 -
  9.1  Events of Default. ........ - 13 -
  9.2  Remedies. ........ - 15 -
**SECTION 10.    INDEMNITY** ........ - 15 -
  10.1  Indemnity. ........ - 15 -
**SECTION 11.    TERM AND TERMINATION** ........ - 15 -
  11.1  Term. ........ - 15 -
  11.2  Termination. ........ - 15 -
  11.3  Effect of Termination. ........ - 16 -
**SECTION 12.    GUARANTY** ........ - 16 -
  12.1  Joint and Several Obligations. ........ - 16 -
  12.2  Obligations Absolute. ........ - 16 -
  12.3  Continuing Obligations; Reinstatement. ........ - 17 -
  12.4  Waivers and Acknowledgments. ........ - 17 -
  12.5  Additional Security, Etc. ........ - 18 -
  12.6  Information Concerning Obligors. ........ - 18 -
  12.7  Deferral of Reimbursement and Other Rights. ........ - 18 -

| | | |
|---|---|---:|
| 12.8 | Subordination. | - 18 - |
| 12.9 | Contribution. | - 19 - |
| **SECTION 13.** | **NOTICES** | **- 19 -** |
| 13.1 | Notices Generally. | - 19 - |
| 13.2 | Electronic Communications. | - 19 - |
| **SECTION 14.** | **conversion option** | **- 20 -** |
| 14.1 | Grant of Option. | - 20 - |
| 14.2 | Exercise Price. | - 20 - |
| 14.3 | Option Term. | - 20 - |
| 14.4 | Exercise of Option. | - 20 - |
| 14.5 | Change in Control. | - 21 - |
| **SECTION 15.** | **GENERAL PROVISIONS** | **- 21 -** |
| 15.1 | Miscellaneous. | - 21 - |
| 15.2 | Assignment by Lender. | - 21 - |
| 15.3 | Consent to Forum. | - 21 - |
| 15.4 | Waivers by Obligors. | - 21 - |
| 15.5 | Amended and Restated Agreement | - 22 - |

## SCHEDULES

| | | |
|---|---|---|
| Schedule A | -- | Fee Schedule |
| Schedule B | -- | Terms Schedule |
| Schedule C | -- | [Reserved] |
| Schedule D | -- | Capital Structure |
| Schedule E | -- | Locations and Jurisdictions in Which Each Obligor is Authorized to do Business |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit 1 | -- | Form of Second Amended and Restated First Advance Note |
| Exhibit 2 | -- | Form of Amended and Restated Second Advance Note |
| Exhibit 3 | -- | Subordinated Debt |
| Exhibit 4 | -- | Operating Agreement Amendment |

15369874.1/043245.0272

## SECOND AMENDED AND RESTATED
## LOAN, GUARANTY AND SECURITY AGREEMENT

THIS SECOND AMENDED AND RESTATED LOAN, GUARANTY AND SECURITY AGREEMENT (as amended, restated, modified or supplemented from time to time, this *"Agreement"*) is entered into effective as of April 29, 2019, among **HIP LENDING GROUP, LLC** (*"Lender"*), having an address at 2999 North 44th Street, Suite 400, Phoenix, Arizona 85018; **GOALZ RESTAURANT GROUP, LLC**, a Wyoming limited liability company (*"Borrower"*); and **CERTAIN SUBSIDIARIES OF COMPANY**, as Subsidiary Guarantors.   All Schedules, Riders and exhibits annexed to this Agreement are an integral part of this Agreement and are incorporated herein by reference.

SECTION 1.   **DEFINITIONS AND RULES OF CONSTRUCTION**

1.1   **Defined Terms.**  When used in this Agreement or in any schedule, rider or exhibit hereto, the following terms shall have the following meanings:

*"Advance"* means an advance of money by Lender to Borrower pursuant to **Section 2** of this Agreement.

*"Affiliate"* means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, such Persons, managers and members.  For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of any equity interest, by contract or otherwise.

*"Allocable Amount"* has the meaning ascribed to it in **Section 12.9** of this Agreement.

*"Anniversary Date"* means, for any year after the year in which the Closing Date occurs, the same month and day in such year as corresponds to the month and day of the Closing Date.

*"Applicable Law"* means all laws, rules and regulations applicable to the Person, conduct, transaction, covenant or Loan Document in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of governmental bodies; and orders, judgments and decrees of all courts and arbitrators.

*"Bankruptcy Code"* means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.).

*"Borrower"* has the meanings ascribed to such terms in the preamble to this Agreement.

*"Business Day"* means a day other than a Saturday, Sunday or any other day on which Lender or banks in Arizona are authorized to close or are required to be closed.

*"Capitalized Lease"* means any lease of property (whether real, personal or mixed) that, in conformity with GAAP, would be accounted for as a capital lease on the balance sheet of the lessee.

*"Change of Control"* means Shawn Eby, RCH – Goalz Holdings, LLC, and Corey Hupp (or any trust or other estate planning vehicle established by any such member, to the extent the assets thereof are at all times controlled solely by such member), collectively, ceasing to own free and clear of all Liens, more than 50% of the outstanding voting equity interests of Borrower in the aggregate.  Any transfer of voting equity interests by any holder to a trust or like entity for estate planning purposes shall not be deemed a transfer of such voting equity interests; provided that one or more holders of Borrower's equity interests set forth in **Schedule D** continue to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower.

*"Closing Date"* means the date appearing on the cover page of this Agreement and in the preamble on the first page.

*"Collateral"* means all property and interests in property in respect of which a Lien is granted in favor of Lender pursuant to this Agreement or the other Loan Documents.

*"Commitments"* means all commitments and other undertakings of Lender in this Agreement to make Loans or other extensions of credit to or for the benefit of Borrower in accordance with the terms of this Agreement and the other Loan Documents.

*"Default"* means any event, which with notice or passage of time, or both, would constitute an Event of Default.

*"Dollars"* mean legal tender of the United States of America.

*"ERISA"* means the Employee Retirement Income Security Act of 1974.

*"Event of Default"* has the meaning ascribed to it in **Section 9.1** of this Agreement.

*"Existing Loan Agreements"* means the Amended and Restated Loan, Guaranty and Security Agreement by and between Lender and Borrower, dated March 14, 2019, as amended from time to time.

"*Existing Member Notes*" means, collectively, (1) the Demand Promissory Note dated February 3, 2019, in the amount of $30,000 made by Steve Piascik, (2) the Demand Promissory Note dated February 3, 2019, in the amount of $50,000 made by Shawn Eby, (3) the Demand Promissory Note dated February 19, 2019 in the amount of $50,000 made by Shawn Eby, (4) the Demand Promissory Note dated February 3, 2019, in the amount of $5,000 made by Corey Hupp, (5) the Demand Promissory Note dated February 19, 2019, in the amount of $5,000 made by Corey Hupp, and (6) the Demand Promissory Note dated March 4, 2019, in the amount of $80,000 made by Shawn Eby.

*"Extraordinary Expenses"* means all costs and expenses (including legal fees) incurred by Lender in connection with the enforcement of any of its rights or remedies under this Agreement, including any costs and expenses incurred in connection with its repossession of any of the Collateral, collection of any of the Collateral, storing or removing any of the Collateral, or advertising for sale or selling any of the Collateral.

*"Fee Schedule"* means the Fee Schedule attached to this Agreement as **Schedule A**.

*"FLSA"* means the Fair Labor Standards Act of 1938.

*"Full Payment"* means, with respect to any of the Obligations, the full, final and indefeasible payment in full, in cash, of such Obligations, including all interest, fees and other charges payable in connection therewith under any of the Loan Documents; termination of the Commitments; and the release by each Obligor (including any representative of such Obligor in an Insolvency Proceeding of such Obligor) of any claims that such Obligor has or claims to have against Lender or any of its Affiliates.

*"GAAP"* means generally accepted accounting principles as in effect from time to time in the United States of America, consistently applied.

*"Governmental Unit"* means a subdivision, agency, department, county, parish, municipality, or other unit of the government of the United States, a state or a foreign country. The term includes an organization having a separate corporate existence if the organization is eligible to issue debt on which interest is exempt from income taxation under the laws of the United States.

*"Guarantor"* means each Person who at any time guarantees the payment or performance of any Obligations, including each Person listed as a Guarantor on the Terms Schedule, if any.

*"Guaranty"* means a guaranty of payment or collection of any or all of the Obligations that is executed by a Guarantor in favor of Lender.

"*Indebtedness*" means, for any Person and without duplication, (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person under conditional sale or other title retention agreements and all obligations of such Person issued or assumed as the deferred purchase price of property or services (other than trade liabilities and intercompany debt maturing within 365 after the incurrence thereof and other operating liabilities not overdue by more than 120 days or being contested in good faith, in each case incurred in the ordinary course of business), (iv) all guarantees by such Person of any Indebtedness of others, (v) all liabilities and obligations under Capitalized Leases of such Person, and (vi) the principal component of all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit or bankers' acceptances. For the avoidance of doubt, Indebtedness of an Obligor includes all of the Obligations.

"*Indemnitee*" means Lender, all Affiliates of Lender and all officers, directors, employees, agents and representatives of any of the foregoing (including legal counsel).

"*Insider Subordinated Debt*" has the meaning ascribed to it in **Section 12.8** of this Agreement.

"*Insolvency Proceeding*" means any case or proceeding commenced by or against a Person (i) under the Bankruptcy Code or any other applicable insolvency law; (ii) as an assignment by a Person for the benefit of such Person's creditors; or (iii) for the appointment of a receiver, trustee, or other custodian for a Person or any of such Person's property.

"*Intellectual Property*" means all intellectual and similar intangible property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"*Interest*" has the meaning ascribed to it in **Section 4.4** of this Agreement.

"*Lender*" has the meaning ascribed to it in the preamble to this Agreement.

"*Lien*" means any security interest in, or common law, statutory or contractual lien or other encumbrance with respect to any property of a Person.

"*Loan Documents*" means this Agreement (including any Schedule or exhibit hereto), the Note, Guaranty Agreement, Subordination Agreement, and all other agreements, documents and instruments now or hereafter executed or delivered by any Obligor or any other Person in connection with, or to evidence or secure or assure the payment or performance of the transactions contemplated by, this Agreement.

"*Loans*" means all monies advanced by Lender to or for the benefit of Borrower pursuant to the terms of this Agreement.

"*Material Adverse Effect*" means any (a) material adverse effect on (i) the business, operations, financial condition, or assets of an Obligor (ii) the ability of any Obligor to perform its respective obligations under any Loan Documents; or (iii) the perfection or priority of any Lien of Lender with respect to any of the Collateral as a result of any action or failure to act by any Obligor; or (b) material impairment on the rights, remedies or benefits available to Lender under any Loan Document as a result of any action or failure to act by any Obligor.

"*Note*" means each promissory note evidencing the Loans and will include the Note evidencing the First Advance (the "*First Advance Note*") and the Note evidencing the Second Advance (the "*Second Advance Note*").

"*Obligations*" means all present and future Loans, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower or any other Obligor to Lender, whether evidenced by or arising under this Agreement or any other Loan Document, whether arising from an extension of credit, guaranty, indemnification or otherwise, whether direct or indirect (including those acquired by assignment and any participation by Lender in Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due, and whether arising before or after the commencement of a proceeding under the Bankruptcy Code

- 3 -

or any similar statute, including all interest, charges, expenses, fees, attorney's fees, expert witness fees, field exam fees, and any other sums chargeable to, or reimbursable by, Borrower under this Agreement or under any other Loan Document, including all Extraordinary Expenses. Without limiting the generality of the foregoing, the term "Obligations" shall include all Indebtedness, liabilities and obligations incurred by any Borrower to Lender in any bankruptcy case of Borrower and any interest, fees or other charges accrued in any such bankruptcy case, whether or not any such interest, fees or other charges are recoverable from one or more Borrowers or their respective estates under Section 506 of the Bankruptcy Code.

*"Obligors"* means, collectively, Borrower, Guarantors, Subsidiary Guarantors and each other Person liable for any of the Obligations.

*"Organizational Documents"* means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended from time to time, and its by-laws, as amended from time to time, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended from time to time, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended from time to time, and (iv) with respect to any limited liability company, its articles of organization, as amended from time to time, and its operating agreement, as amended from time to time. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

*"Other Property"* means any and all other property of any nature whatsoever of Borrower that is now or hereafter in the possession of, or assigned, pledged or hypothecated to, Lender for any purpose, including balances, credits, deposits, accounts, items and monies of Borrower now or hereafter with Lender.

*"Permitted Discretion"* means a determination made in the exercise of reasonable business judgment, from the perspective of a secured asset-based lender.

*"Permitted Indebtedness"* means Indebtedness incurred by Borrower or any of its Subsidiaries following the date of this Agreement, provided that such Indebtedness shall meet the following requirements: (i) all such Indebtedness shall be issued pursuant to the United Stated Small Business Administration's business loan programs or issued by another qualified lender; (ii) the proceeds of such Indebtedness will be used by the Borrower or any of its Subsidiaries to finance the purchase of furniture, fixtures or equipment to be used in equipping and furnishing a franchised restaurant; (iii) the loan to value ratio for each such item of Indebtedness shall not exceed the ratio of 0.8 to 1.0; and (iv) the aggregate number of separate items of Indebtedness outstanding at any time shall not exceed ten (10).

*"Permitted Liens"* means any of the following: (i) Liens at any time granted in favor of Lender; (ii) Liens for taxes that are not yet due or which are the subject of a Permitted Protest; (iii) statutory Liens (excluding any Lien for taxes or Liens imposed under ERISA) arising in the ordinary course of business of a Borrower or Subsidiary, but only so long as payment in respect of such Liens is not at the time required or the liabilities secured by any such Liens are the subject of a Permitted Protest, and such Liens do not materially detract from the value of the affected property and do not materially impair the use thereof in the operation of Borrowers' or such Subsidiary's business; (iv) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially impair the use thereof in the operation of Borrowers' or such Subsidiary's business; (v) deposits to secure the performance of bids, contracts, statutory obligations, surety and appeal bonds, performance bonds and other similar obligations, in each case, in the ordinary course of business; (vi) Liens arising from judgments that do not constitute an Event of Default under Section 9 of this Agreement; (vii) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (viii) normal and customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC on payment items in the course of collections; and (ix) Liens granted in connection with any Permitted Indebtedness.

*"Permitted Protests"* means proceedings conducted diligently and in good faith by a Borrower to challenge any tax, <u>provided</u> that adequate reserves therefor have been established in accordance with GAAP.

- 4 -

*"Permitted Tax Distributions"* means cash dividends or distributions to the holders of equity interests in Borrower no more frequently than once per fiscal year based upon the taxable income of Borrower under the Internal Revenue Code, as amended, for the immediately preceding fiscal year in an amount that does not exceed the amount necessary to pay federal and state income taxes solely attributable to the holders' distributive shares of the taxable income of Borrower, determined assuming each holder is subject to taxation at a rate equal to the highest federal and state income tax rate payable by any direct or indirect holder of equity interests in Borrower for the applicable tax year, <u>provided</u> that (a) such dividend or distribution is permitted under Applicable Law, and (b) at the time of and after giving effect to such dividend or distribution, (i) Borrower is Solvent, (ii) no Default or Event of Default exists, and (ii) not less than five (5) Business Days prior to the payment of any such dividend or distribution, Borrower has delivered to Lender written notice thereof.

*"Person"* means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization or association, or any state, county, municipal, national or foreign government or Governmental Unit.

*"Post-Petition Interest"* has the meaning ascribed to it in **Section 12.8** of this Agreement.

*"Proceeds"* means, with respect to any Collateral, all cash and non-cash proceeds from a sale, collection, lease or other disposition of such Collateral, and all other "proceeds" (as defined in the UCC) from any such disposition.

*"Records"* means all of each Borrower's books and records relating to its business or assets, including records pertaining to any Collateral. Without limiting the generality of the foregoing, Borrower's books and records include all records (whether paper, computer or electronic) data, tapes, discs, or other media and all programs, files, records and procedure manuals relating thereto wherever located.

*"Schedules"* means the Fee Schedule, the Terms Schedule and any other schedule annexed to this Agreement from time to time.

*"Solvent"* means with respect to any Person is able on such date to pay and does pay all of its debts as they become due in the ordinary course of business, and has working capital on such date that is adequate to meet its reasonably foreseeable business needs and to carry on its business in the ordinary course.

*"Subordinated Creditor"* means each holder of Subordinated Debt, including, at any time of determination, the holder of any of the Subordinated Debt described on **Exhibit 3** hereto.

*"Subordinated Debt"* means, with respect to any Person, debt of such Person the payment of which is subordinated to the payment of the Obligations in a manner satisfactory to Lender.

*"Subordination Agreement"* means each Subordination Agreement between a Subordinated Creditor and Lender pursuant to which debt owed to such Subordinated Creditor is subordinated in right of payment to the Obligations.

*"Subsidiary"* means an entity at least 50% of whose voting securities or other equity interests is owned by a Borrower (including indirect ownership by a Borrower through other entities in which such Borrower directly or indirectly owns 50% of the voting securities or other equity interests).

*"Subsidiary Guarantor"* means each Subsidiary of Borrower a party to the Subsidiary Guaranty as of the date hereof, and subsequent to the date hereof, each Subsidiary of Borrower that becomes a party to the Guaranty pursuant this Agreement.

*"Subsidiary Guaranty"* means the guaranty of each Subsidiary Guarantor set forth in **Section 12**.

*"Term"* has the meaning ascribed to it in **Section 11.1**.

*"Terms Schedule"* means the Terms Schedule attached to this Agreement as **Schedule B.**

- 5 -

*"UCC"* means the Uniform Commercial Code as adopted and in effect at such time in the State of Arizona.

1.2      **Accounting Terms.**  All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with GAAP.

1.3      **UCC Terms.**  The following terms, as used herein, shall have the meanings ascribed to them in the UCC:  Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Equipment, General Intangible, Fixture, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Payment Intangible, Securities Account and Supporting Obligation.

1.4      **Rules of Construction.**  The term "including," whenever used in this Agreement, shall mean "including, but not limited to." The singular form of any term shall include the plural form, and *vice versa*, when the context so requires.  References to Sections, subsections and Schedules are to Sections and subsections of, and Schedules to, this Agreement.  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  References to agreements and statutes shall include all amendments thereto and successor statutes in the case of statutes; to the time of day shall mean the time of day on the day in question in Phoenix, Arizona; to Lender's "discretion" means Lender's sole and absolute discretion unless expressly indicated otherwise herein.  A Default or an Event of Default shall be deemed "to continue," "be continuing," "exist" or be "in existence" at all times during the period commencing on the date such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing by Lender or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement.

SECTION 2.      **LOAN ADVANCES**

2.1      **Advances.**  Subject to the terms and conditions in this Agreement, at Borrower's request and provided that no Default or Event of Default exists, Lender agrees to make Advances to Borrower as contemplated herein, **provided** that, immediately after giving effect to each such Advance, the outstanding balance of all Obligations in respect of Advances will not exceed $3,000,000.00 (the "*Maximum Advance Amount*")

2.2      **First Advance.**  Lender made an initial Advance (the "*First Advance*") to Borrower in the amount of $800,000.00 represented by the Amended and Restated First Advance Note.

2.3      **Second Advance.**  Lender shall make a second Advance (the "*Second Advance*") to Borrower in the amount of $2,200,000.00 upon satisfaction or waiver of the conditions precedent set forth in Sections 3.1 and 3.2.  The Second Advance shall be represented by the Amended and Restated Second Advance Note.

2.4      **Existing Member Notes.**  In connection with the execution of the Existing Loan Agreements, the Existing Member Notes were assigned to and assumed by the Borrower, with the Borrower becoming the maker and debtor under the Existing Member Notes.  For purposes of this Agreement, the Existing Member Notes shall be deemed to be part of the Second Advance made by the Lender to Borrower.  Upon execution of the Existing Loan Agreements, the Existing Member Notes were cancelled and the indebtedness represented thereby became part of the indebtedness represented by the Second Advance Note.

2.5      **Disbursement of Advances; Use of Proceeds.**  All proceeds of Advances to Borrower may be disbursed by Lender to Borrower, and Borrower shall thereafter promptly make such proceeds available to Borrower one or more Subsidiary Guarantor.  The proceeds of each Advance disbursed by Lender to Borrower shall be deemed to be an Advance made by Lender directly to all Borrower and all Subsidiary Guarantors.  Borrower shall be authorized to use the proceeds of the Advances solely to pay the Obligations, and to make expenditures for lawful purposes of Borrower to the extent such expenditures are not prohibited by the provisions of this Agreement or Applicable Law.  Borrower represents and warrants that Loans to Borrower will be used solely for commercial purposes and not for personal, family or household purposes.

2.6      **Loan Repayment.**  Principal and interest with respect to Advances shall be paid as stated in the Notes made by Borrower to the order of Lender in the forms annexed hereto as **Exhibit 1** and **Exhibit 2**.

- 6 -

SECTION 3.    **CONDITIONS PRECEDENT**

3.1    **Initial Conditions Precedent.**  Lender shall not be obligated to fund any Loan or make any other extension of credit unless, on or before the date hereof (or such later date to which Lender in its sole discretion may consent in writing), each of the following conditions has been satisfied, as determined by Lender in its sole discretion:

(a)    all Loan Documents shall have been duly executed and delivered in a manner satisfactory to Lender;

(b)    Lender shall have received assurances satisfactory to it that its Liens upon all of the Collateral are duly perfected Liens that are senior to all other Liens except as otherwise permitted under any Loan Document;

(c)    Lender shall have received (i) sufficient copies of each Organizational Document executed (if applicable) and delivered by each Obligor, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party; (iii) resolutions of the governing body of each Obligor approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its an authorized member, manager or officer as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Unit of each Obligor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other documents as Lender may reasonably request.

(d)    since December 31, 2018, no event shall have occurred and no condition shall exist that could reasonably be expected to have a Material Adverse Effect;

(e)    Borrowers shall have paid all fees and expenses to be paid to Lender on or before the date of such funding or grant;

(f)    no litigation shall be pending or threatened that would constitute an Event of Default or could reasonably be expected to result in a Material Adverse Effect;

(g)    no Default or Event of Default shall exist at the time of or result from the funding of any Loan or other extension of credit;

(h)    all representations and warranties of each Obligor in any of the Loan Documents are true and correct in all material respects on and after giving effect to such funding or grant; and

(i)    Borrowers shall have satisfied all conditions specified as additional conditions precedent on the Terms Schedule.

3.2    **Ongoing Conditions Precedent.**  Lender shall not be obligated to fund any Loan or make any other extension of credit hereunder (including the initial Loans to be funded on or about the date of this Agreement) unless each of the following conditions is satisfied, as determined by Lender in its sole discretion:

(a)    all the conditions precedent set forth in Section 3.1 shall have been satisfied;

(b)    no Default or Event of Default shall exist at the time of or result from the funding of such Loan or the granting of such extension of credit;

(c)    all representations and warranties made by any Obligor in any Loan Document, or otherwise in writing to Lender, shall be true and correct in all material respects with the same effect as though such representations and warranties have been made on and as of the date of the funding of such Loan or other extension of credit;

15369874.1/043245.0272

(d) no event shall have occurred and no condition shall exist that could reasonably be expected to have a Material Adverse Effect;

(e) the Lender shall be satisfied with its on-going financial, business, tax, legal and other due diligence review of the Borrower and its properties and assets; and

(f) the Lender, in its Permitted Discretion, deems itself insecure, even though no Default or Event of Default shall have occurred.

## SECTION 4. INTEREST, FEES AND EXPENSES; LOAN ACCOUNT

4.1 **Interest.** Interest shall accrue on the unpaid principal balance of the Advances at the applicable rate set forth in the Terms Schedule, and shall be calculated and repaid in accordance with the Note. The balance of the Obligations, other than the principal amount of the Loans, shall likewise bear interest at the same rates, and calculated in the same manner, as is applicable to Advances; provided, however, that interest shall not accrue on any past due interest to the extent prohibited by Applicable Law.

4.2 **Fees and Expenses.** In addition to all interest and other sums payable by Borrower under this Agreement, Borrower shall pay Lender the fees and reimbursements set forth in the Fee Schedule, which shall be deemed earned in full on the date when the same have accrued (whether or not then due and payable hereunder) and shall not be subject to rebate or proration upon termination of this Agreement or otherwise unless and to the extent required by Applicable Law.

4.3 **Expense Reimbursement.** Borrower shall reimburse Lender for (i) any Extraordinary Expenses incurred by Lender and (ii) all legal, accounting, consulting and other fees and expenses suffered or incurred by Lender in connection with (a) the negotiation and preparation of any of the Loan Documents and any amendment or modification thereto; (b) the administration of the Loan Documents and the transactions contemplated thereby; (c) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral, including any and all Lien search fees, credit inquiry and investigation fees and costs; or (d) any effort by Lender to verify or appraise any of the Collateral, which fees and expenses of subsection (ii) shall not exceed $10,000. If any of the Obligations are collected by or through an attorney at law, then Borrower shall be obligated to pay, in addition to all principal and interest in respect of the Obligations, Lender's attorneys' fees and court costs as provided in **Section 9.2** of this Agreement. All amounts chargeable to or reimbursable by Borrower under this **Section 4.3** shall constitute Obligations and shall be payable to Lender on demand. The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the indemnification or reimbursement by Borrower of claims suffered or incurred by Lender.

4.4 **Maximum Interest.** Regardless of any provision contained in this Agreement or any other Loan Document, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this Agreement or any other Loan Document and that are deemed interest under Applicable Law exceed the highest rate permissible under any applicable law, which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. No agreements, conditions, provisions or stipulations contained in any of the Loan Documents or the exercise by Lender of the right to accelerate the payment or the maturity of all or any portion of the Obligations or the exercise of any option whatsoever contained in any of the Loan Documents, or the prepayment by Borrowers of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle Lender to charge or receive, in any event, interest or charges, amounts, premiums or fees deemed interest by Applicable Law (such interest, charges, amounts, premiums and fees referred to collectively as "*Interest*") in excess of the maximum rate allowable under Applicable Law and in no event shall any Obligor be obligated to pay Interest exceeding such maximum rate, and all agreements, conditions, or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel any Obligor to pay Interest exceeding the maximum rate allowable under Applicable Law shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over such maximum rate.

## SECTION 5. COLLATERAL

5.1 **Grant of Security Interest.** To secure the full and timely payment and performance of all of the Obligations, Borrower and each Subsidiary Guarantor hereby grants to Lender a continuing security interest in and

- 8 -

Lien upon the following property and interests in property of such Obligor, whether tangible or intangible, now owned or in existence or hereafter created, acquired or arising, and wherever located: all Accounts, Chattel Paper, Goods (including all Inventory, Equipment and Fixtures), Documents, Instruments, General Intangibles (including Payment Intangibles), Investment Property, Letter-of-Credit Rights, Supporting Obligations, Commercial Tort Claims, Other Property, and Borrower's limited liability company membership interests in its Subsidiaries; all Proceeds and products of all of the foregoing (including Proceeds of any insurance policies and claims against third parties for loss or any destruction of any of the foregoing); and all Records relating to any of the foregoing.

5.2     **[Reserved]**.

5.3     **Further Assurances.**  Borrower and each Subsidiary Guarantor agrees to take such steps as are necessary or appropriate under Applicable Law, and consents to Lender taking any such steps, to perfect and maintain the perfection and priority of Lender's Lien in the Collateral and to execute such documents as Lender may require to effectuate the foregoing and to implement this Agreement.  Borrower and each Subsidiary Guarantor irrevocably authorizes Lender to file financing statements, and all amendments and continuations with respect thereto, in order to create, perfect or maintain its Lien in the Collateral as a duly perfected Lien, subject to no other Liens except for Permitted Liens; and ratifies and confirms any and all financing statements (and amendments and continuations with respect thereto) heretofore and hereafter filed by Lender pursuant to the foregoing authorization.

SECTION 6.     **LOAN ADMINISTRATION**

6.1     **Payments.**  All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in immediately available funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Lender not later than 4:00 p.m. (Phoenix time) on the date due via wire transfer of immediately available funds to a location or bank account within the Arizona as may be designated by Lender from time to time; funds received by Lender after that time on such due date shall be deemed to have been paid by Borrower on the next Business Day.  All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.  If a Default or an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 9, all payments or proceeds received by Lender hereunder or under any Loan Document in respect of any of the Obligations, including, but not limited to all proceeds received by Lender in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, shall be applied in full or in part as follows:  first, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to Lender and its agents and counsel, and all other expenses, liabilities and advances made or incurred by Lender in connection therewith, and all amounts for which Lender is entitled to indemnification hereunder or under any Loan Document and all advances made by any Lender under any Loan Document for the account of the applicable Obligor, and to the payment of all costs and expenses paid or incurred by Lender in connection with the exercise of any right or remedy hereunder or under any Loan Document, all in accordance with the terms hereof or thereof; second, to the extent of any excess of such proceeds, to the payment of all other Obligations; and third, to the extent of any excess of such proceeds, to the payment to or upon the order of such Obligor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

SECTION 7.     **REPRESENTATIONS AND WARRANTIES**

7.1     **General.**  To induce Lender to enter into this Agreement, Borrower and each Subsidiary Guarantor, jointly and severally, makes the following representations and warranties (each of which shall be deemed to have been made on the Closing Date and on each date thereafter on which any Advance is made available to Borrower by the Lender):

(a)     such Obligor's legal name and state or incorporation or organization is exactly as set forth on the signature page of this Agreement and on **Schedule E**;

- 9 -

(b)     such Obligor is duly organized and validly existing under the laws of its state of organization and is qualified to do business in each state where such qualification is required (except where the failure to so qualify could not reasonably be expected to result in a Material Adverse Effect), all of which are listed on **Schedule E**;

(c)     such Obligor is duly authorized to execute, deliver and perform its Loan Documents, the execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action by such Obligor, and the execution, delivery and performance of the Loan Documents by such Obligor do not require any consent or approval of any Person except those already obtained, contravene the articles, by-laws or analogous organizational documents of such Obligor, violate or cause a default under any Applicable Law or material contract, or result in or require imposition of a Lien on such Obligor's property;

(d)     such Obligor has good title to its assets, and each Lien granted by such Obligor to Lender in the Collateral is and will at all times remain a duly perfected, first priority Lien in such Collateral, subject only to Permitted Liens;

(e)     each Loan Document is a legal, valid and binding obligation of such Obligor, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally;

(f)     such Obligor has filed all federal, state and local tax returns and other reports that it is required by law to file, and has paid, or made provision for the payment of, all taxes that are due and payable by such Obligor, except to the extent subject to a Permitted Protest that has been disclosed to Lender in writing;

(g)     each Obligor is Solvent;

(h)     the most recent financial statements provided to Lender accurately reflect such Obligor's financial condition as of that date and since that date no condition exists and no event has occurred that has had or could reasonably be expected to have a Material Adverse Effect, and all projections delivered from time to time to Lender have been prepared in good faith, based on reasonable assumptions in light of the circumstances at such time;

(i)     such Obligor has duly complied, and its properties and business operations are in compliance, in all material respects with, all Applicable Law (including, without limitation, all environmental laws, ERISA, OSHA and FLSA), except where noncompliance could not reasonably be expected to have a Material Adverse Effect, and no Obligor, any Subsidiary of an Obligor or any director, officer, employee, agent, affiliate or representative thereof, is or is owned or controlled by an individual or entity that is currently the subject or target of any sanction or is located, organized or resident in a country, territory or jurisdiction that is the subject of a sanction;

(j)     there are no actions, suits or other legal proceedings of any kind now pending or, to such Obligor's knowledge, threatened against any Obligor that if successful could reasonably be expected to have a Material Adverse Effect;

(k)     no Default or Event of Default exists;

(l)     such Obligor has never carried on business under or used any name other than its legal name and the trade names or trade styles (if any) listed on **Schedule E**;

(m)     such Obligor has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Units and all other Persons as is required or necessary to own its assets and to carry on its business, and such Obligor has not been notified by any such Governmental Unit or other Person that such Governmental Unit or other Person has rescinded or not renewed, or intends to rescind or not renew, any such license, consent, accreditation, approval or authorization;

(n)     such Obligor has unrestricted access to its Records and owns or leases all Equipment in or on which any Records are stored, kept or otherwise maintained (and, in the event that any such Equipment is leased by Obligor, such lease is in full force and effect and no default exists thereunder);

15369874.1/043245.0272

(n)      except as otherwise disclosed to Lender in writing, no Obligor is party to or bound by any collective bargaining agreement, management agreement or consulting agreement, and there are no material existing or (to any Obligor's knowledge) threatened grievances, disputes or controversies with any union or other organization of any Obligor's employees, or, to any Obligor's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining; and

(o)      all information furnished by any Obligor to Lender (including all information contained in the Information Certificate delivered to Lender on or before the Closing Date) is true and correct in all material respects.

Obligors further represent, warrant and acknowledge that, while separately organized, Obligors operate as an integrated unit and in a collective business enterprise that is interdependent; the successful operation and condition of Obligors is dependent on the continued successful performance of the functions of the group of Obligors as a whole and the successful operation of each Obligor is dependent on the successful performance and operation of each other Obligor; and each Obligor will derive significant benefit from the successful operation of each of the other Obligors and the credit extended by Lender to Obligors hereunder, both in their separate capacities and as members of the group of companies.

Each of the foregoing representations and warranties shall be deemed reaffirmed and remade as of the date of funding of each Advance and shall not be affected by any knowledge of, or any investigation by, Lender.  The continuing accuracy of each of the foregoing representations and warranties shall be a condition precedent to each Advance.

SECTION 8.    **COVENANTS**

8.1    **Affirmative Covenants**.  Until Full Payment of the Obligations, Borrower shall:

(a)      permit representatives of Lender from time to time, as often as may be reasonably requested, but (when no Default or Event of Default exists) only during normal business hours, to inspect and appraise the Collateral and to inspect, audit, and make extracts from Borrower's Records and to discuss Borrower's financial affairs with such Borrower's independent accountants;

(b)      keep adequate Records with respect to its business activities in accordance with prudent accounting practices;

(c)      reimburse Lender for all costs of inspections and Collateral audits of Borrower, its Records and such other matters as Lender may deem reasonable, and for all appraisals of the Collateral;

(d)      pay and discharge all taxes prior to the date on which such taxes become delinquent or penalties attach thereto unless subject to a Permitted Protest, and pay when due, all wages, salaries and other benefits, together with withholdings relating thereto;

(e)      comply with all Applicable Law and promptly notify Lender of any violation or asserted violation of any Applicable Law if any adverse resolution could reasonably be expected to have a Material Adverse Effect;

(f)      promptly notify Lender in writing of any change in location of any place of business, or the establishment of any new place of business;

(g)      carry property, liability and other insurance, with insurers acceptable to Lender, in such form and amounts, and with such deductibles and other provisions as Lender shall require in its Permitted Discretion, with each such insurance policy naming Lender as lender loss payee or an additional insured, as applicable, pursuant to a form of endorsement acceptable to Lender; and

(h)      promptly notify Lender of (i) the existence of any Default or Event of Default; (ii) the threat or commencement of any proceeding or investigation, whether or not covered by insurance; (iii) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any environmental laws); (iv) the discharge of or any withdrawal or resignation by Borrower's independent accountants; (v) any judgment in an amount exceeding $25,000 (whether or not insured), and any casualty, condemnation, seizure or other loss with

- 11 -

15369874.1/043245.0272

respect to any Collateral or other property with a value in excess of $25,000 (whether or not insured); and (vi) any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract, or any other event or circumstance that may reasonably be anticipated to result in the closure, shut-down or cessation of operations for a Borrower or any material portion of its business outside the ordinary course of business.

8.2     **Additional Subsidiaries.**  In the event that any Person becomes a Subsidiary of Borrower, Borrower shall (a) concurrently with such Person becoming a Subsidiary cause such Subsidiary to become a Subsidiary Guarantor hereunder by executing and delivering to Lender a joinder to this Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1 3.2 and 3.3.  With respect to each such Subsidiary, Borrower shall promptly send to Lender written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Borrower, and (ii) all of the data required to be set forth in **Schedules C** with respect to all Subsidiaries of Borrower.

8.3     **Negative Covenants.**  Until Full Payment of the Obligations, Borrower shall not (and shall not permit any Subsidiary to):

(a)     merge or consolidate with another Person; acquire any assets except in the ordinary course of business as presently conducted or as otherwise permitted by this Agreement or the other Loan Documents;

(b)     enter into any transaction outside the ordinary course of business;

(c)     sell or transfer any Collateral or other assets, except, if no Default or Event of Default exists, Borrowers may sell or otherwise dispose of worn-out or obsolete Equipment, or Equipment that is no longer used or useful in the business of Borrowers, so long as the book value of all such Equipment disposed in any fiscal year does not exceed the amount specified for Equipment Dispositions on the Terms Schedule and the proceeds of any such disposition are remitted to Lender and applied to the Obligations in accordance with the Loan Documents;

(d)     make any loans or other advances of money to any Person;

(e)     incur any Indebtedness other than (i) the Obligations, (ii) the Permitted Indebtedness; (iii) Subordinated Debt in existence on the Closing Date or which is incurred after the Closing Date on terms acceptable to Lender, and (iv) any other Indebtedness to which Lender in its sole discretion consents in writing;

(f)     guarantee or otherwise become liable with respect to any Indebtedness (other than the Obligations) of another Person;

(g)     pay or declare any dividends or other distributions on all or any part of any Borrower's equity interests or make any other special payment to an equity holder (except for Permitted Tax Distributions, if applicable), or redeem, retire, purchase or otherwise acquire, directly or indirectly, any of any Borrower's equity interests;

(h)     dissolve or elect to dissolve or otherwise discontinue its business or engage in any business other than the business conducted on the Closing Date and activities incidental thereto;

(i)     make any payment on or in respect of any Subordinated Debt;

(j)     change its fiscal year or have a fiscal year that is not the same as the fiscal year of all other Borrowers;

(k)     suffer to exist any Lien upon any of its assets other than a Permitted Lien;

(l)     amend, modify or otherwise change its Organizational Documents;

(m)     amend, modify or otherwise change the salaries and other compensation of the Borrower's management team and equity holders;

- 12 -

(n)        pay any bonus to any employee or equity holder of the Borrower or any Subsidiary;

(o)        enter into or be party to any transaction with an Affiliate, except (A) transactions expressly permitted by the Loan Documents; (B) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities; (C) transactions solely among Obligors; and (D) other transactions with Affiliates in the ordinary course of business, upon fair and reasonable terms fully disclosed to Lender and no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate; or

(p)        amend, supplement or otherwise modify any indenture, instrument or other agreement relating to any Subordinated Debt other than to decrease the amount of scheduled payments thereunder, extend the time for payment of the principal amount thereof, reduce the rate of interest applicable thereto or delete or make less onerous any covenant, event of default or remedy thereunder.

8.4       **[Reserved].**

8.5       **Reporting Covenants.**  Until Full Payment of the Obligations, Borrower Agent shall provide Lender the reports listed below in a format acceptable to Lender.  All reports, which are to be submitted in Excel format and/or via direct data submission to an online computer system authorized and in form and substance acceptable to Lender, are due as follows:

(a)        annual unaudited financial statements of Borrower and its Subsidiaries, as of the end of each fiscal year, on a consolidated and consolidating basis and without qualification, reviewed by a firm of independent certified public accountants reasonably acceptable to Lender, shall be prepared in accordance with GAAP and furnished to Lender within 120 days after the end of each fiscal year of Borrowers;

(b)        an unaudited balance sheet of Borrowers and its Subsidiaries as of the last day of each month, and related unaudited statements of income and cash flow for such month and for the portion of Borrower's fiscal year then elapsed, on a consolidated and consolidating basis shall be prepared in accordance with GAAP and furnished to Lender within 21 days after the end of each month;

(c)        upon the prior request of Lender, monthly bank statements for all bank accounts of Borrower, as of the last day of the prior calendar month;

(d)        monthly projections for each fiscal year are due no later than 60 days before the end of the immediately preceding fiscal year;

(e)        all tax returns for Borrower and each Subsidiary delivered to Lender no later than five (5) Business Days after such tax returns are filed with the applicable Governmental Unit;

(f)        a personal financial statement for each Guarantor that is a natural Person (if applicable), as of the end of each calendar year, is due no later than thirty (30) days after the end of such year; and

(g)        such other information as Lender may reasonably request form time to time shall be promptly furnished to Lender.

8.6       **[Reserved].**

SECTION 9.      **EVENTS OF DEFAULT AND REMEDIES**

9.1       **Events of Default.**  The occurrence of any of the following events or conditions shall constitute an *"Event of Default"* under this Agreement; provided, that Lender shall notify Borrower of the occurrence of any such event and Borrower shall have five (5) Business Days following the receipt of such notice of cure such Default:

(a)        Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration, or otherwise);

- 13 -

(b)      any representation, warranty, or other statement to Lender by or on behalf of any Obligor, whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made;

(c)      any Obligor shall fail or neglect to perform, keep or observe any covenant contained in this Agreement or any other Loan Document;

(d)      any Obligor shall cease to be Solvent; or any breach or default of an Obligor occurs under any instrument or agreement to which it is a party or by which it or any of its properties is bound, relating to any Indebtedness (other than the Obligations), if the maturity of or any payment with respect to such Indebtedness may be accelerated or demanded due to such breach;

(e)      any Insolvency Proceeding shall be commenced by or against any Obligor and, if against an Obligor, shall not be dismissed within 60 days after commencement;

(f)      one or more judgments or orders for the payment of money in excess of $25,000 in the aggregate shall be entered against any Obligor and remain undismissed and unpaid for 30 days or more, provided that all Liens securing any such judgment are junior to Lender's Liens in the Collateral;

(g)      any Obligor shall revoke or attempt to revoke or terminate, or fail to confirm such Obligor's liability under, any Guaranty to which such Obligor is a party;

(h)      a Change of Control shall occur;

(i)      Shawn Eby shall cease, for any reason, to be engaged on a full-time basis in the management and day-to-day operations of the Borrower;

(j)      any default shall occur under any other agreement or arrangement between one or more Obligors and Lender;

(k)      any failure of any Obligor to furnish Lender current financial information upon request;

(l)      any failure of any Obligor or any pledgor of any security interest in the Collateral to observe or perform any covenant contained in any agreement, instrument or certificate executed in connection with the granting of a security interest in any Collateral;

(m)      any uninsured loss, theft, substantial damage, destruction, sale, foreclosure of or encumbrance (other than a Permitted Lien) on any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon or the rendering of any garnishment or attachment against any Obligor or its property, whether actual or threatened;

(n)      the dissolution or termination of existence of any Obligor; or any Guarantor that is a natural Person shall die, unless Borrowers shall cause a replacement Guarantor with financial wherewithal and liquid assets no less favorable to (and as determined in its sole discretion by) Lender as those of the deceased Guarantor, to execute and deliver to Lender a replacement Guaranty in substantially the same form and substance as the Guaranty of the deceased Guarantor, within sixty (60) days after the death of such Guarantor; or any Guarantor that is a natural Person shall be declared incompetent;

(o)      any amendment or termination of a financing statement naming any Obligor as debtor and Lender as secured party, or any corrective statement with respect thereto, is filed by or on behalf of any Obligor without the prior written consent of Lender;

(p)      any Obligor, any Subsidiary of an Obligor, or any officer or director of an Obligor or Subsidiary thereof, shall be indicted for or convicted of (or plead *nolo contendere* to) any crime punishable under Applicable Law as a felony; or

- 14 -

(q)     any event shall occur or any condition shall exist that has or could reasonably be expected to have a Material Adverse Effect.

9.2     **Remedies.**  Upon or after the occurrence of an Event of Default (and for so long as such Event of Default shall exist), Lender may in its discretion declare the principal of and accrued interest on the Loans and all other outstanding Obligations to be, whereupon the same shall thereupon become without further notice or demand (all of which notice and demand Borrower expressly waives), forthwith due and payable and Borrowers shall forthwith jointly and severally pay to Lender the entire principal of and accrued and unpaid interest on the Loans and other Obligations, together with reasonable attorneys' fees and court costs if such principal and interest are collected by or through an attorney at law, and Lender may terminate this Agreement.  In addition, Lender may, in its discretion, at any time or times exercise all of the rights and remedies of a secured party under the UCC or any other Applicable Law and all other legal and equitable rights to which Lender may be entitled under any of the Loan Documents, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in any of the Loan Documents or available pursuant to Applicable Law, and none of which shall be exclusive.  Each Obligor agrees that any requirement of notice to such Obligor of any proposed public or private sale or other disposition of any Collateral by Lender shall be deemed reasonable notice thereof if given at least 10 days prior thereto.  Lender may purchase all or any part of the Collateral at a public sale or, if permitted by Applicable Law, at any private sale, and, in lieu of actual payment of such purchase price, Lender may set off the amount of such price against the outstanding Obligations.  The proceeds realized from any sale or other disposition of Collateral may be applied first to any Extraordinary Expenses incurred by Lender, second to interest and fees accrued with respect to any of the Obligations, and then to the principal balance of the Obligations.  If any deficiency shall arise, Obligors shall remain jointly and severally liable to Lender therefor.  Lender may, in its discretion, petition for and obtain the appointment of a receiver to take possession of any or all of the Collateral and to operate any Obligor's business and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver, Obligors hereby consenting thereto and waiving any requirement under Applicable Law that Lender post a bond in connection with the appointment of any such receiver.  Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of each Obligor, computer hardware and software, brochures, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral.  Each Obligor's rights and interests under Intellectual Property shall inure to Lender's benefit.  The failure or delay of Lender to require strict performance by any Obligor of any provision of the Loan Documents or to exercise or enforce any rights, Liens, powers, or remedies under any of the Loan Documents shall not operate as a waiver of such performance, Liens, rights, powers, and remedies, but all such rights, Liens, powers, and remedies shall continue in full force and effect until Full Payment of the Obligations.

SECTION 10.   **INDEMNITY**

10.1     **Indemnity.**   Obligors hereby agree, jointly and severally, to indemnify and defend each Indemnitee and hold such Indemnitee harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every nature, character and description, which such Indemnitee may sustain or incur based upon or arising out of any of the transactions contemplated by this Agreement or the other Loan Documents or any of the Obligations or any other matter, cause or thing whatsoever occurred, done, omitted or suffered to be done by Lender relating to any Obligor, the Loan Documents, or the Obligations except to the extent any such amounts are sustained or incurred as the result of the gross negligence or willful misconduct of such Indemnitee.  Notwithstanding any provision in this Agreement to the contrary, this **Section 10.1** shall survive any termination of this Agreement and Full Payment of the Obligations.

SECTION 11.   **TERM AND TERMINATION**

11.1     **Term.**  All Commitments hereunder shall, subject to the satisfaction (or waiver by Lender in its sole discretion) of each condition set forth in **Section 3** hereof, become effective on the date hereof and shall expire at the close of business on the day specified as the maturity date specified in the Terms Schedule (the *"Term"*).

11.2     **Termination.**  Borrower may terminate the Commitments at any time by Borrower giving Lender at least 60 days prior written notice thereof, and all Commitments shall automatically terminate upon the occurrence

- 15 -

of an Event of Default resulting from the commencement of an Insolvency Proceeding by or against Borrower. At any time that an Event of Default exists, Lender may terminate the Commitments immediately, without prior notice to Borrower.

     11.3    **Effect of Termination.** On the effective date of any termination of the Commitments, whether by Lender or Borrower, all Obligations shall become immediately due and payable without further notice to or demand upon any Obligor. No termination shall affect or impair any Lien, right or remedy of Lender hereunder or under any of the other Loan Documents (including any right of Lender to indemnification hereunder or under any other Loan Document) or relieve any Obligor of any of covenant, duty or liability hereunder or under any other Loan Document until Full Payment of the Obligations.

SECTION 12.   **GUARANTY**

     12.1    **Joint and Several Obligations.** Each Obligor agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations. Each Obligor agrees that its liability hereunder shall not be discharged until Full Payment of the Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for any Obligations or any action, or the absence of any action, by Lender in respect thereof (including the release of any security or guaranty); (d) whether any Obligor ceases to be Solvent; (e) any election by Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Obligor, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of Lender against any Obligor for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except Full Payment of the Obligations.

     12.2    **Obligations Absolute.** The obligations of each Obligor hereunder are and shall be joint and several and absolute and unconditional, irrespective of the validity, regularity or enforceability of any of the Loan Documents, shall not be subject to any counterclaim, setoff, deduction or defense based upon any claim any Obligor may have against any Obligor or Lender, hereunder or otherwise, and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by, to the fullest extent permitted by Applicable Law, any circumstance or condition whatsoever (whether or not any Obligor shall have any knowledge or notice thereof), including:

          (i)    any amendment or modification of or supplement to any of the Loan Documents (including any increase or decrease in the Obligations or rate of interest or amount of fees payable in connection therewith or any extension of the Term or time for payment of any Obligations) or any other instrument referred to herein or therein, or any assignment or transfer of any thereof or of any interest therein, or any furnishing or acceptance of additional security for any of the Obligations;

          (ii)    any waiver, consent or extension under any Loan Document or any such other instrument, or any indulgence or other action or inaction under or in respect of, or any extensions or renewals of, any Loan Document, any such other instrument or any Obligation;

          (iii)    any failure, omission or delay on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on or available to Lender against any Obligor or subsidiary of a Obligor;

          (iv)    the commencement of any Insolvency Proceeding with respect to an Obligor or any subsidiary of a Obligor, any unavailability of assets against which any of the Obligations may be enforced, or any release of Collateral or Liens thereon;

          (v)    any merger or consolidation of any Obligor into or with any other Person or any sale, lease or transfer of any or all of the assets of any Obligor or Subsidiary of a Obligor to any Person;

15369874.1/043245.0272

(vi)     any failure on the part of a Obligor or any Subsidiary of a Obligor for any reason to comply with or perform any of the terms of any agreement with any other Obligor;

(vii)    any exercise or non-exercise by Lender of any right, remedy, power or privilege under or in respect of any of the Loan Documents, including under this **Section 12.2**;

(viii)   any default, failure or delay, willful or otherwise, in the performance or payment of any of the Obligations;

(ix)     any furnishing or acceptance of security, or any release, substitution or exchange thereof, for any of the Obligations;

(x)      any failure to give notice to any Obligor of the occurrence of any breach or violation of, or any event of default or any default under or with respect to, any of the Loan Documents or the Obligations;

(xi)     any partial prepayment, or any assignment or transfer, of any of the Obligations; or

(xii)    any other circumstance (other than Full Payment) which might otherwise constitute a legal or equitable discharge or defense of a guarantor or which might in any manner or to any extent vary the risk of any Obligor.

Obligors covenant that their obligations hereunder will not be discharged except by complete performance of the Obligations contained in the Loan Documents and the Full Payment of the Obligations.  Obligors unconditionally waive, to the fullest extent permitted by Applicable Law (A) notice of any of the matters referred to in this **Section 12.2**; (B) any and all rights which any Obligor may now or hereafter have arising under, and any right to claim a discharge of a Obligor's obligations hereunder by reason of the failure or refusal by Lender to take any action pursuant to, any statute permitting a Obligor to request that Lender attempt to collect the Obligations from any Obligor or other Person; (C) presentment to or demand of payment from an Obligor or any of its Subsidiaries with respect to any Loan Document, and notice to any Obligor of default or protest for nonpayment or dishonor; (D) any diligence in collection from or protection of or realization upon all or any portion of the Obligations or any security therefor, any liability hereunder, or any party primarily or secondarily liable for all or any portion of the Obligations; and (E) any duty or obligation of Lender to proceed to collect all or any portion of the Obligations from, or to commence an action against, any Obligor or other Person, or to resort to any Collateral or to any balance of any deposit account or credit on the books of Lender in favor of any Obligor or any other Person, despite any notice or request of any of any Obligor to do so.

12.3    **Continuing Obligations; Reinstatement.**  The obligations of the Obligors under this Agreement are continuing obligations and shall continue in full force and effect until Full Payment of the Obligations.  The obligations of Obligors under this Agreement shall continue to be effective or be automatically reinstated, as the case may be, if any payment made by an Obligor on, under or in respect of any of the Obligations is rescinded or must otherwise be restored or returned by the recipient in any Insolvency Proceeding of an Obligor or its subsidiary or otherwise, all as though such payment had not been made.  If an event permitting the acceleration of all or any portion of the Obligations shall at any time have occurred and be continuing, and such acceleration shall at such time be stayed, enjoined or otherwise prevented for any reason, including because of the pendency of any Insolvency Proceeding of an Obligor or its subsidiary, for purposes of this Agreement and the obligations of the Obligors hereunder, such Obligations shall be deemed to have been accelerated with the same effect as if such Obligations had been accelerated in accordance with the terms of the applicable Loan Documents or of this Agreement.

12.4    **Waivers and Acknowledgments.**  Each Obligor hereby unconditionally and irrevocably waives:

(i)      Promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and any requirement that Lender protect, secure, perfect or insure any Lien or any Property subject thereto or exhaust any right or take any action against any Obligor or any other Person or any Collateral;

- 17 -

(ii)     Any defense based upon an election of remedies by Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution, indemnification or other rights of such Obligor to proceed against any other Obligor, any other Person or any Collateral, and any defense based on any right of setoff or counterclaim against or in respect of the obligations of such Obligor hereunder;

(iii)    Any duty on the part of Lender to disclose to such Obligor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, Property or prospects of any other Obligor or any of its subsidiaries now or hereafter known by Lender;

(iv)     All rights that it may have now or in the future under any Applicable Law to compel Lender to marshal any assets or to proceed against any Person or security for the payment or performance of any of the Obligations before, or as a condition to, proceeding against such Obligor; and

(v)     All other defenses available to a surety, guarantor or accommodation co-obligor other than Full Payment of all of the Obligations.

Each Obligor acknowledges that it will receive substantial direct and indirect benefits from the financing and arrangements contemplated by the Loan Documents and that the waivers set forth herein are knowingly made in contemplation of such benefits.

12.5    **Additional Security, Etc.**    Obligors authorize Lender, without notice to or demand on the Obligors and without affecting their liability hereunder, from time to time (a) to obtain additional or substitute endorsers or guarantors; (b) to exercise or refrain from exercising any rights against, and grant indulgences to, any Obligor or others; and (c) to apply any sums, by whomsoever paid or however realized, to the payment of the principal of, premium, if any, and interest on, and other obligations consisting of, the Obligations.  Each Obligor waives any right to require Lender to proceed against any additional or substitute endorsers or guarantors or any other Obligor or any other Person or to pursue any other remedy available to Lender.

12.6    **Information Concerning Obligors.**  Each Obligor assumes full responsibility for being informed of the financial condition and assets of all Obligors and their respective Affiliates, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks which each Obligor assumes hereunder, and agrees that no Lender shall have any duty to advise any Obligor of information known to Lender regarding or in any manner relevant to any of such circumstances or risks.

12.7    **Deferral of Reimbursement and Other Rights.**    Each Obligor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against any Obligor that arise from the existence, payment, performance or enforcement of such Obligor's obligations under or in respect of any Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Lender against any Obligor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Obligor, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim, remedy or right, unless and until Full Payment of all Obligations.  If any amount shall be paid to any Obligor in violation of the immediately preceding sentence, such amount shall be received and held in trust for the benefit of Lender, shall be segregated from the property and funds of such Obligor and shall forthwith be paid or delivered to Lender in the same form received (with the addition of any necessary endorsement or assignment) to be credited and applied to the Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents or to be held as collateral security for any Obligations then existing or thereafter arising.

12.8    **Subordination.**    Each Obligor hereby subordinates any and all debts, liabilities and other obligations owed to such Obligor by any other Obligor (the "*Insider Subordinated Debt*") to the Full Payment of the Obligations, and no Obligor shall demand, accept or take any action to collect any payment on account of any Insider Subordinated Debt at any time.  In any Insolvency Proceeding relating to any Obligor, each Obligor agrees that Lender shall be entitled to receive Full Payment of all Obligations (including all interest, fees and expenses accruing after the commencement of such Insolvency Proceeding, whether or not constituting an allowed claim in such Insolvency Proceeding ("*Post-Petition Interest*")) before such Obligor receives any payment of any Insider

- 18 -

Subordinated Debt. At any time a Default or an Event of Default exists, each Obligor shall collect, enforce and receive payments on account of any Insider Subordinated Debt as trustee for Lender and shall deliver such payments to Lender on account of the Obligations, including all Post-Petition Interest and other charges, together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Obligor under this Agreement. At any time an Event of Default exists, Lender is authorized and empowered (but without any obligation to do so), in its discretion, (i) in the name of each Obligor, to collect and enforce, and to submit claims in respect of, any Insider Subordinated Debt and to apply any amounts received thereon to the Obligations (including any and all Post-Petition Interest), and (ii) to require each Obligor (A) to collect and enforce, and to submit claims in respect of, any Insider Subordinated Debt and (B) to pay any amounts received on such obligations to Lender for application to the Obligations (including any and all Post-Petition Interest).

12.9   **Contribution.**   If and to the extent any Obligor shall make a payment under this Agreement (a "***Co-Obligor Payment***") which, taking into account all other Co-Obligor Payments then previously or concurrently made by any other Obligor, exceeds the amount that otherwise would have been paid by or attributable to such Obligor if each Obligor had paid the aggregate Obligations satisfied by such Co-Obligor Payment in the same proportion as such Obligor's "Allocable Amount" (as defined below) (as determined immediately prior to such Co-Obligor Payment) bore to the aggregate Allocable Amounts of each of the Obligors as determined immediately prior to the making of such Co-Obligor Payment, then, following indefeasible Full Payment of the Obligations, such Obligor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Obligor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Co-Obligor Payment. As of any date of determination, the "***Allocable Amount***" of any Obligor shall be equal to the excess of the fair saleable value of the property of such Obligor over the total liabilities of such Obligor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Obligor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Obligors as of such date in a manner to maximize the amount of such contributions. This **Section 12.9** is intended only to define the relative rights of the Obligors, and nothing set forth herein is intended to or shall impair the obligations of Obligors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement. The parties acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Obligor or Obligors to which such contribution and indemnification is owing.

SECTION 13.   **NOTICES**

13.1   **Notices Generally.**   Except as provided in **Section 13.2** below, all notices given under this Agreement shall be in writing and shall be given by hand delivery by a reputable overnight courier or private delivery service, by regular first-class mail or certified mail return receipt requested, addressed to Lender and Borrower Agent at the address set forth for notices in the Terms Schedule, or by facsimile transmission to Borrower Agent or Lender at the facsimile number set forth in the Terms Schedule, or such other address or facsimile number as may be designated in writing by one party to the other delivered in accordance with the provisions hereof. In no event shall a voicemail message be effective as a notice, communication or confirmation under any of the Loan Documents. Any written notice, request or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice, request or demand is actually received by the individual to whose attention at the noticed party such notice, request or demand is required to be sent.

13.2   **Electronic Communications.**   With respect to electronic communications:

(i)   Borrower authorizes Lender to extend Loans and transfer funds to or on behalf of Borrowers based on instructions sent by electronic mail.

(ii)   Electronic mail may be used for delivery of financial statements and other information required by **Section 8.5** (other than notices), administrative matters and distribution of Loan Documents for execution, pursuant to procedures approved by Lender or as otherwise determined by Lender. Anything herein to the contrary notwithstanding, except as expressly provided **Section 13.2(i)**, notices delivered by electronic mail may not be used as effective notice under the Loan Documents.

15369874.1/043245.0272

(iii)    Unless Lender otherwise requires, communications sent to an electronic mail address of Lender shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgement); provided that if such communication is not sent during the normal business hours of the recipient, such communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(iv)    Lender shall not have any liability for any loss suffered by any Obligor as a result of Lender's acting upon its understanding of electronic mail requests or instructions from a Person believed in good faith by Lender to be a Person authorized to give such requests or instructions on an Obligor's behalf. Each Obligor shall indemnify, defend and hold harmless each Indemnitee from any claims arising from any electronic communication purportedly given by or on behalf of an Obligor.

(v)    Lender may, in its discretion and upon notice Borrower (A) cease or suspend any actual or implied obligation it may have to act based on such electronic communications and (B) thereafter, disregard any such electronic communications.

(vi)    Notwithstanding the foregoing, no notice to or upon Lender pursuant to **Sections 6.1, 8.1**(i) or **11.2** shall be effective until after actually received by the individual to whose attention at Lender such notice is required to be sent.

SECTION 14.    **CONVERSION OPTION**

14.1    **Grant of Option.**  Borrower hereby irrevocably grants to Lender the right and option (the "**Option Right**") to purchase thirty percent (30.00%) (measured at the time the Option Right is exercised) of Borrower's issued and outstanding limited liability company membership interests on a fully diluted, as-converted basis, including all equity securities issued by Borrower or convertible into equity securities issued by Borrower (the "**Option Interest**"). The Option Right and the Option Interest shall apply to and be enforceable against Borrower and any and all of Borrower's successors and assigns whether by assignment, merger, or operation of applicable law. In the event that at the time the Option Right is exercised, Borrower has issued more than one class of equity securities, the Option Interest shall be *pari passu* with Borrower's most senior voting securities with the most senior voting, preferential and liquidation rights.

14.2    **Exercise Price.**  The exercise price for the Option Interest shall equal $400,000.00 and shall be paid by Lender to Borrower by offset against Borrower's Obligations under the Second Advance Note on the date the Option Interest is acquired by Lender (the "**Option Acquisition Date**"). No other consideration shall be paid by Lender to Borrower in exchange for the Option Interest.

14.3    **Option Term.**  Lender may, in accordance with the terms of this Agreement, exercise the Option Right at any time on or before the Obligations are paid in full (the "**Expiration Date**"); provided that should Borrower elect to prepay all or any portion of the Obligations prior to January 1, 2023, Lender may, in lieu of accepting such prepayment, exercise its Option Right. If the Option Right is not exercised prior to the Expiration Date it shall automatically terminate, and Lender shall have no further rights whatsoever with respect to Borrower or any ownership interest therein.

14.4    **Exercise of Option.**  The Option Right may be exercised by written notice to Borrower (the "**Option Notice**"). The Option Notice shall state the election to exercise the Option Right, and shall be signed by Lender. Lender shall include with the Option Notice a payoff letter addressed to Borrower and signed by Lender indicating that upon issuance of the Option Interest to Lender, Borrower shall have been deemed to have made a $400,000.00 payment on the Second Advance Note. Upon issuance of the Option Interest to Lender pursuant to its exercise of the Option Right, Lender and the other members of Borrower shall enter into an amendment to the Second Amended and Restated Operating Agreement of Borrower in the form attached to the Agreement as **Exhibit 4** (the "**Operating Agreement Amendment**"). Execution of the Operating Agreement Amendment by Lender and the other members of Borrower shall be a condition precedent to the exercise of the Option Right and the issuance of the Option Interest. If the members of Borrower refuse to execute the Operating Agreement Amendment in connection with Lender's exercise of the Option Right, such refusal shall be deemed an Event of Default. In addition, in connection with Lender's exercise of the Option Right, at Lender's reasonable request, Borrower shall

- 20 -

execute and deliver to Lender such instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Lender may reasonably request in order to fully consummate the issuance of the Option Interest to Lender.

 14.5 **Change in Control.** If Borrower engages in any transaction that results in a Change in Control, Borrower shall provide Lender with written notice of such Change in Control and Lender may immediately exercise all or any part of the Option Right.

SECTION 15. **GENERAL PROVISIONS**

 15.1 **Miscellaneous.** This Agreement has been accepted by Lender in the State of Arizona, is a contract that has been made in the State of Arizona and shall be governed by and construed in accordance with the internal laws of the State of Arizona (without giving effect to its conflict of law rules); may not be amended, except by written agreement of Borrower and Lender; expresses the entire understanding of the parties hereto with respect to the subject matter hereof; may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute but one and the same instrument; and shall be binding upon and inure to the benefit of the parties and their respective successors and assigns (provided that no Obligor may assign or transfer any of its rights under this Agreement or other Loan Documents without the prior written consent of Lender). The paragraph and section headings in this Agreement are for convenience of reference only and shall not affect the substantive meaning of any provision of this Agreement. Time is of the essence of this Agreement and all of the other Loan Documents.

 15.2 **Assignment by Lender.** Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement and the Notes (including all or a portion of the Loans at the time owing to it and all or a portion of the Option Right).

 15.3 **Consent to Forum.** Each Borrower hereby consents to the non-exclusive jurisdiction of any United States federal court sitting in or with direct or indirect jurisdiction over the District of Arizona or in any Arizona state or superior court sitting in Maricopa County, Arizona, in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents and each Borrower irrevocably agrees that all claims and demands in respect of any such action, suit or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such action, suit or proceeding brought in any such court or that such court is an inconvenient forum. Nothing herein shall limit the right of Lender to bring proceedings against any Obligor or with respect to any Collateral in the courts of any other jurisdiction. Any judicial proceeding commenced by any Borrower against Lender involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan Document shall be brought only in a United States federal court sitting in or with direct or indirect jurisdiction over the District of Arizona or in any Arizona state or superior court sitting in Maricopa County, Arizona. Nothing in this Agreement shall be deemed to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

 15.4 **Waivers by Obligors.** **To the fullest extent permitted by Applicable Law, each Obligor waives (i) the right to trial by jury (which Lender hereby also waives) in any action, suit, proceeding or counterclaim of any kind arising out of or related to any of the Loan Documents, the Obligations or the Collateral; (ii) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all Accounts, contract rights, Documents, Instruments, Chattel Paper and guaranties at any time held by Lender on which such Obligor may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (iii) notice prior to taking possession or control of the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; (iv) the benefit of all valuation, appraisement and exemption laws; (v) any claim against Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in respect of any claim for breach of contract or any other theory of liability arising out of, or the taking of any enforcement action, or related to any of the Loan Documents, any transaction thereunder or the use of the proceeds of any Loans; and (vi) notice of Lender's acceptance of this Agreement or any other Loan Document. Each Obligor acknowledges that the foregoing waivers are a material inducement to Lender's entering into this Agreement and that Lender is relying upon the foregoing waivers in its future dealings with**

- 21 -

such Obligor.  **Each Obligor warrants and represents that it has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial rights following consultation with legal counsel.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.**

15.5    **Amended and Restated Agreement.**    This Agreement amends and restates in its entirety the Existing Loan Agreement.  All outstanding advances and all accrued and unpaid interest under the Existing Loan Agreement shall automatically be outstanding Advances and accrued and unpaid interest under this Agreement. Borrower has no claims, counterclaims, defenses, or set-offs with respect to the Existing Loan Agreement or the loans or the loan documents described therein.  Borrower fully, finally, and absolutely and forever releases and discharges Lender and its present and former managers, members, directors, officers, employees, agents, representatives, successors and assigns, and their separate and respective heirs, personal representatives, successors and assigns, from any and all actions, causes of action, claims, debts, damages, demands, liabilities, obligations, and suits, of whatever kind or nature, in law or equity of Borrower, whether now known or unknown to Borrower, and whether contingent or matured, (i) in respect of the Existing Loan Agreement, or the actions or omissions of Lender in respect of the loans or the loan documents described therein, and (ii) arising from events occurring prior to the date of this Agreement.

[Remainder of page intentionally left blank;
signatures begin on following page.]

15369874.1/043245.0272

IN WITNESS WHEREOF, Borrower, the Subsidiary Guarantors and Lender have caused this Agreement to be signed, sealed and delivered by their duly authorized officers or agents as of the date set forth above.

BORROWER:

**GOALZ RESTAURANT GROUP, LLC,**
a Wyoming limited liability company


By: _____
      Shawn Eby, authorized person

SUBSIDIARY GUARANTORS:

**GOALZ CD POOLER GA, LLC**
a Wyoming limited liability company


By: _____
      Shawn Eby, authorized person


**GOALZ DQ DENVER NC, LLC**
a Wyoming limited liability company


By: _____
      Shawn Eby, authorized person


**GOALZ DAIRY FT. PIERCE FL, LLC**
a Florida limited liability company


By: _____
      Shawn Eby, authorized person


**GOALZ DH CO SPRINGS CO, LLC**
a Wyoming limited liability company


By: _____
      Shawn Eby, authorized person


**GOALZ DH GEORGETOWN KY 111, LLC**
a Wyoming limited liability company


By: _____
      Shawn Eby, authorized person

**GOALZ DH IL 107, LLC**
an Illinois limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DH IL 109, LLC**
an Illinois limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ DH SLIDELL LA 112, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP COWY, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP FLA, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP KTY, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

**GOALZ RESTAURANT GROUP NCSC, LLC**
a Wyoming limited liability company

By: _____
      Shawn Eby, authorized person

[Signatures continue on following page.]

15369874.1/043245.0272

Accepted by Lender in Phoenix, Arizona:

HIP LENDING GROUP, LLC

By: _____

    Craig Hannay

## SCHEDULE A

### Fee Schedule

This Fee Schedule is an integral part of, and is incorporated into, that certain Loan, Guaranty and Security Agreement dated as of April 29, 2019, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***"), and is the "Fee Schedule" referenced therein.  Capitalized terms not otherwise defined in this Fee Schedule have the meanings ascribed to such terms in the Loan Agreement.

1.      The fees and expense reimbursements listed on this Schedule are in addition to any fees listed in the Loan Agreement, any of the Loan Documents or subsequently agreed to by Lender and Obligors, and are not intended to exclude any expenses for which Obligors are required to reimburse Lender under the Loan Agreement or any of the Loan Documents.

2.      Obligors jointly and severally agree to pay to Lender:

(a)      **Lender's Expenses**.  Borrower shall reimburse Lender for (i) any Extraordinary Expenses incurred by Lender and (ii) all legal, accounting, consulting and other fees and expenses suffered or incurred by Lender in connection with (a) the negotiation and preparation of any of the Loan Documents and any amendment or modification thereto; (b) the administration of the Loan Documents and the transactions contemplated thereby; (c) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral, including any and all Lien search fees, credit inquiry and investigation fees and costs; or (d) any effort by Lender to verify or appraise any of the Collateral which fees and expenses of subsection (ii) shall not exceed $10,000.  If any of the Obligations are collected by or through an attorney at law, then Borrower shall be obligated to pay, in addition to all principal and interest in respect of the Obligations, Lender's attorneys' fees and court costs as provided in **Section 9.2** of the Agreement.  All such expenses shall be payable to Lender on demand.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Loan Documents regarding the indemnification or reimbursement by Borrower of claims suffered or incurred by Lender.

All of the foregoing fees shall continue to accrue until Full Payment.  Fees that accrue on a monthly or other periodic basis shall be due and payable on the dates set forth above; provided, however, if the Loan Agreement expires or is terminated on a day other than the last day of a month, then any such fee shall be due and payable upon such termination or expiration and shall nevertheless be payable in full on the effective date of such expiration of termination.  Fees and expenses shall be due and payable on the dates set forth in the Loan Documents or, if no date is provided, the same shall be payable on demand.

## SCHEDULE B

<u>Terms Schedule</u>

This Terms Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of April 29, 2019, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***"), and is the "Terms Schedule" referenced therein.   Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

1.      **Loan Terms:**

(a)     <u>Maximum Loan Amount</u>: $3,000,000.00.

(b)     <u>Maturity Date</u>: January 1, 2023.

(c)     <u>Loan Payments for First Advance</u>:   36 equal payments of accrued interest and principal commencing on January 1, 2020.

(d)     <u>Loan Payments for Second Advance</u>:  Interest only payments monthly commencing on January 1, 2020.

3.      **Interest (§ 4):**

(a)     <u>Interest Rate</u>: 15.0% per annum.

(b)     <u>Default Rate</u>: Ten percentage points (10.0%) in excess of the otherwise applicable rate.

4.      **Guarantors:** All Borrower's Subsidiaries and Shawn Eby and Corey Hupp.

5.      **Additional Covenants:** N/A

11.     **Additional Events of Default (§ 9):** N/A

12.     **Notice Addresses:**

(a)     <u>If to Borrowers</u>:

GOALZ RESTAURANT GROUP, LLC
4470 Cox Road
Suite 250
Glen Allen VA 23060

Phone number:          804-527-1817
Facsimile number:      804-527-2048
E-mail address:   <u>shawn@goalzllc.com</u>

(b)    If to Lender:

HIP Lending Group, LLC
2999 N. 44th Street
Suite 400
Phoenix, Arizona 85018
Attn:  Craig Hannay

Phone number:           602-374-2000
E-mail address: channay@hannayra.com

with a copy (which shall not constitute notice) to:

Fennemore Craig
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
Attn: C.W. Ross, Esq.
Facsimile No.: (602) 916-5503

- 2 -

**SCHEDULE C**

[Reserved]

**SCHEDULE D**

Capital Structure

    This Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of April 29, 2019, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the *"Loan Agreement"*), and is the "Terms Schedule" referenced therein.  Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

| Record Owner | Percent of Equity Interests |
|---|---|
| Shawn Eby | 55% |
| RCH – Goalz Holdings, LLC, an Arizona limited liability company | 15% |
| Corey Hupp | 30% |
| | |
| | |
| **TOTAL** | **100.0%** |

## SCHEDULE E

<u>Locations and Jurisdictions in which
each Borrower is Authorized to Do Business</u>

   This Schedule is an integral part of, and is incorporated into, that certain Loan and Security Agreement dated as of April 29, 2019, among **GOALZ RESTAURANT GROUP, LLC**, certain of its subsidiaries and affiliates (if applicable), and **HIP LENDING GROUP, LLC** (collectively with this and every other Schedule and Exhibit thereto, as any of the foregoing may be amended, restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***"), and is the "Terms Schedule" referenced therein.  Capitalized terms not otherwise defined in this Terms Schedule have the meanings ascribed to such terms in the Loan Agreement.

**<u>Chief Executive Offices</u>**

4470 Cox Road
Suite 250
Glen Allen VA 23060

**<u>Other Locations:</u>**

  None.

**<u>Jurisdictions (Include Legal Name and all Trade Names Used in the Last 5 Years)</u>\***

| Legal Name | Type of Entity | State | Organization Number |
|---|---|---|---|
| Goalz CD Pooler GA, LLC | LLC | WY | |
| Goalz Dairy Ft. Pierce FL, LLC | LLC | FL | |
| Goalz DQ Denver NC, LLC | LLC | WY | |
| Goalz DH CO Springs CO, LLC | LLC | WY | |
| Goalz DH Georgetown KY 111, LLC | LLC | WY | |
| Goalz DH IL107, LLC | LLC | IL | |
| Goalz DH IL 109, LLC | LLC | IL | |
| Goalz DH Slidell LA 112, LLC | LLC | WY | |
| Goalz Restaurant Group, LLC | LLC | WY | |
| Goalz Restaurant Group COWY, LLC | LLC | WY | |
| Goalz Restaurant Group FLA, LLC | LLC | WY | |
| Goalz Restaurant Group KTY, LLC | LLC | WY | |
| | | | |
| | | | |

EXHIBIT 1

Form of Second Amended and Restated First Advance Note

(See attached)

**SECOND AMENDED AND RESTATED
SECURED PROMISSORY NOTE**

$800,000.00

April 29, 2019
Phoenix, Arizona

FOR VALUE RECEIVED, the undersigned, **GOALZ RESTAURANT GROUP, LLC**, a Wyoming limited liability company ("Borrower"), hereby promises to pay to the order of **HIP LENDING GROUP, LLC** ("Lender"), at Lender's main office in Phoenix, Arizona, or at such other place as Lender may designate, the principal sum of EIGHT HUNDRED THOUSAND AND NO/100 DOLLARS ($800,000.00) or so much thereof as may from time to time be outstanding as Advances under that certain Amended and Restated Loan, Guaranty and Security Agreement dated April 29, 2019 by and among Borrower, Borrower's Subsidiaries and Lender (as at any time amended, restated, modified or supplemented, the "Loan Agreement"), together with interest thereon, at the times and on the terms set forth herein and in the Loan Agreement. Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

Interest shall accrue on the unpaid principal balance of this Amended and Restated Secured Promissory Note (this "Note") at a fixed rate per annum equal to the "Interest Rate" set forth in the Terms Schedule.

Interest on this Note shall accrue daily from the date of the First Advance, and commencing on January 1, 2020 shall be due and payable monthly, in arrears, on the first day of each month until the full principal amount and accrued interest in respect of this Note are paid in full. Upon and after the occurrence of any Event of Default and during the continuance thereof, interest shall accrue and be payable at a per annum rate described as the "Default Rate" in the Terms Schedule plus the otherwise applicable rate of interest. Interest shall be calculated on the basis of actual days elapsed in a year of 360 days. All payments received in respect of this Note may be applied by Lender first to accrued interest and other charges due and owing to Lender and any remaining amount may be applied to the principal balance hereof. Borrower may prepay all or part of this Note without penalty.

If not sooner repaid, accrued interest and the principal balance of this Note shall be paid in 36 equal monthly installments commencing on January 1, 2020 and payable on the first day of each month thereafter until paid in full. The entire principal balance of this Note shall be due and payable in full, together with all interest, fees and other charges hereunder, on January 1, 2023 and as otherwise provided in Section 9.2 of the Loan Agreement.

This Note is the First Advance Note referred to in the Loan Agreement, evidences the unpaid balance of First Advance under the Loan Agreement, is secured by the Collateral, and is entitled to all the benefits of the Loan Agreement. Lender, from time to time will make Advances as contemplated by the Loan Agreement and accept payments in accordance with and subject to the provisions of the Loan Agreement, and therefore the amount outstanding under this Note may vary.

It is the intention of Lender and Borrower to conform strictly to Applicable Law relating to maximum interest charges. Accordingly, if any provision of this Note would violate any Applicable Law governing the Highest Lawful Rate (as defined below), then, in that event, notwithstanding anything to the contrary in this Note, the following will apply: the aggregate of all payments that constitute interest under Applicable Law that are contracted for, taken, reserved, charged, or received by Lender under this Note shall under no circumstances be in an amount or at a rate that would otherwise cause a violation of such law or exceed the Highest Lawful Rate (as defined below), and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of Lender, be credited by Lender on the principal amount of any Obligations or refunded by Lender to Borrower. The term "Highest Lawful Rate" means the maximum interest rate that at any time or from time to time may be lawfully contracted for, taken, reserved, charged, or received on amounts due to Lender, under laws applicable to Borrower or Lender with regard to this Note that are presently in effect or, to the extent allowed by law, under such Applicable Law that then allows a higher maximum lawful rate than Applicable Law now allows.

The occurrence of an Event of Default shall entitle Lender, at any time and without notice to or demand upon any Borrower or any Obligor, to declare the entire unpaid principal balance hereof and all accrued interest hereon to be, and the same shall thereupon become, immediately due and payable.

15369874.1/043245.0272

Upon termination of the Loan Agreement pursuant to **Section 11.2** of the Loan Agreement, all Obligations (including, without limitation, those evidenced by this Note) shall become immediately due and payable without further notice to or demand upon any Obligor.

Time is of the essence of this Note.

Borrower hereby waives demand, presentment, notice, protest and notice of dishonor and diligence in collection or bringing suit and agrees that Lender may accept partial payment, or release or exchange security or Collateral, without discharging or releasing any unreleased Collateral or the Obligations evidenced hereby. Lender shall not be deemed to waive or have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by an authorized agent of Lender, and no failure, delay or omission by Lender in exercising any of its rights or remedies shall operate as a waiver of such rights or remedies. A waiver by Lender in writing on one occasion shall not be construed as a consent to or a waiver of any right or remedy on any future occasion.

If this Note is collected by or through an attorney at law, Borrower shall be obligated to pay, in addition to the unpaid principal balance and accrued interest, reasonable attorneys' fees plus court costs.

This Note has been delivered in the State of Arizona, is intended to take effect as a contract under seal under the laws of the State of Arizona, and shall be governed in all respects by and construed in accordance with the internal laws of the State of Arizona. This Note shall be binding upon Borrower and its respective successors and assigns.

BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS NOTE, THE OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY LENDER WHICH MAY IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISE OUT OF OR RELATE TO THE RELATIONSHIP BETWEEN SUCH BORROWER AND LENDER.

[Remainder of page intentionally left blank; signatures begin on following page.]

15369874.1/043245.0272

IN WITNESS WHEREOF, Borrower has caused this Note to be executed by its duly authorized person and has delivered this Note to Lender, on the day and year first above written.

BORROWERS:

**GOALZ RESTAURANT GROUP, LLC,**
a Wyoming limited liability company

By: _____
    Shawn Eby, authorized person

**EXHIBIT 2**

Form of Amended and Restated Second Advance Note

(See attached)

## SECURED PROMISSORY NOTE

**$2,200,000.00**

**April 29, 2019**
**Phoenix, Arizona**

FOR VALUE RECEIVED, the undersigned, **GOALZ RESTAURANT GROUP, LLC**, a Wyoming limited liability company ("Borrower"), hereby promises to pay to the order of **HIP LENDING GROUP, LLC** ("Lender"), at Lender's main office in Phoenix, Arizona, or at such other place as Lender may designate, the principal sum of TWO MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($2,200,000.00) or so much thereof as may from time to time be outstanding as Advances under that certain Amended and Restated Loan, Guaranty and Security Agreement dated April 29, 2019 by and among Borrower, Borrower's Subsidiaries and Lender (as at any time amended, restated, modified or supplemented, the "Loan Agreement"), together with interest thereon, at the times and on the terms set forth herein and in the Loan Agreement. Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

Interest shall accrue on the unpaid principal balance of this Secured Promissory Note (this "Note") at a fixed rate per annum equal to the "Interest Rate" set forth in the Terms Schedule.

Interest on this Note shall accrue daily from the date of the First Advance, and commencing on January 1, 2020 shall be due and payable monthly, in arrears, on the first day of each month until the full principal amount and accrued interest in respect of this Note are paid in full. Upon and after the occurrence of any Event of Default and during the continuance thereof, interest shall accrue and be payable at a per annum rate described as the "Default Rate" in the Terms Schedule plus the otherwise applicable rate of interest. Interest shall be calculated on the basis of actual days elapsed in a year of 360 days. All payments received in respect of this Note may be applied by Lender first to accrued interest and other charges due and owing to Lender and any remaining amount may be applied to the principal balance hereof. Borrower may prepay all or part of this Note without penalty; provided that should Borrower elect to prepay all or any portion of the amount owned hereunder, Lender may, in lieu of accepting such prepayment, exercise its option contemplated by **Section 14** of the Loan Agreement.

If not sooner repaid, accrued and unpaid interest and the entire principal balance of this Note shall be due and payable in full, together with all interest, fees and other charges hereunder, on January 1, 2023 and as otherwise provided in **Section 9.2** of the Loan Agreement; provided that should Borrower elect to prepay all or any portion of the amount owned hereunder, Lender may, in lieu of accepting such prepayment, exercise its option contemplated by **Section 14** of the Loan Agreement.

This Note is the Second Advance Note referred to in the Loan Agreement, evidences the unpaid balance of the Second Advance under the Loan Agreement, is secured by the Collateral, and is entitled to all the benefits of the Loan Agreement. Lender, from time to time will make Advances as contemplated by the Loan Agreement and accept payments in accordance with and subject to the provisions of the Loan Agreement, and therefore the amount outstanding under this Note may vary.

It is the intention of Lender and Borrower to conform strictly to Applicable Law relating to maximum interest charges. Accordingly, if any provision of this Note would violate any Applicable Law governing the Highest Lawful Rate (as defined below), then, in that event, notwithstanding anything to the contrary in this Note, the following will apply: the aggregate of all payments that constitute interest under Applicable Law that are contracted for, taken, reserved, charged, or received by Lender under this Note shall under no circumstances be in an amount or at a rate that would otherwise cause a violation of such law or exceed the Highest Lawful Rate (as defined below), and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of Lender, be credited by Lender on the principal amount of any Obligations or refunded by Lender to Borrower. The term "Highest Lawful Rate" means the maximum interest rate that at any time or from time to time may be lawfully contracted for, taken, reserved, charged, or received on amounts due to Lender, under laws applicable to Borrower or Lender with regard to this Note that are presently in effect or, to the extent allowed by law, under such Applicable Law that then allows a higher maximum lawful rate than Applicable Law now allows.

The occurrence of an Event of Default shall entitle Lender, at any time and without notice to or demand upon any Borrower or any Obligor, to declare the entire unpaid principal balance hereof and all accrued interest hereon to be, and the same shall thereupon become, immediately due and payable.

Upon termination of the Loan Agreement pursuant to **Section 11.2** of the Loan Agreement, all Obligations (including, without limitation, those evidenced by this Note) shall become immediately due and payable without further notice to or demand upon any Obligor.

Time is of the essence of this Note.

Borrower hereby waives demand, presentment, notice, protest and notice of dishonor and diligence in collection or bringing suit and agrees that Lender may accept partial payment, or release or exchange security or Collateral, without discharging or releasing any unreleased Collateral or the Obligations evidenced hereby.  Lender shall not be deemed to waive or have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by an authorized agent of Lender, and no failure, delay or omission by Lender in exercising any of its rights or remedies shall operate as a waiver of such rights or remedies.  A waiver by Lender in writing on one occasion shall not be construed as a consent to or a waiver of any right or remedy on any future occasion.

If this Note is collected by or through an attorney at law, Borrower shall be obligated to pay, in addition to the unpaid principal balance and accrued interest, reasonable attorneys' fees plus court costs.

This Note has been delivered in the State of Arizona, is intended to take effect as a contract under seal under the laws of the State of Arizona, and shall be governed in all respects by and construed in accordance with the internal laws of the State of Arizona.  This Note shall be binding upon Borrower and its respective successors and assigns.

BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS NOTE, THE OBLIGATIONS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY LENDER WHICH MAY IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISE OUT OF OR RELATE TO THE RELATIONSHIP BETWEEN SUCH BORROWER AND LENDER.

[Remainder of page intentionally left blank;
signatures begin on following page.]

15369874.1/043245.0272

IN WITNESS WHEREOF, Borrower has caused this Note to be executed by its duly authorized person and has delivered this Note to Lender, on the day and year first above written.

BORROWERS:

**GOALZ RESTAURANT GROUP, LLC,**
a Wyoming limited liability company


By: _____
    Shawn Eby, authorized person

**EXHIBIT 3**

<u>Subordinated Debt</u>

None.

**EXHIBIT 4**

<u>Operating Agreement Amendment</u>

(see attached)

_____ AMENDMENT TO THE
SECOND AMENDED AND RESTATED OPERATING AGREEMENT
OF
GOALZ RESTAURANT GROUP, LLC

This _____ Amendment to the Second Amended and Restated Operating Agreement of Goalz Restaurant Group, LLC (this "**Amendment**") is made and entered into on _____, 20__ (the "**Effective Date**"), by and among [HIP Lending Group, LLC, an Arizona limited liability company ("**HIP**")/_____, a(n) corporation/partnership/limited liability company ("**Holder**")] *[NOTE: IF HIP ASSIGNS THE LOAN AGREEMENT OR RIGHT TO EXERCISE THE OPTION, HIP TO BE REPLACED ON THIS AMENDMENT BY THE NEW HOLDER]*, as a Member, and RCH – Goalz Holdings, LLC, an Arizona limited liability company ("**RCH**"), Corey S. Hupp ("**Hupp**"), and Shawn Eby ("**Eby**"), as Managers and Members, of Goalz Restaurant Group, LLC, an Arizona limited liability company (the "**Company**").

## RECITALS

A.      The Company was formed as a Wyoming limited liability company upon the filing of its articles of organization with the Wyoming Secretary of State on July 22, 2016. The business and affairs of the Company, and the rights, privileges, duties and obligations of its Members are governed by that certain Second Amended and Restated Operating Agreement of Goalz Restaurant Group, LLC dated effective as of September 4, 2018, as amended by the First Amendment to the Second Amended and Restated Operating Agreement of Goalz Restaurant Group, LLC dated March ___, 2019 [and the _____ Amendment to the Second Amended and Restated Operating Agreement of Goalz Restaurant Group, LLC dated _____, 20__] (collectively, the "**Operating Agreement**"). Unless specifically defined in this Amendment, capitalized terms and phrases appearing in this Amendment shall have the meanings given those terms and phrases in the Operating Agreement.

B.      Pursuant to that certain Amended and Restated Loan, Guaranty, and Security Agreement dated effective March ___, 2019 by and among HIP, the Company, and certain subsidiaries of the Company (the "**Loan Agreement**"), the Company granted HIP an option (the "**Option**") to acquire a Membership Interest equal to thirty percent (30%) of all issued and outstanding Membership Interests in the Company on a fully diluted, as-converted basis, including all equity securities issued by the Company or convertible into equity securities issued by the Company (the "**Option Interest**") for the exercise price of $400,000.

*[NOTE: IF HIP ASSIGNS THE LOAN AGREEMENT OR OPTION, USE THE ALTERNATE RECITAL B BELOW:]*

[B.      Pursuant to that certain Amended and Restated Loan, Guaranty, and Security Agreement dated effective March ___, 2019 by and among HIP Lending Group, LLC, an Arizona limited liability company ("**HIP**"), the Company, and certain subsidiaries of the Company (the "**Loan Agreement**"), the Company granted HIP an option (the "**Option**") to acquire a Membership Interest equal to thirty percent (30%) of all issued and outstanding Membership Interests in the Company on a fully diluted, as-converted basis, including all equity securities issued by the Company or convertible into equity securities issued by the Company (the "**Option Interest**") for the exercise price of $400,000. HIP subsequently assigned its rights [under the Loan Agreement/to the Option] to Holder.]

C.      [HIP/Holder] has decided to exercise its option to acquire the Option Interest, and the Members now desire to clarify the nature, mechanics, and implementation of the transactions related to exercise of the option, all as provided more fully in this Amendment.

**AGREEMENTS**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    <u>Issuance; Admission of [HIP/Holder] as a Member</u>. The Company issues to [HIP/Holder], and [HIP/Holder] accepts, the Option Interest. The Managers and Members consent to the issuance of the Option Interest and the admission of [HIP/Holder] as a full Member with respect to the Option Interest. [HIP/Holder] agrees to be bound by all provisions of the Operating Agreement, including as amended by this Amendment, from and after the Effective Date.

2.    <u>Percentage Interests; Amended Exhibit A</u>. Exhibit A to the Operating Agreement is deleted and replaced in its entirety by the <u>Exhibit A</u> attached to this Amendment (the "**Updated Exhibit A**"). The Members agree that, from and after the Effective Date, the Percentage Interests of the Members shall be as provided on the Updated Exhibit A.

3.    <u>Board of Managers</u>. [HIP/Holder] hereby waives its right, under Section 6.2.2 of the Operating Agreement, to appoint a Manager to the Board of Managers.

4.    <u>Adjustments to Capital Accounts and Adjusted Capital Balance Upon Exercise</u>.

    (a)    In connection with the admission of [HIP/Holder] as a Member upon exercise of the Option, the Company shall, in accordance with the Regulations (including, without limitation, Regulations Section 1.704-1(b)(iv)($s$)), adjust the Capital Accounts and Adjusted Capital balance of the Members (including [HIP/Holder]) to equal the amounts that would be distributed to the Members by the Company if the Company sold all of its assets at the values mutually agreed to by the Managers and [HIP/Holder], paid all of the Company's liabilities, and distributed the proceeds of such sale in the order of priority set forth in Section 11.3 of the Operating Agreement immediately after exercise of the Option (using the Percentage Interests contained on the Updated Exhibit A). Any adjustment to the Members' Capital Accounts and Adjusted Capital balances must be approved by both the Board of Managers and [HIP/Holder]. In addition, the Company will make any "corrective allocations" deemed reasonably necessary by both the Board of Managers and [HIP/Holder] to comply with Regulations Section 1.704-1(b)(2)(iv)($s$)(3) and Regulations Section 1.704-1(b)(4)($x$).

5.    <u>Continuing Effect</u>. Except as modified, amended, or superseded by this Amendment, all terms and provisions of the Operating Agreement shall remain in full force and effect; in the case of a conflict in meaning between the Operating Agreement and this Amendment, this Amendment shall prevail.

6.    <u>Additional Documents</u>. Each party, upon the request of any other party, agrees to perform all further acts and execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Amendment.

7.    <u>Incorporation of Recitals; Counterpart Execution</u>. The Recitals set forth above are incorporated herein, confirmed as being true and correct, and are binding upon the parties. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument. Facsimile signatures, and photographic copies of signatures stored and delivered via any other electronic means (including .pdf files), shall be given the same effect as original signatures.

**Remainder of this page left blank.**
**Signatures follow on next page.**

IN WITNESS WHEREOF, the parties hereto have executed this Amendment effective as of the date first above written.

[*NOTE: IF HIP ASSIGNS ITS RIGHTS, REPLACE ITS SIGNATURE BLOCK BELOW WITH THE HOLDER'S SIGNATURE BLOCK*]

**HIP LENDING GROUP, LLC**
an Arizona limited liability company

By:    Hannay Investment Properties, Inc.,
an Arizona corporation
Manager

By:_____
R. Craig Hannay, President

_____
**SHAWN EBY**

_____
**COREY S. HUPP**

**RCH – GOALZ HOLDINGS, LLC,**
an Arizona limited liability company

By:    Hannay Investment Properties, Inc.,
an Arizona corporation
Manager

By:_____
R. Craig Hannay, President

**Exhibit A**

| Member Name/Address | Percentage Interest |
|---|---|
| Shawn Eby<br>9432 Aspen Pointe Lane<br>Cheyenne, WY 82009 | 42.06% |
| [*NOTE: IF HIP ASSIGNS ITS RIGHTS, REPLACE ITS INFORMATION BELOW WITH THE HOLDER'S INFORMATION*]<br><br>HIP Lending Group, LLC<br>2999 North 44th Street, Suite 400<br>Phoenix, Arizona 85018 | 30.00% |
| RCH – Goalz Holdings, LLC<br>2999 North 44th Street, Suite 400<br>Phoenix, Arizona 85018 | 15.00% |
| Corey S. Hupp<br>3428 Brantford Road<br>Ottawa Hills, Ohio 43606 | 12.94% |
| Total | 100% |

| Board of Managers | Address |
|---|---|
| Shawn Eby | 9432 Aspen Pointe Lane<br>Cheyenne, WY 82009 |
| RCH – Goalz Holdings, LLC | 2999 North 44th Street, Suite 400<br>Phoenix, Arizona 85018 |
| Corey S. Hupp | 3428 Brantford Road<br>Ottawa Hills, Ohio 43606 |

# EXHIBIT F

## CONTINUING GUARANTY
(Shawn Eby)

THIS CONTINUING GUARANTY (this "Guaranty") is entered into on August 27, 2018, by **SHAWN EBY**, an individual who resides at 9432 Aspen Pointe Lane, Cheyenne, WY 82009 ("Guarantor"), in favor of **HIP LENDING GROUP, LLC**, having an address at 2999 North 44th Street, Suite 400, Phoenix, Arizona 85018 (together with its successors and assigns, "Lender").

### Recitals:

Lender and **GOALZ RESTAURANT GROUP, LLC**, a Wyoming limited liability company ("Borrower"), are parties to a certain Loan, Guaranty and Security Agreement dated on or about the date hereof (together with all schedules, exhibits and supplements thereto and all amendments, restatements and modifications thereof, the "**Loan Agreement**") and that certain Secured Promissory Note dated on or about the date hereof (the "Note"), pursuant to which Lender has agreed, subject to all the terms and conditions thereof, to make loans and other extensions of credit to Borrower from time to time secured by a security interest in and lien upon substantially all of the personal property assets and certain real property assets of Borrower.

A condition to Lender's willingness to make loans or other extensions of credit to Borrower is Guarantor's execution and delivery to Lender of this Guaranty.  Guarantor is willing to execute this Guaranty to induce Lender to make loans or otherwise extend credit or other financial accommodations from time to time to Borrower.

### Statement of Agreement:

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, Guarantor hereby agrees as follows:

1.      **Definitions; Rules of Construction.**  Capitalized terms used herein, unless otherwise defined, shall have the meanings ascribed to them in the Loan Agreement.  As used herein, the words "herein," "hereof," "hereunder," and "hereon" shall have reference to this Guaranty taken as a whole and not to any particular provision hereof; and the word "including" shall mean "including, without limitation."

2.      **Guaranty; Limitations.**

2.1      Guarantor hereby unconditionally and absolutely guarantees to Lender the due and punctual payment, performance and discharge (whether upon stated maturity, demand, acceleration or otherwise) of (i) all of the Obligations (including all debts, obligations and liabilities of Borrower to Lender arising under the Note), and (ii) all agreements at any time made by Borrower to Lender, including those set forth in the Loan Documents and the Note (the Obligations and all such other debts, liabilities and obligations described in clause (ii) being jointly referred to as the "Guaranteed Obligations").  Without limiting the generality of the foregoing, the term "Guaranteed Obligations" shall include all debts, liabilities and obligations incurred by Borrower to Lender in any Insolvency Proceeding of Borrower and all interest, fees or other charges accrued in any such Insolvency Proceeding, whether or not any such interest, fees or other charges are recoverable from Borrower or its estate under 11 U.S.C. § 506.

2.2      Notwithstanding anything contained in this Guaranty or any of the other Loan Documents to the contrary, if and for so long as no Recourse Event (as defined below) has occurred, "Guaranteed Obligations" shall be defined as and limited to the following:  (a) the due and punctual payment of an amount equal to $400,000.00 of the principal balance of the Loan, together with interest thereon, and (b) the amount of the Non-Recourse Carve-Outs (as defined below).  Guarantor hereby consents to Lender's application of payments of any kind, including through the proceeds of the realization on Collateral for the Loan, to any of the foregoing fees, costs or expenses in such order as Lender may elect, it being the understanding and agreement of the Guarantor that Lender shall be entitled to apply such proceeds in a manner designed to maximize Lender's recovery hereunder.  Without limitation of the foregoing, Guarantor hereby irrevocably agrees that amounts bid at any foreclosure sale or other realization on collateral for the Loan shall be binding for determining the reduction of any obligation of Guarantor hereunder.

2.3     For purposes of this Guaranty, the term "Recourse Event" shall mean any of the following:  (i) any transfer or conveyance of all or any part of the property secured by the Loan Documents or of the equity interests in the Borrower other than as expressly permitted in the Loan Documents, (ii) any voluntary encumbrance (which, for avoidance of doubt, shall be deemed not to include mechanics' or similar liens) or grant of a security interest in or deed of trust or mortgage on all or any part of the Collateral secured by the Loan Documents, (iii) the commencement by Borrower of any Insolvency Proceeding, (iv) the commencement as to Borrower of any involuntary Insolvency Proceeding in which Borrower or any of its Affiliates shall affirmatively acquiesce or collude and such involuntary Insolvency Proceeding is not dismissed within sixty (60) days, (v) the voluntary commencement by Borrower of any proceeding for its dissolution or liquidation, (vi) the filing or maintenance by or on behalf of Borrower, following the occurrence of an Event of Default, of any litigation or other proceeding against Lender, or the assertion of any claims or defenses against Lender, which has the effect of hindering, delaying or preventing Lender obtaining the installation of a receiver or completing a foreclosure of any of the Collateral initiated or maintained in bad faith or (vii) the revocation of this guaranty by any Guarantor.

2.4     For purposes of this Guaranty, the term "Non-Recourse Carve-Out" shall mean each and all of the following: any loss, damage, cost, expense, liability, claim or other obligation actually incurred by Lender (including reasonable attorneys' fees and costs) arising out of or in connection with any of the following: (A) fraud or intentional misrepresentation by Borrower or Guarantor or any of their respective principals, affiliates, employees, officers, directors, members, and/or agents in connection with the Loan; (B) material physical destruction of the Collateral for the Loan by Borrower or any of their respective principals, affiliates, employees, officers, directors, members, and/or agents; and (C) Borrower, any officer or director of Borrower, or Guarantor shall be indicted for or convicted of (or plead *nolo contendere* to) any crime punishable under applicable law as a felony.

2.5     Lender shall be under no obligation to marshal any assets in favor of Guarantor or in payment of any of the Guaranteed Obligations.  If and to the extent Lender receives any payment on account of any of the Guaranteed Obligations (whether from Borrower, Guarantor or any other Person or from the disposition or collection of any Collateral) and such payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person in any Insolvency Proceeding or otherwise, then the part of the Guaranteed Obligations intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.  The foregoing provisions of this section shall survive the termination of this Guaranty.

2.6     Lender shall have the right to seek recourse against Guarantor to the full extent provided for herein and against Borrower to the full extent provided for in any of the Loan Documents.  No election to proceed in one form of action or proceeding, or against any Person, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against any other Person unless Lender has expressly waived such right in writing.  Without limiting the generality of the foregoing, no action or proceeding by Lender against Borrower shall serve to diminish Guarantor's liability hereunder.

3.     **Nature of Guaranty**.  This Guaranty is a primary, immediate and original obligation of Guarantor; is an absolute, unconditional, continuing and irrevocable guaranty of payment of the Guaranteed Obligations and not of collectability only; is not contingent upon the exercise or enforcement by Lender of whatever rights or remedies Lender may have against Borrower or others, or the enforcement of any Lien or realization upon any Collateral or other security that Lender may at any time possess; and shall remain in full force and effect without regard to future changes in conditions, including change of law or any invalidity or unenforceability of any of the Guaranteed Obligations or agreements evidencing same.  This Guaranty shall be in addition to any other present or future guaranty or other security for any of the Guaranteed Obligations, shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security, and is not conditioned upon or subject to the execution by any other Person of this Guaranty or any other guaranty or suretyship agreement.

4.     **Payment of Guaranteed Obligations**.

4.1     If Guarantor should die or become incompetent (except to the extent the death of Guarantor does not constitute an Event of Default under Section 9.1 of the Loan Agreement), or if an Insolvency Proceeding is filed by or against Guarantor, or if a receiver, trustee or conservator should be appointed for any of Guarantor's property,

- 2 -

or if an Event of Default shall occur and be continuing, then, in any such event and whether or not any of the Guaranteed Obligations are then due and payable or the maturity thereof has been accelerated or demand for payment thereof has been made, Lender may, without notice to Guarantor, make the Guaranteed Obligations immediately due and payable hereunder as to Guarantor (whether or not the same are due and payable from Borrower), and Lender shall be entitled to enforce the obligations of Guarantor hereunder as if the Guaranteed Obligations were then due and payable in full.  If any of the Guaranteed Obligations are collected by or through an attorney at law, Guarantor shall pay to Lender, together with all other Guaranteed Obligations, reasonable attorneys' fees and court costs.

4.2     Guarantor's payment of the Guaranteed Obligations shall be without setoff or other deductions, irrespective of any counterclaim, defense, or other claim that Guarantor may have or assert at any time against Borrower, Lender or any other Person.  If for any reason Borrower has no legal existence or is under no legal obligation to discharge any of the Guaranteed Obligations, or if any of the Guaranteed Obligations become unrecoverable from Borrower by reason of an Insolvency Proceeding or by other operation of law or for any other reason, this Guaranty shall nevertheless be binding on Guarantor to the same extent as if Guarantor had at all times been the principal obligor on all such Guaranteed Obligations.  If demand or acceleration of the time for payment of any Guaranteed Obligations is stayed upon the commencement of an Insolvency Proceeding or for any other reason, all amounts otherwise subject to demand or acceleration under the terms of any Loan Document shall be immediately due and payable by Guarantor.

4.3     Lender's books and records showing the status of the account between Lender and Borrower shall be admissible in evidence in any action or proceeding against or involving Guarantor as *prima facie* proof of the items therein set forth, and the monthly statements of Lender rendered to Borrower, to the extent no written objection thereto is made in the manner and within the time period set forth in the Loan Agreement, shall be deemed conclusively correct and shall constitute an account stated between Lender and Borrower and shall be binding on Guarantor.

5.     **Specific Waivers of Guarantor.**  To the fullest extent permitted by Applicable Law, Guarantor waives notice of Lender's acceptance hereof and reliance hereon; notice of the extension of credit from time to time by Lender to Borrower and the creation, existence or acquisition of any Guaranteed Obligations; notice of the amount of Guaranteed Obligations from time to time (subject, however, to Guarantor's right to make inquiry of Lender to ascertain the amount of Guaranteed Obligations at reasonable times); notice of any adverse change in Borrower's financial condition or of any other fact that might increase Guarantor's risk; notice of presentment for payment, demand, protest and notice thereof as to any instrument; notice of default or acceleration; all other notices and demands to which Guarantor might otherwise be entitled; any right to direct apportionment of payments provided for under applicable law; any right Guarantor may have, by statute or otherwise, to require Lender to institute suit against Borrower after notice or demand from Guarantor or to seek recourse first against Borrower, or to realize upon any Collateral or other security for the Guaranteed Obligations, as a condition to Lender's enforcing Guarantor's liability and obligations hereunder; any defense that Borrower may at any time have based upon the statute of limitations, the statue of frauds, failure of consideration, fraud, bankruptcy, lack of legal capacity, usury, or accord and satisfaction; any defense that other indemnity, guaranty, or security was to be obtained for any of the Guaranteed Obligations; any defense or claim that any Person purporting to bind Borrower to the payment of any of the Guaranteed Obligations did not have actual or apparent authority to do so; any defense or claim that any other act or omission by Lender had the effect of increasing Guarantor's risk of payment; and any other legal or equitable defense to payment hereunder.  Guarantor also waives any right that Guarantor may have to claim or recover, in any litigation arising out of this Guaranty or any of the other Loan Documents, any special, exemplary, punitive or consequential damages or any other damages that are not actual damages.  If any Collateral consists of real property, Guarantor waives any defense based on any failure by Lender to seek or obtain any judicial confirmation of any sale of such real estate by foreclosure or pursuant to a power of sale in the instrument encumbering such real estate.

6.     **Guarantor's Consents and Acknowledgments.**

6.1     Guarantor consents and agrees that, without notice to or by Guarantor and without reducing, releasing, diminishing, impairing or otherwise affecting the liability or obligations of Guarantor hereunder, Lender may (with or without consideration) compromise or settle any of the Guaranteed Obligations; accelerate the time for payment of any of the Guaranteed Obligations; extend the period of duration or the time for the payment, discharge

14195782/043245.0272

or performance of any of the Guaranteed Obligations; increase the amount of the Guaranteed Obligations; refuse to enforce, or release any and all Persons liable for the payment of, any of the Guaranteed Obligations; increase, decrease or otherwise alter the rate of interest payable with respect to any of the Guaranteed Obligations or grant other indulgences to Borrower in respect thereof; amend, modify, terminate, release, or waive any Loan Documents (other than this Guaranty); release, surrender, exchange, modify or impair, or consent to the sale, transfer or other disposition of, any Collateral or other property at any time securing (directly or indirectly) any of the Guaranteed Obligations; fail or refuse to perfect (or to continue the perfection of) any Lien granted or conveyed to Lender with respect to any Collateral, or to preserve rights to any Collateral, or to exercise care with respect to any Collateral (whether or not in Lender's possession); extend the time of payment of any Collateral consisting of accounts, instruments, payment intangibles, chattel paper or other rights to the payment of money; refuse to enforce or forbear from enforcing its rights or remedies with respect to any Collateral or any Person liable for any of the Guaranteed Obligations or make any compromise or settlement or agreement therefor in respect of any Collateral or with any party to the Guaranteed Obligations; or release or substitute any one or more of the endorsers or guarantors of the Guaranteed Obligations, whether parties to this Guaranty or not.

6.2     Guarantor is fully aware of the financial condition of Borrower and delivers this Guaranty based solely upon Guarantor's own independent investigation and in no part upon any representation or statement of Lender with respect thereto.  Guarantor is in a position to and hereby assumes full responsibility for obtaining any additional information concerning Borrower's financial condition as Guarantor may deem material to Guarantor's obligations hereunder and Guarantor is not relying upon, nor expecting Lender to furnish Guarantor any information at any time in Lender's possession concerning, Borrower's financial condition.  If Lender, in its sole discretion, undertakes at any time or from time to time to provide any information to Guarantor regarding Borrower, any of the Collateral, or any transaction or occurrence in respect of any of the Loan Documents, Lender shall have no obligation to update any such information or to provide any such information to Guarantor on any subsequent occasion.  Guarantor hereby knowingly accepts the full range of risks encompassed within a contract of "Guaranty," which risks include, without limitation, the possibility that Borrower will contract additional Guaranteed Obligations for which Guarantor may be liable hereunder after Borrower's financial condition or ability to pay its lawful debts when they fall due has deteriorated.

7.      **Continuing Nature of Guaranty.**

7.1     This Guaranty shall continue in full force and effect until Full Payment of the Guaranteed Obligations.  Guarantor acknowledges that there may be future advances by Lender to Borrower (although Lender may be under no obligation to make such advances) and that the types and amount of the Guaranteed Obligations are unlimited and may fluctuate from time to time hereafter, and this Guaranty shall remain in force at all times until terminated in accordance with its terms, whether or not there are any Guaranteed Obligations outstanding.  This Guaranty shall be unaffected by the death or incompetence of Guarantor and shall not be limited to the amount of Guaranteed Obligations outstanding at the time of the death or incompetence of Guarantor.

7.2     To the fullest extent permitted by Applicable Law, Guarantor waives any right that Guarantor may have to terminate or revoke this Guaranty.  If, notwithstanding the foregoing waiver, Guarantor shall nevertheless have any right under Applicable Law to terminate or revoke this Guaranty (which right cannot be waived by Guarantor), such termination or revocation shall not be effective until a written notice of such termination or revocation, specifically referring to this Guaranty and signed by Guarantor, is sent by Guarantor in conformity with Section 14 hereof and is actually received by Lender; but any such termination or revocation shall not affect the obligation of Guarantor with respect to any of the Guaranteed Obligations owing to Lender and existing at the time of the receipt by Lender of such revocation or to arise out of or in connection with any transactions theretofore entered into by Lender with or for the account of Borrower.  If Lender grants loans or other extensions of credit to or for the benefit of Borrower or takes other action prior to Lender's receipt of such written notice of termination or revocation, then the rights of Lender hereunder with respect thereto shall be the same as if such termination or revocation had not occurred.

8.      **Sole and Separate Property.**  Notwithstanding anything to the contrary set forth herein, this Guaranty and the obligations and liabilities hereunder shall be limited to Guarantor's sole and separate property and not to Guarantor's community property.  Guarantor hereby represents and warrants to Lender that all of the assets of

- 4 -

Guarantor disclosed to Lender in the financial information provided by Guarantor to Lender in connection with the Guaranty are the sole and separate property of Guarantor.

9.      **Subordination; Postponement of Subrogation Rights.**

9.1     The payment and performance of all present and future debts and other obligations of Borrower to Guarantor (other than, for so long as Guarantor is employed as an officer of Borrower, employment compensation and benefits arising out of Guarantor's employment in the ordinary course of business and consistent with past practices) are hereby postponed and subordinated to the Full Payment of the Guaranteed Obligations except as may be otherwise provided in any subordination agreement executed in connection herewith.  If any payment shall be made to Guarantor on account of any such debts or other obligations owing by Borrower to Guarantor during any time that any Guaranteed Obligations are outstanding, Guarantor shall hold such payment in trust for the benefit of Lender and shall make such payment to Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the discretion of Lender.  The provisions of this Guaranty shall be supplemental to and not in derogation of any rights and remedies of Lender or any affiliate of Lender under any separate subordination agreement that Lender or such affiliate may at any time enter into with Guarantor.

9.2     Until the Full Payment of the Guaranteed Obligations, Guarantor shall have no claim, right or remedy (whether or not arising by contract, equity or Applicable Law) against Borrower or any other Person by reason of Guarantor's payment or other performance hereunder.  Without limiting the generality of the foregoing, Guarantor subordinates to the Full Payment of the Guaranteed Obligations all legal and equitable rights or claims that Guarantor may have against Borrower or any other Person to reimbursement, subrogation, indemnity, contribution and exoneration and agrees that, until the Full Payment of the Guaranteed Obligations, Guarantor shall have no recourse to any property of Borrower (including any Collateral) and no right of recourse against or contribution from any other Person in any way directly or contingently liable for any of the Guaranteed Obligations, whether any of such rights arise by contract, equity or Applicable Law.

10.     **Other Guaranties.**  If Lender hereafter obtains any other guaranty from Guarantor or any other Person of any of the Guaranteed Obligations, such additional guaranty shall not be deemed in lieu of or to supersede, terminate or diminish this Guaranty, but shall be construed as an additional or supplementary guaranty unless otherwise expressly provided in such additional or supplementary guaranty; and if, on or prior to the date hereof, Guarantor or any other Person has given to Lender a previous guaranty or guaranties, this Guaranty shall be construed to be an additional or supplementary guaranty and not be deemed in lieu thereof or to supersede, terminate or diminish such previous guaranty or guaranties.

11.     **Application of Payments.**  Unless otherwise required by law or a specific agreement to the contrary, all payments received by Lender from Borrower, Guarantor or any other Person with respect to the Guaranteed Obligations or from proceeds of the Collateral may be applied (or reversed and reapplied) by Lender to the Guaranteed Obligations in accordance with the terms of the Loan Agreement and the Note.

12.     **Limitation on Guaranty.**  To the extent any performance of this Guaranty would violate any applicable usury statute or other similar law, the obligation to be fulfilled shall be reduced to the limit legally permitted, so that this Guaranty shall not require any performance in excess of the limit legally permitted, but such obligation shall be fulfilled to the limit of legal validity.  Nothing in this Guaranty shall be construed to authorize Lender to collect from Guarantor any interest that has not yet accrued, is unearned or is otherwise not entitled to be collected by Lender under Applicable Law.  The provisions of this section shall control every other provision of this Guaranty.

13.     **Financial Status; Credit Reports.**  Guarantor represents and warrants that all financial information provided by Guarantor to Lender truly and accurately depicts Guarantor's financial condition as of the date specified in such financial information; Guarantor is meeting Guarantor's current liabilities as they mature; there are not now pending against Guarantor any court or administrative proceedings that have not been disclosed to Lender in writing prior to the date hereof, nor have there been filed (or threatened to be filed) against Guarantor any undischarged judgments or federal or state tax Liens; and Guarantor is not in default or claimed default under any agreement to which Guarantor is a party for borrowed money.  The foregoing representations and warranties shall be deemed continuing and Guarantor shall promptly notify Lender in writing if any of the foregoing warranties become incorrect or inaccurate.  Guarantor shall provide to Lender such information regarding Guarantor's assets, liabilities

- 5 -

and financial condition generally as Lender may from time to time request, including copies of Guarantor's tax returns and financial statements signed by Guarantor. Guarantor agrees that Lender may obtain Guarantor's personal credit profile from one or more national credit bureaus, with such authorization to extend to obtaining a credit profile in considering this Guaranty and subsequently for the purposes of update, renewal or extension of any credit or the provision of additional credit.

14.    **Notices.**   All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and shall be effective upon receipt by the noticed party. Acceptable methods for giving notices hereunder shall include first-class U.S. mail, facsimile transmission and commercial courier service. Regardless of the manner in which notice is provided, notices may be sent to the addresses for Lender and Guarantor as set forth above or to such other address as either party may give to the other for such purpose in accordance with this Section 14.

15.    **Governing Law; Venue.**   This Guaranty and the rights and obligations of the parties hereto shall be governed, construed and interpreted according to the internal laws (excluding conflict of law rules) of the State of Arizona. All actions, suits or proceedings arising directly or indirectly hereunder may, at the option of Lender, be litigated in courts located in Maricopa County, Arizona, and Guarantor hereby expressly consents to the jurisdiction of any state or federal court located within said county and agrees that any service of process in such action or proceedings may be made by personal service upon Guarantor wherever Guarantor may be then located, or by certified or registered mail directed to Guarantor at Guarantor's last known address; provided, however, that the foregoing shall not prevent Lender from bringing any action, enforcing any Lien or judgment or exercising any rights or remedies against Guarantor or any property of Guarantor, within any other county, state or other foreign or domestic jurisdiction. Guarantor waives any objection to venue and any objection based on a more convenient form in any action instituted under this Guaranty.

16.    **Successors, Assigns and Participants.**   This Guaranty shall be binding upon Guarantor and Guarantor's legal representatives, administrators, heirs and executors, and shall inure to the benefit of Lender and its successors and assigns. Lender may, at any time, assign or transfer its rights and interests under this Guaranty in whole or in part to an Affiliate. On and after a Default or an Event of Default, and in the event of a sale or assignment by Lender of all or any part of the Obligations on or after a Default of an Event of Default, Lender may assign or transfer its rights and interests under this Guaranty in whole or in part to the purchaser or purchasers of such Obligations, whereupon such purchaser or purchasers shall become vested with all of the powers and rights given to Lender hereunder, and Lender shall thereafter be forever released and fully discharged from any liability or responsibility hereunder with respect to the rights and interests so assigned. If Lender elects to assign or sell any of the Guaranteed Obligations or the Loan Documents, including this Guaranty, Lender may forward to each assignee and each prospective assignee all documents and information relating to this Guaranty or to Guarantor, whether furnished by Borrower, Guarantor or any other Person.

17.    **Miscellaneous.**   This Guaranty expresses the entire understanding of the parties with respect to the subject matter hereof; may not be changed orally and no provision hereof can be released or waived by Lender except by a writing signed by a duly authorized officer of Lender; is intended to take effect as a sealed instrument under the laws of the State of Arizona; and may be executed in multiple counterparts, all of which taken together shall constitute one and the same Guaranty (and the signature page of any counterpart may be removed therefrom and attached to any other counterpart). If any part of this Guaranty is determined to be invalid, the remaining provisions of this Guaranty shall be unaffected and shall remain in full force and effect. No delay or omission on Lender's part to exercise any  right, power or remedy arising hereunder will impair any such  right, power or remedy or be considered a waiver of any such  right, power or remedy, nor will Lender's action or inaction impair any such  right, power or remedy, and all of Lender's rights, powers and remedies hereunder are cumulative and not exclusive of any other rights, powers or remedies that Lender may have by contract, equity or Applicable Law. Time is of the essence of this Guaranty. The section headings in this Guaranty are inserted for convenience of reference only and shall in no way alter, modify or define, or be used in construing, the text of this Guaranty.

18.    **JURY TRIAL AND OTHER WAIVERS.** Guarantor hereby waives: the right to trial by jury (which Lender also waives) in any action, suit, proceeding or counterclaim concerning this Guaranty; presentment and demand for payment of any of the Guaranteed Obligations; protest and notice of dishonor or default

-6-

with respect to any of the Guaranteed Obligations; and all other notices to which Guarantor might otherwise be entitled except as herein expressly provided.

[Remainder of page intentionally left blank]

14195782/043245.0272

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal on the day and year first written above.

Witness:

Print Name: JERON BROWER

Guarantor:

Print Name: Shawn Eby

State of VA

County of Henrico

Before me, the undersigned attesting officer duly authorized to administer oaths in the state and county aforesaid, personally appeared **Shawn Eby**, who, being personally known to me or having satisfactorily proved himself to be said person and having been duly sworn on his oath, acknowledged that he executed the within and foregoing Continuing Guaranty as his own free act and deed, this 28 day of August, 2018.

Notary Public
[Notarial Seal]
My commission expires:
2/29/2020

CHELSEA LAVERY
NOTARY
PUBLIC
REG # 7665954
MY COMMISSION
EXPIRES
2/29/2020
COMMONWEALTH OF VIRGINIA

# EXHIBIT G

## PROMISSORY NOTE

$283,093                                                    <u>September 20th</u>, 2019

FOR VALUE RECEIVED, the undersigned (the "Debtors"), promises to pay to the order of Cajun Global LLC, d/b/a Church's Chicken, a Delaware limited liability company (the "Holder") the principal sum of **Two Hundred and Eighty-three Thousand, Ninety-three and 00/100 Dollars ($283,093)**, as follows:

1.    <u>Payment Schedule</u>.  The Debtors shall pay the principal sum to Holder in twelve (12) equal monthly installments of **Twenty-three Thousand, Five Hundred and Ninety-one and 08/100 ($23,591.08)** commencing on **January 1, 2020** and continuing on the first (1st) of each calendar month until paid in full as shown on the attached Payment Schedule.  Notwithstanding the Payment Schedule, the Debtors shall pay this Note in full at the closing of a sale of any Church's Chicken restaurant or restaurants owned and operated by any entity controlled by Shawn Eby, Craig Hannay or Corey Hupp.

Holder will permit Debtors to commence payments on June 1, 2020 (and adjust the Payment Schedule by six months) if (A) no later than December 31, 2019, Debtors and their Affiliates (as subsequently defined), open the four (4) Church's Chicken Restaurants currently under construction in (collectively, the "New Restaurants"): (i) Melbourne, Florida, (ii) Lancaster, South Carolina, (iii) Cheyenne, Wyoming and (iv) Louisville, Kentucky; (B) prior to opening the New Restaurants, Debtors sign all franchise agreement and pay all required franchise fees; and (C) Debtors and/or their Affiliates are not otherwise in default or commit an event of default in any other agreement with Holder or its affiliates.  Debtor's Affiliates are defined as Goalz Restaurant Group Cowy, LLC, Goalz Restaurant Group FLA, LLC, Goalz Restaurant Group KTY, LLC or any other business entity owned in whole or in party by Shawn Eby.

2.    <u>Rate of Interest</u>.  This Note does not bear interest.

3.    <u>Place of Payment</u>.  The Debtor shall deliver the payments to the Holder at the address listed below via wire transfer with the following wire instructions or by ACH pursuant to an automatic debit agreement:

**Bank of America**
**New York, NY**
**ABA/Routing #:  026 009 593**
**Recipient Account Name:  Cajun Global LLC**
**Recipient Account #:  3340 3263 9429**
**Reference: Goalz Restaurant Group NCSC, LLC**

4.    <u>Prepayment</u>.  The Debtors may prepay this Note at any time, in whole or in part.

5.    <u>Default</u>.  Each of the following shall constitute an event of default under this Note: (i) any failure to make any payment when due hereunder, (ii) any breach by the Debtors of any

provision in this Note, (iii) the Debtors default under or commits any other breach of any Church's Chicken Franchise Agreement or any other agreement between the Debtors and the Holder or any affiliate of the Holder. Interest on a default payment shall accrue at twelve (12%) percent.

6.      Cross Default.   In the event of default under this Note that remains uncured for 10 days, Debtors hereby acknowledges that such a default will be an event of default under all Franchise Agreements between Debtors and Holder or affiliates of Holder, as well as any Promissory Note signed by Debtors for monies owed to Holder or Holder's affiliates.

7.      **Remedy Upon Default**.   After a default has occurred, without notice or demand to the Debtors or any right to cure, (i) at the option of the Holder, the entire unpaid balance of this Note shall become immediately due and payable, (ii) the outstanding balance of this Note shall automatically bear a default fee equal to 1.5% per month (or, if such amount exceeds the maximum permitted under applicable law, then the maximum permitted by applicable law), (iii) demand collateral for this Note, and (iv) the Holder may exercise and any all remedies available to a creditor upon default as provided herein and at law.

8.      Termination.  This Promissory Note shall automatically terminate if, no later than December 31, 2019, Debtors reopen and operate their Church's Chicken Restaurant #11055 located at 1220 Memorial Pkwy NW, Huntsville, AL  35801.

9.      Time of the Essence.  Time is of the essence of this Note.

10.     Waiver.  The Debtors hereby waive presentment for payment, demand, protest and all other demands and notices.

11.     Collection.  In the event this Note is collected by law or through an attorney at law, the Debtors shall pay all costs of collection, including attorney's fees.

12.     Amendment.  This Note may be changed or modified only by an agreement in writing executed by the Debtors and the Holder.  No delay in enforcement, acceptance of past due amount, or course of dealing shall constitute a waiver of any right or remedy of the Holder.

13.     Notices.  All notices and other communications under or in connection with this Note shall be in writing and shall be deemed to have been duly given when hand delivered, when delivered via overnight courier service (such as FedEx) or when mailed, postage prepaid, by certified mail, return receipt requested and addressed to the recipient at the address specified on the signature page hereof.  The Holder may change its address for such notices and for payment by giving notice thereof to the Debtors in accordance with this Section.

14.     Captions.  The captions in this Note are for convenience only and shall not be considered a part hereof or affect the construction or interpretation of any provisions of this Note.

15.     Severability.  Wherever possible, each provision of this Note is to be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note is

prohibited or invalid under applicable law, then such provision is to be construed to be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Note.

16.    <u>Applicable Law and Venue</u>.  This Note shall be governed by and construed in accordance with the laws of the State of Georgia, except for its principles of conflicts of laws.  Any dispute concerning this Note shall be subject to the exclusive venue of the federal or state court located in the State of Georgia.  Debtors consents to the personal jurisdiction of those courts over Debtors.

17.    <u>Binding Effect</u>.  All of the terms, covenants, agreements and conditions contained in this Note shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors, and assigns.

18.    <u>Release</u>.  In order to induce the Holder to accept this Note, Debtors and any guarantors forever release and covenant not to sue Cajun, its parent, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, agents and employees, in their corporate and individual capacities, from any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected held by any such party from the beginning of time until such party's execution hereof.

19.    <u>Joint and Several Liability</u>.  If more than one person or entity executes this Note, then the word "Debtors" shall include all such persons and entities collectively, and each signatory shall be jointly and severally liable hereunder.

[Signatures appear on the following page]

IN WITNESS WHEREOF, undersigned has caused this Note to be executed as of the date first written above.

**DEBTORS:**

GOALZ RESTAURANT GROUP NCSC, LLC

Address of Debtors:

By: _____

Shawn Eby
9432 Aspen Pointe Lane, Cheyenne, WY 82009

Shawn Eby

Title: CEO

_____

By: _____

Shawn Eby, individually

Address of Holder:
Cajun Global LLC
980 Hammond Drive, Suite 1100
Atlanta GA 30328

EBY NOTE PAYMENT SCHEDULE

| Due Date | Balance | Payment |
|----------|---------|---------|
| 1/1/2020 | $ 283,093.00 | $ 23,591.08 |
| 2/1/2020 | $ 259,501.92 | $ 23,591.08 |
| 3/1/2020 | $ 235,910.84 | $ 23,591.08 |
| 4/1/2020 | $ 212,319.76 | $ 23,591.08 |
| 5/1/2020 | $ 188,728.68 | $ 23,591.08 |
| 6/1/2020 | $ 165,137.60 | $ 23,591.08 |
| 7/1/2020 | $ 141,546.52 | $ 23,591.08 |
| 8/1/2020 | $ 117,955.44 | $ 23,591.08 |
| 9/1/2020 | $ 94,364.36 | $ 23,591.08 |
| 10/1/2020 | $ 70,773.28 | $ 23,591.08 |
| 11/1/2020 | $ 47,182.20 | $ 23,591.08 |
| 12/1/2020 | $ 23,591.12 | $ 23,591.08 |

# EXHIBIT H

Andra J. Terrell

Vice President, Deputy General Counsel

Phone: 770.512.3917

aterrell@churchs.com

## NOTICE OF DEFAULT OF PROMISSORY NOTE

March 5, 2020

<u>Via FEDEX and E-mail</u>

Attn: Shawn Eby
Goalz Restaurant Group NCSC, LLC
9432 Aspen Pointe Lane
Cheyenne, WY 82009
shawn@goalzllc.com

Dear Shawn:

Reference is hereby made to the promissory note in the amount of $283,093 (the "Promissory Note") payable to Cajun Global LLC ("Cajun") and dated September 20, 2019 executed by Shawn Eby and Goalz Restaurant Group NCSC, LLC ("Goalz NCSC"). You and Goalz NCSC are collectively referred to as the "Franchisee" or "you."

**This letter constitutes formal "NOTICE OF DEFAULT" of the Promissory Note.**

You agreed, in Paragraph 1 of the Promissory Note, to make payments in accordance with the Payment Schedule attached thereto. Paragraph 5 of the Promissory Note provided that failure to make payments timely is an event of default of the Promissory Note, and pursuant to Paragraph 7 therein, Cajun can demand full payment of the entire balance of the Promissory Note ("Acceleration"), and the outstanding balance of the Promissory Note will bear a default fee of 1.5% per month or the maximum amount permitted by law. In addition to Acceleration, if you fail to cure within 10 days from the date of Notice, Cajun has the right to cross-default all Franchise Agreements.

As of March 4, 2020, you failed to pay $70,773.24, which is comprised of the Promissory Note payments due on January 1, 2020 and February 1, 2020 and March 1, 2020. **This failure constitutes a default under Paragraph 5 of the Promissory Note.**

**Although Cajun has the right to accelerate the entire amount due, in accordance with Paragraph 5 of the Promissory Note, Cajun hereby demands that you pay Cajun $70,773.24 for the past due Promissory Note payments.**

**If Franchisee does not cure the Defaults to Cajun's satisfaction within the time period specified above, then Cajun may, upon written notice, terminate the Promissory Note and accelerate the entire**

Cajun Operating Company d/b/a Church's Chicken
www.churchs.com
Restaurant Support Center: 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800



balance due, as well as cross-default of any of your Franchise Agreements with Cajun and advise distributors of products proprietary to Cajun that delivery of all such products should be immediately suspended. Further, in the event of such termination, your obligations to comply with the post-termination obligations imposed by each of the Franchise Agreement or by law shall remain in full force and effect. Cajun will insist on strict performance of such obligations and will also take action to recover damages accruing to it as a result of the termination.

We hope you recognize the serious nature of these defaults, and we look forward to hearing from you. Cajun reserves all rights and remedies it may have under each of the Franchise Agreements or otherwise.

Sincerely,
CAJUN GLOBAL LLC
CAJUN OPERATING COMPANY

Andra Terrell
Vice President, Deputy General Counsel

CC:     Pete Servold
        Craig S. Prusher
        Harold Murphy

Attachments

Cajun Operating Company d/b/a Church's Chicken
www.churchs.com
Restaurant Support Center: 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

# EXHIBIT I



Andra J. Terrell

Vice President, Deputy General Counsel

Phone: 770.512.3917

aterrell@churchs.com

## NOTICE OF DEFAULT OF FRANCHISE AGREEMENT

March 5, 2020

<u>Via FEDEX and E-mail</u>

Attn: Shawn Eby
Goalz Restaurant Group COWY, LLC
9432 Aspen Pointe Lane
Cheyenne, WY 82009
shawn@goalzllc.com

Cory Hupp
1440 Arrowhead Drive
Maumee, OH  43537

Re:       *Church's Chicken®* #11238
Location:  2815 Ridge Road, Cheyenne, WY  82001 ("Restaurant #11238")

Dear Shawn and Cory:

Reference is hereby made to (i) the franchise agreement dated October 11, 2019 (the "Franchise Agreement") by and between Goalz Restaurant Group COWY, LLC ("Goalz COWY") and Cajun Global LLC ("Cajun" or "we") for the Restaurant #11238; and (ii) the personal guaranty agreement dated October 10, 2019 signed by Shawn Eby and the personal guaranty agreement dated October 11, 2019 signed by Cory Hupp (collectively, the "Guarantees").   You and Goalz COWY are collectively referred to as the "Franchisee" or "you."

**This letter constitutes formal "NOTICE OF DEFAULT" of the Franchise Agreement.**

By way of background, on February 25, 2020 our representative conducted an equipment survey at Restaurant #11238.  During the equipment survey our representative entered the walk-in cooler where they discovered 5 cases of chicken with use by date of 2/17/2020 and 10 cases of chicken with the use by date of 2/22/2017 (see Exhibit A).  Your Cook Station Leader confirmed the chicken was in use.  Our representative demanded you immediately discard the cases of chicken past the use by date and that all surfaces that came in contact with the that chicken were washed and sanitized, including the entire Batter Cart.

Further, our representative noted several other issues demonstrating that Restaurant #11238 is failing to operate in compliance with our standards and specifications (see Exhibit A).  Additionally, Cajun requested you complete the following critical items:

***Food Safety***

- Management planner- Food safety log, Cookouts, Top 12 checklist incomplete
- Sanitizer buckets not set up correctly

**Cajun Operating Company d/b/a Church's Chicken**
**www.churchs.com**
**Restaurant Support Center:** 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

- Hand washing
- Manager on duty- Not meeting certifications

**Our Facilities**
- Toaster not in use due to no Telfon sheet
- Three compartment sink/mop sink not clean/not setup properly
- Fryer Excellence/Hot soak procedures/shortening quality not followed

**Our Guests**
- Service goal times were not meet in Drive Thru and front counter, nor survey feedback was asked to guest.  Coached RGM on this opportunity so that there is a better understanding the importance to have more survey counts to bring up their SAT Track overall. No knowledge of SAT Track.

**Our Team**
- The restaurant does not actively use the PTE U Training system; Names not matching schedule
- Management Planner available but not in use

**Our Food**
- Cooking chicken and tenders' procedures not met; Cook station leaders was coached
- Hot Soak Calendar/Fryer excellence not effectively followed
- FREADY not being utilized
- Hold times exceeded-chicken, fried side items, and biscuits- Time and temperature chart trained

Section 10.A of your Franchise Agreement requires you to operate Restaurant #11238 in conformity with our "standards, specifications and procedures…to ensure that quality, service and cleanliness are uniformly maintained and to refrain from any deviation…which reflects adversely on Church's name, goodwill and Proprietary Marks." In that Section you also agreed to use ingredients conforming to our standards and specifications, as well as to prepare products in accordance with our methods and techniques.  Failure to comply with this section is a default of the Franchise Agreement.  Our Manual clearly states, in the Food Safety sections, that a Restaurant "…must never at any time serve expired chicken to guests".  As previously stated, your Cook Station Leader advised that the chicken past the use by date was in use, and thus, your Restaurant served, and was serving, expired chicken. **Due to your sale of expired chicken, you have failed to comply with our standards and are in default of the Franchise Agreement.**

Additionally, the Food Safety, Restaurant Operations and Guest Services sections of the Operations Manual set forth our standards, specifications and procedures in those areas.  The issues listed above demonstrate that you have failed to comply with Cajun's operating standards.  **Due to your failure to comply with the Food Safety, Restaurant Operations and Guest Services sections of the Operations Manual, you have failed to comply with our standards and are in default of the Franchise Agreement.**

In accordance with Section 17.B(1) of the Franchise Agreement, Franchisee must cure the Defaults by doing or causing to be done the following:

1. **No later than 30 days from the date of this Notice Franchisee must** correct  all deficiencies identified in this Notice, any other instance where Restaurant #11238 is failing to maintain the standards or procedures prescribed by Cajun, and any situation at Restaurant #11238 that poses a threat to public health or safety.

If Franchisee fails to cure the Defaults as outlined previously, Cajun will have the right to send Franchisee a Notice of Termination for the Franchise Agreement and require closure and deidentification of

**Cajun Operating Company d/b/a Church's Chicken**
www.churchs.com
Restaurant Support Center: 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

**Franchised Restaurant #11238 no later than 30 days after the date of this notice. De-identification Requirements are attached hereto as Exhibit B.**

We hope you recognize the serious nature of these defaults, and we look forward to hearing from you. Cajun reserves all rights and remedies it may have under the Franchise Agreement or otherwise.

Sincerely,
CAJUN GLOBAL LLC
CAJUN OPERATING COMPANY

Andra Terrell
Vice President and Deputy General Counsel

CC:     Pete Servold
        Craig S. Prusher
        Harold Murphy

Attachments

**Cajun Operating Company d/b/a Church's Chicken**
**www.churchs.com**
**Restaurant Support Center:** 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

**EXHIBIT A:  PICTURES FROM RESTAURANT #11238**



- Total Time for order to be handed out – LTO
- Toaster not in use/Chemicals not properly stored/ Sanitizer buckets not set up correctly
- Tender cooking procedures not followed
- Incorrect jobs aids placed

Cajun Operating Company d/b/a Church's Chicken
www.churchs.com
Restaurant Support Center: 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

  

- Chicken use by date 2-22-2020
- Chicken use by date 2-17-2020
- Batter Cart cleaned to began selling product

**Cajun Operating Company d/b/a Church's Chicken**
**www.churchs.com**
**Restaurant Support Center:** 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

## EXHIBIT B:  RESTAURANT CLOSING/DE-IDENTIFICATION CHECKLIST

All CHURCH'S CHICKEN® Restaurants that are permanently closing must be de-identified as a CHURCH'S CHICKEN® Restaurant.

The following list must be completed immediately but no later than seven (7) business days after the restaurant ceases operation.  Once the de-identification work is completed you must take several photographs of the Restaurant, which will verify the completion of the de-identification work, and send them to your Regional Franchise Director.  Cajun may inspect a closed Restaurant to insure compliance and if necessary complete the de-identification process and pass these costs on to the Franchisee.

_____    Remove all interior and exterior signage, including removal of all CHURCH'S CHICKEN logos from the building, interior and exterior menu boards (and translites), roof flags, cloud signs, star signs or other signs containing CHURCH'S CHICKEN branding elements, awnings, drive-thru canopies, tower panels, pole/monument signs, directional signs and channel letter signs.  The pole sign frame may be removed.

_____    Remove all Department of Transportation, billboard, or other signage that would direct customers to the location.

_____    Remove all CHURCH'S CHICKEN P.O.P. elements and trademarks, decals, kids' merchandise, and any other promotional material or merchandising items.

_____    Board all windows and glass doors, if required under the lease and/or to prevent vandalism.

_____    Notify suppliers to stop delivery of food and paper.

_____    Remove all food and paper from the premises.

_____    Photographs (Digital Preferred) sent to Regional Franchise Director.

_____    Return all CHURCH'S CHICKEN Operations Manuals, Equipment Manual, Marketing Plans, training materials other materials marked "Property of Cajun OPERATING COMPANY" to Cajun headquarters in Atlanta, 980 Hammond Drive NE, Suite 1100, Atlanta, GA 30328.

Please note that you should also consider taking the following typical closing actions:

_____    Properly cap all exposed electrical wiring.

_____    Ensure interior and exterior (including dumpsters) are free from trash and debris.

_____    Notify the trash removal company of restaurant closure and request that the dumpsters either be removed or welded shut.

_____    Contact pest control company and other service providers to discontinue service (*e.g.*, landscaping, HVAC, etc.).

_____    Clean exhaust hood.

_____    Pump grease and sewer systems.

_____    Ensure interior and exterior are clean.

_____    Winterize plumbing (for Restaurant in cold weather areas).

_____    Contact CO2 supplier to retrieve CO2 tank.

_____    Remove POS system and all drive-thru timers.

_____    Notify all utility companies that effective upon a certain date there will no longer be a CHURCH'S CHICKEN restaurant operating at this location and to terminate service.  In some situations it may be necessary to leave certain utilities on in order to provide heat so that the pipes will not freeze or to comply with local ordinances (such as fire alarms).

_____  Electric            _____  Gas
_____  Telephone          _____  Water

**Cajun Operating Company d/b/a Church's Chicken**
**www.churchs.com**
**Restaurant Support Center:** 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800



Andra J. Terrell

Vice President, Deputy General Counsel

Phone: 770.512.3917

aterrell@churchs.com

### NOTICE OF DEFAULT OF FRANCHISE AGREEMENT

March 5, 2020

<u>Via FEDEX and E-mail</u>

Attn: Shawn Eby
Goalz Restaurant Group FL, LLC
9432 Aspen Pointe Lane
Cheyenne, WY 82009
shawn@goalzllc.com

Cory Hupp
1440 Arrowhead Drive
Maumee, OH  43537

Re:  *Church's Chicken®* #11047
Location:   2015 North Wickham Road, Melbourne, FL 32935 ("Restaurant #11047")

Dear Shawn and Cory:

Reference is hereby made to (i) the franchise agreement dated November 20, 2019 (the "Franchise Agreement"), between Goalz Restaurant Group FLA, LLC  ("Goalz FLA"), and Cajun Global LLC ("Cajun" or "we"); and (ii) the guaranty agreement dated November 15, 2019 signed by Shawn Eby in favor of Cajun for Goalz FLA and the guaranty agreement dated November 15, 2019 signed by Corey Hupp in favor of Cajun for Goalz FLA (collectively, the "Guarantees").   You and Goalz COWY are collectively referred to as the "Franchisee" or "you."

**This letter constitutes formal "NOTICE OF DEFAULT" of the Franchise Agreement.**

By way of background, on February 26, 2020 our representative visited Restaurant #11047 to work with your restaurant manager on standard operations.  During the restaurant visit our representative entered the walk-in cooler where they discovered 17 cases of dark chicken with use by date of February 19, 2020 and 2 cases of mixed chicken  with  use by dates of  February 24, 2020 and February 25, 2020 (see Exhibit A).  The use by dates were covered by "use first" stickers.  Kurt Doolittle, your Market Leader, stated that the chicken was frozen, but freezing chicken and using it after the best by date does not meet our standards.  Our representative demanded you immediately discard the cases of chicken past the use by date.

Section 10.A of your Franchise Agreement requires you to operate Restaurant #11047 in conformity with our "standards, specifications and procedures…to ensure that quality, service and cleanliness are uniformly maintained and to refrain from any deviation…which reflects adversely on Church's name, goodwill and Proprietary Marks." In that Section you also agreed to use ingredients conforming to our standards and specifications, as well as to prepare products in accordance with our methods and techniques.  Failure to comply with this section is a default of the Franchise Agreement.  Our Manual clearly states, in the Food Safety sections, that a Restaurant "…must

**Cajun Operating Company d/b/a Church's Chicken**
**www.churchs.com**
**Restaurant Support Center:** 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

never at any time serve expired chicken to guests". As previously stated, your Market Leader advised that the chicken past the use by date was frozen although expired, and because the chicken had not been discarded it appeared your intent was to serve it to guests. **Due to your failure to discard expired chicken, you have failed to comply with our standards and are in default of the Franchise Agreement.**

**In accordance with Section 17.B(1) of the Franchise Agreement, Franchisee must cure the Defaults by doing or causing to be done the following:**

1. <u>**No later than 30 days from the date of this Notice Franchisee must**</u> correct all deficiencies identified in this Notice, any other instance where Restaurant #11047 is failing to maintain the standards or procedures prescribed by Cajun, and any situation at Restaurant #11047 that poses a threat to public health or safety.

**If Franchisee fails to cure the Defaults as outlined previously, Cajun will have the right to send Franchisee a Notice of Termination for the Franchise Agreement and require closure and de-identification of Franchised Restaurant #11047 no later than 30 days after the date of this notice. De-identification Requirements are attached hereto as Exhibit B.**

We hope you recognize the serious nature of these defaults, and we look forward to hearing from you. Cajun reserves all rights and remedies it may have under the Franchise Agreement or otherwise.

Sincerely,
CAJUN GLOBAL LLC
CAJUN OPERATING COMPANY

Andra Terrell
Vice President and Deputy General Counsel

CC:     Pete Servold
          Craig S. Prusher
          Harold Murphy

Attachments

**Cajun Operating Company d/b/a Church's Chicken**
**www.churchs.com**
**Restaurant Support Center:** 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

EXHIBIT A:  PICTURES FROM RESTAURANT #11047



Cajun Operating Company d/b/a Church's Chicken
www.churchs.com
Restaurant Support Center: 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800



Cajun Operating Company d/b/a Church's Chicken
www.churchs.com
Restaurant Support Center: 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800



Cajun Operating Company d/b/a Church's Chicken
www.churchs.com
Restaurant Support Center: 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

## EXHIBIT B:  RESTAURANT CLOSING/DE-IDENTIFICATION CHECKLIST

All CHURCH'S CHICKEN® Restaurants that are permanently closing must be de-identified as a CHURCH'S CHICKEN® Restaurant.

The following list must be completed immediately but no later than seven (7) business days after the restaurant ceases operation.  Once the de-identification work is completed you must take several photographs of the Restaurant, which will verify the completion of the de-identification work, and send them to your Regional Franchise Director.  Cajun may inspect a closed Restaurant to insure compliance and if necessary complete the de-identification process and pass these costs on to the Franchisee.

_____  Remove all interior and exterior signage, including removal of all CHURCH'S CHICKEN logos from the building, interior and exterior menu boards (and translites), roof flags, cloud signs, star signs or other signs containing CHURCH'S CHICKEN branding elements, awnings, drive-thru canopies, tower panels, pole/monument signs, directional signs and channel letter signs.  The pole sign frame may be removed.

_____  Remove all Department of Transportation, billboard, or other signage that would direct customers to the location.

_____  Remove all CHURCH'S CHICKEN P.O.P. elements and trademarks, decals, kids' merchandise, and any other promotional material or merchandising items.

_____  Board all windows and glass doors, if required under the lease and/or to prevent vandalism.

_____  Notify suppliers to stop delivery of food and paper.

_____  Remove all food and paper from the premises.

_____  Photographs (Digital Preferred) sent to Regional Franchise Director.

_____  Return all CHURCH'S CHICKEN Operations Manuals, Equipment Manual, Marketing Plans, training materials other materials marked "Property of Cajun OPERATING COMPANY" to Cajun headquarters in Atlanta, 980 Hammond Drive NE, Suite 1100, Atlanta, GA 30328.

Please note that you should also consider taking the following typical closing actions:

_____  Properly cap all exposed electrical wiring.

_____  Ensure interior and exterior (including dumpsters) are free from trash and debris.

_____  Notify the trash removal company of restaurant closure and request that the dumpsters either be removed or welded shut.

_____  Contact pest control company and other service providers to discontinue service (*e.g.*, landscaping, HVAC, etc.).

_____  Clean exhaust hood.

_____  Pump grease and sewer systems.

_____  Ensure interior and exterior are clean.

_____  Winterize plumbing (for Restaurant in cold weather areas).

_____  Contact $CO_2$ supplier to retrieve $CO_2$ tank.

_____  Remove POS system and all drive-thru timers.

_____  Notify all utility companies that effective upon a certain date there will no longer be a CHURCH'S CHICKEN restaurant operating at this location and to terminate service.  In some situations it may be necessary to leave certain utilities on in order to provide heat so that the pipes will not freeze or to comply with local ordinances (such as fire alarms).

_____ Electric        _____ Gas
_____ Telephone       _____ Water

**Cajun Operating Company d/b/a Church's Chicken**
www.churchs.com
**Restaurant Support Center:** 980 Hammond Drive, Suite 1100 Atlanta, GA 30328 (770) 350-3800

# EXHIBIT J

# Redacted

**From:** Shawn Eby <shawn@goalzllc.com>
**Date:** March 6, 2020 at 11:32:59 AM MST
**To:** Tamara Hartrick <THartrick@hannayra.com>, "Corey Hupp (chupp@bridgepointrm.com)"
<chupp@bridgepointrm.com>, Craig Hannay <channay@hannayra.com>
**Subject: RE:  Est cash projection through PR 3/17**

See below in yellow

**From:** Tamara Hartrick <THartrick@hannayra.com>
**Sent:** Friday, March 6, 2020 11:05 AM
**To:** Shawn Eby <shawn@goalzllc.com>; Corey Hupp (chupp@bridgepointrm.com)
<chupp@bridgepointrm.com>; Craig Hannay <channay@hannayra.com>
**Subject:** Est cash projection through PR 3/17

Please see my cash projection through payroll 3/17.

I propose paying the $9000 remaining balance due for the Amex 2/25 pmt. That would give about
$5,000 so they can book plane tickets for the DQ Commerce City opening. Agreed please pay today

I propose paying $1,000 on Shawn's Capital One card that is due 3/8 and $500 on Wade's Capital One
card that is due 3/9. These are both GRG credit cards. Aggred

1

Case 2:20-cv-00344-DJH   Document 1-12   Filed 08/19/20   Page 3 of 3

I propose paying the past due utility bills that were due 1/24 and 2/23 totaling about $29.00 so there is no disruption of service. We were past due 7 days on Duke Energy for Apopka and they were going to disconnect today if not paid. We paid that bill yesterday.  Only pay if we get a disconnect notice

We also paid the AFCO excess insurance financing payment yesterday for payment due 2/18. The insurance would have been canceled today without payment.  thanks

We will need to pay the mgmt liability insurance premium. It was due 2/15, and they extended it until 3/15. Since Goalz is in the process of renewing this, I think it's really important that it gets paid.  agreed

We're currently only one week past due on the Liberty Mutual pkg insurance.

We have not paid any rent for March at any locations. We haven't paid the February rent at the new Dog Haus in Cheyenne.  Good do not pay any of these until you here otherwise from me

We need to get my 3/3 payment paid today

Who is getting paid out of CD Shelbyville?  I will end that.

**Tamara Hartrick, CPA**
*Director of Finance*



d: 602.374.2020 | o: 602.374.2000 | f: 602.237.6901
hannayra.com | thartrick@hannayra.com
2999 N. 44th Street, Ste. 400
Phoenix, Arizona  85018

Arizona | California | Nevada

CONFIDENTIALITY NOTICE: This email, including any attachments, is intended only for the named recipient(s) above and is covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521. Any unauthorized review, copy, use, disclosure, or distribution is prohibited. This email is confidential and may contain information that is privileged or exempt from disclosure under applicable law. If you have received this message in error please immediately notify the sender by return email and delete this email message from your computer.

# Redacted

**From:** Tamara Hartrick <THartrick@hannayra.com>
**Sent:** Friday, March 6, 2020 11:05 AM
**To:** Craig Hannay <channay@hannayra.com>; Corey Hupp (chupp@bridgepointrm.com) <chupp@bridgepointrm.com>
**Subject:** FW: Amex and Payment

Email just received from Shawn.

**Tamara Hartrick, CPA**
*Director of Finance*

 d: 602.374.2020 | o: 602.374.2000 | f: 602.237.6901
hannayra.com | thartrick@hannayra.com
2999 N. 44th Street, Ste. 400
Phoenix, Arizona  85018

Arizona | California | Nevada

1

CONFIDENTIALITY NOTICE: This email is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the writer's company. Transmission of this email is protected under the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521. Any unauthorized review, copy, use, disclosure, or distribution is prohibited. This email is confidential and may contain information that is privileged or exempt from disclosure under applicable law. If you have received this message in error please immediately notify the sender by return email and delete this email message from your computer.

**From:** Shawn Eby <shawn@goalzllc.com>
**Sent:** Friday, March 6, 2020 11:07 AM
**To:** Tamara Hartrick <THartrick@hannayra.com>
**Subject:** Amex and Payment

Tamara,

We really need to figure out on paying Amex and my guaranteed payment today.

Shawn

**Shawn Eby**
**Chief Executive Officer**
**Goalz Restaurant Group**
**(307) 630-2277**
**shawn@goalzllc.com**
**http://www.goalzllc.com/**



# EXHIBIT K

# Redacted

**From:** Shawn Eby <shawn@goalzllc.com>
**Sent:** Monday, March 9, 2020 2:17 PM
**To:** Tamara Hartrick <THartrick@hannayra.com>; Corey Hupp (chupp@bridgepointrm.com)
<chupp@bridgepointrm.com>; Craig Hannay <channay@hannayra.com>
**Subject:** RE: Disconnect notices

Tamara,

Any suggestions on what we can do about the rent in Cheyenne?  As you saw they are getting ready to send a 3 day letter and this is going to be a top priority.

Thanks,
Shawn

**Shawn Eby**
**Chief Executive Officer**

1

**Goalz Restaurant Group**
**(307) 630-2277**
shawn@goalzllc.com
http://www.goalzllc.com/



**From:** Tamara Hartrick <THartrick@hannayra.com>
**Sent:** Monday, March 9, 2020 12:06 PM
**To:** Shawn Eby <shawn@goalzllc.com>; Corey Hupp (chupp@bridgepointrm.com) <chupp@bridgepointrm.com>; Craig Hannay <channay@hannayra.com>
**Subject:** Disconnect notices

We have received disconnect notices for the following locations. Service will be disconnected if past due amounts are not paid by specified date. Since four of them will be disconnected at the same time payroll will come out, I recommend paying all of these we received disconnect notices on. Please let me know.

| | |
|---|---|
| CD Pooler – Hargray | $254.70 will be disconnected if payment not recd by 3/17/20 |
| CC Melbourne – FPL | $1,347.98 will be disconnected if payment not recd by 3/17/20 |
| CD Lancaster – Comporium | $130.97 will be disconnected if payment not recd by 3/18/20 |
| CC Lancaster – Comporium | $131.59 will be disconnected if payment not recd by 3/18/20 |
| CC Lancaster – Duke Energy | $566.69 will be disconnected if payment not recd by 3/30/20 |
| Total | $2,431.93 |

Funds from weekend sales came in $14,600 higher than I projected. Based on that, my updated projection without paying any other utilities other than the ones above, is a shortage of about $4000 for payroll. That does not include Shawn's payment.

Thanks.

**Tamara Hartrick, CPA**
*Director of Finance*



d: 602.374.2020 | o: 602.374.2000 | f: 602.237.6901
hannayra.com | thartrick@hannayra.com
2999 N. 44th Street, Ste. 400
Phoenix, Arizona  85018

Arizona | California | Nevada

CONFIDENTIALITY NOTICE: This email, including any attachments, is intended only for the named recipient(s) above and is covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521. Any unauthorized review, copy, use, disclosure, or distribution is prohibited. This email is confidential and may contain information that is privileged or exempt from disclosure under applicable law. If you have received this message in error please immediately notify the sender by return email and delete this email message from your computer.

# EXHIBIT L

**Post Lester Partnership**
**c/o Realty Management Services**
**180 E. Prospect Ave #137**
**Mamaroneck, NY  10543**
**914-698-5831**

March 10, 2020

VIA CERTIFIED MAIL AND EMAIL
shawn@goalzllc.com
jeron@goalzllc.com

Goalz CD Pooler GA, LLC
161 Tanger Drive
Pooler, Georgia  31322

Goalz CD Pooler GA, LLC
2999 N. 44th Street, Suite 400
Phoenix, AZ  85018

Goalz CD Pooler GA, LLC
c/o Shawn Eby
9432 Aspen Pointe Lane
Cheyenne, WY  82009

Goalz Restaurant Group, LLC
c/o Shawn Eby
9432 Aspen Pointe Lane
Cheyenne, WY  82009

Shawn Eby
9432 Aspen Pointe Lane
Cheyenne, WY  82009

Jeron Boemer
9432 Aspen Pointe Lane
Cheyenne, WY  82009

Re:  **Notice of Default; Demand for Payment**

Dear Mr. Eby and Mr. Boemer:

We are the Landlord, Post Lester Partnership, Hearthfield Homes, LLC, and Hearthfield Homes GA, LLC (collectively "Landlord"), successors in interest to Desibrook Development, LLC ("Desibrook"). Desibrook entered into an Amended and Restated Restaurant Lease dated April 27, 2018 and First Amendment to Amended and Restated Restaurant Lease with Goalz CD Pooler GA, LLC ("Goalz" or "Tenant"), for lease of the property located at 161 Tanger Drive, Pooler, Georgia 31322 (the "Property") for the purpose of operating a Captain D's Restaurant (the "Restaurant Lease"). The Restaurant Lease was assigned to Landlord on or about May 24, 2019.

Pursuant to the terms of the Restaurant Lease, Goalz is required to pay base rent in the amount of $13,333.33, CAM in the amount of $355.40, and "in lieu of" tax payment in the amount of $1,331.15 on the first day of each month. If payment is not received within five (5) days, a late fee of five percent (5%) of the amount due is assessed. This Letter constitutes written notice of Goalz's default under Section 22.1(a) of the Restaurant Lease for failure to pay base rent, CAM, and "in lieu of" tax pament when due for the month of March 2020. Demand is hereby made for the immediate repayment of the total amount past due, including late fees, of $15,770.87 ("Current Demand Amount"). An invoice is attached hereto. Please note the Current Demand Amount does not include default interest or attorney's fees.

If the ongoing defaults are not cured by delivering the Current Demand Amount in cash or cash equivalent to Landlord on or before the date ten (10) days from the date of receipt of this letter, Landlord will be forced to pursue its remedies under the Lease, including without limitation, suing Tenant and you personally under your lease guaranties for collection of amounts due and owing pursuant to the terms of the Restaurant Lease. Additionally, if you fail to deliver the Current Demand Amount within ten (10) days form the date of receipt of this letter, the provisions of the Lease relating to default interest and the payment of attorney's fees and costs will be enforced. If you make such payment of the Current Demand Amount, pursuant to OCGA §13-1-11, the provision obligating you to pay attorney's fees will not be enforced and Landlord will also waive any interest which has accrued pursuant to Section 22.1(a) of the Restaurant Lease.

Neither this letter, nor any statement by or on behalf of Landlord as to the amount due and owing under the Restaurant Lease: (i) shall constitute a waiver of any rights of Landlord to collect any additional amounts to which Landlord may lawfully be entitled pursuant to the terms of the Restaurant Lease, or otherwise at law or in equity; or (ii) shall constitute an offer to settle or waive any rights of Landlord under the Lease.

Finally, pursuant to the requirements of Exhibit "G", Lease Addendum, Paragraph 2, we are providing Captain D's, LLC with a copy of this notice. Captain D's, LLC shall have thirty (30) days from receipt of this notice to cure the default, to assume Tenant's position under the Lease Agreement, to take over operation of the Restaurant, and/or to assign its rights under the Lease Agreement to an approved franchisee.

Please contact me if you wish to discuss this matter further.


Sincerely,

Diane L. Schoenacher
Post Lester Partnership, et al.



cc:    Catherine M. Bolger, Esq.
       Michael Larkin, Esq.
       Captain D's, LLC

GOALZ CD Pooler GA, LLC
161 Tanger Outlets Blvd.
Pooler, GA 31322

### STATEMENT

| DATE | DESCRIPTION | CHARGE | PAYMENT | BALANCE |
|---|---|---|---|---|
| 03/01/20 | March Rent | 13333.33 | | 13,333.33 |
| 03/01/20 | March Fixed CAM | 355.40 | | 355.40 |
| 03/01/20 | March In Lieu Of Re Tax | 1331.15 | | 1,331.15 |
| 03/10/20 | Late Fee | 750.99 | | 750.99 |
| | | TOTAL AMOUNT DUE | | 15,770.87 |

Please make your check payable to
POST LESTER PARTNERSHIP

Mail to:
POST LESTER PARTNERSHIP
c/o Realty Management Services
180 E. Prospect Ave. #137
Mamaroneck, NY  10543

Interest of 12 % will accrue until paid.

# Redacted

**From:** Shawn Eby <shawn@goalzllc.com>
**Sent:** Monday, March 9, 2020 2:13 PM
**To:** Craig Hannay <channay@hannayra.com>
**Cc:** Hupp Corey (chupp@bridgepointrm.com) <chupp@bridgepointrm.com>
**Subject:** RE: Dog Hause Rent

I understand and we can't move any faster.  We didn't get the all clear from the Attorney until late Friday and they said they couldn't meet today.  I was hoping Rich would hold off but that doesn't seem to be the case.  Do I have a call with him?  Do I call Tyler?  I am worried if we do that than it is even worse.  However if I talk with him vs ignoring we can probably get him to hold off till next week.

I will ask Tamara if she has any thoughts and where we are compared to what she forecasted last week.

**Shawn Eby**
**Chief Executive Officer**
**Goalz Restaurant Group**

1

(307) 630-2277
shawn@goalzllc.com
http://www.goalzllc.com/



**From:** Craig Hannay <channay@hannayra.com>
**Sent:** Monday, March 9, 2020 2:58 PM
**To:** Shawn Eby <shawn@goalzllc.com>
**Cc:** Hupp Corey (chupp@bridgepointrm.com) <chupp@bridgepointrm.com>
**Subject:** Re: Dog Hause Rent

This is why getting the company into bank is urgent


**R. Craig Hannay**
*President*

c: 602.309.2113 | o:602.374.2000
hannayra.com |channay@hannayra.com
2999 N. 44th Street, 400
Phoenix, Arizona 85018

 Arizona | California | Colorado | Illinois | Nevada | Washington
CONFIDENTIALITY NOTICE: This email, including any attachments, is intended only for the named recipient(s) above and is covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521. Any unauthorized review, copy, use, disclosure, or distribution is prohibited. This email is confidential and may contain information that is privileged or exempt from disclosure under applicable law. If you have received this message in error please immediately notify the sender by return email and delete this email message from your computer.



On Mar 9, 2020, at 1:52 PM, Shawn Eby <shawn@goalzllc.com> wrote:

Craig & Corey,

What should we do hear?  We cannot afford for this one to go away.  In Six weeks we have done over $378,000 and that is the most any DH has done in that time period.

Shawn

**Shawn Eby**
**Chief Executive Officer**
**Goalz Restaurant Group**
**(307) 630-2277**
**shawn@goalzllc.com**
**http://www.goalzllc.com/**

2

**From:** Rich Bennion <Rich@adventut.com>
**Sent:** Monday, March 9, 2020 2:52 PM
**To:** Shawn Eby <shawn@goalzllc.com>
**Cc:** Greg Stuart <greg@gstuart.net>; Tyler Heath <heath.tyler@gmail.com>; Jeff Bennion <Jeff@adventut.com>
**Subject:** Dog Hause Rent
**Importance:** High

I am distressed that there has been no rent received, and you are 2 months late on your rent.  We hear that the store is busy, you even asked my Son Jeff if we would be interested in financing another restaurant for Goalz.  This is not the way to start a 20 year relationship, we are most distressed that not only have you defaulted on the rent the first month you have been opened, but you have not even responded to our mails, texts or calls.  It is as though that if you don't communicate that this issue will automatically disappear.  The building is built, the contractor has been paid and you are open.  We have no option but to declare you in default and give you a 3 day notice to pay or quit.  The lease authorizes us to immediately afterwards take possession of the premises and shut down your operations. We do not want to take this step, but we do not see what alternative we have at this point.

# EXHIBIT M

# FENNEMORE CRAIG
## ATTORNEYS

Anthony W. Austin
Director
aaustin@fclaw.com

2394 E. Camelback Road, Suite 600
Phoenix, Arizona  85016
PH (602) 916-5347  |  FX (602) 916-5547
fennemorecraig.com

February 27, 2020

**BY HAND DELIVERY**
**BY REGULAR FIRST-CLASS MAIL**

Shawn Eby
President
Goalz Restaurant Group, LLC
4470 Cox Road, Suite 250
Glen Allen, VA  23060

9432 Aspen Point Lane
Cheyenne, WY 82009

Re:   Notice of Default to Borrower and Subsidiary Guarantors
Second Amended and Restated Loan, Guaranty and Security Agreement
dated April 29, 2019 ("Loan Agreement"), Secured Promissory Note dated
September 4, 2018 (the "First Advance Note"), and Secured Promissory
Note dated April 29, 2019 (the "Second Advance Note," with the First
Advance Note the "Notes")

Dear Shawn:

This Firm represents HIP Lending Group, LLC ("Lender") with respect to the Loan
Agreement and the Notes.  As detailed below, the Borrower and Subsidiary Guarantors (both as
defined in the Loan Agreement) have defaulted under their obligations pursuant to the Loan
Agreement and Notes.

Specifically, and without limitation, Borrower and Subsidiary Guarantors have failed to
make timely payments as set forth and required in the Notes and the Loan Agreement.  Pursuant
to the First Advance Note, monthly payments of principal and interest were required to be paid by
the Borrower beginning January 1, 2019.  The Subsidiary Guarantors unconditionally guaranteed
the payments required by the First Advance Note.  To date, no payments have been made to
Lender.

Further, Borrower and Subsidiary Guarantors have ceased to be solvent as set forth in their
year-end financial records.  These records indicate that Borrower and Subsidiary Guarantors have
liabilities that far exceed their assets and are not currently able to pay their bills as they come due,
including payroll for their respective employees.

FENNEMORE CRAIG

Shawn Eby
February 27, 2020
Page 2


     Lender, pursuant to Section 9.1 of the Loan Agreement and the terms of the Notes, hereby issues this notice of default with respect to the defaults set forth herein. Borrowers and Subsidiary Guarantors have five (5) days from the date of this letter to cure the defaults to the satisfaction of Lender. Failure to do so shall, among other things, result in the Lender declaring the Notes immediately due and payable in full with outstanding interest and attorneys' fees and costs without further notice to the Borrower or Subsidiary Guarantors.

     Please note this is not the first letter in a series attempting to collect payment. If the defaults set forth herein are not cured as required, we have been instructed to pursue all available remedies available against the Borrower and the Subsidiary Guarantors. Lender reserves all rights with respect to any other default that may exist that is not set forth herein. Lender further reserves all right with respect to exercise any and all remedies available to it pursuant to the Loan Agreement, the Notes, and/or at law.


                  Sincerely,

                  FENNEMORE CRAIG, P.C.

                  Anthony W. Austin


AAUS/awa

15588937.2

# EXHIBIT N

# FENNEMORE CRAIG
ATTORNEYS

**Anthony W. Austin**
Director
aaustin@fclaw.com

2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
PH (602) 916-5347 | FX (602) 916-5547
fennemorecraig.com

March 9, 2020

**BY EMAIL**
**BY REGULAR FIRST-CLASS MAIL**

Shawn Eby
President
Goalz Restaurant Group, LLC
4470 Cox Road, Suite 250
Glen Allen, VA 23060

9432 Aspen Point Lane
Cheyenne, WY 82009

Re:   Notice of Acceleration and Demand for Payment to Borrower and
Subsidiary Guarantors
Second Amended and Restated Loan, Guaranty and Security Agreement
dated April 29, 2019 ("Loan Agreement"), Secured Promissory Note dated
September 4, 2018 (the "First Advance Note"), and Secured Promissory
Note dated April 29, 2019 (the "Second Advance Note," with the First
Advance Note the "Notes")

Dear Shawn:

On March 2, 2020, HIP Lending Group, LLC ("Lender") delivered to you a Notice of
Default setting forth numerous defaults under the Loan Agreement and the Notes. Pursuant to
Section 9.1 of the Loan Agreement, and the terms of the Notes, Borrower and Subsidiary
Guarantors had five (5) days to cure the defaults specified within the Notice of Default. To date,
Borrower and Subsidiary Guarantors have failed to cure the defaults.

Lender, pursuant to Section 9.2 of the Loan Agreement and the terms of the Notes, hereby
accelerates and declares immediately due and payable all amounts due under the Loan Agreement
and Notes. As of the date of this letter, Borrower and Subsidiary Guarantors are indebted to Lender
in the amount of $3,377,869.48 (the "Indebtedness"). Failure to immediately pay the Indebtedness
will result in Lender pursuing all remedies available to it pursuant to the Loan Agreement, the
Notes, and/or at law, including, but not limited to, foreclosing on its security interest in the assets
of the Borrower and Subsidiary Guarantors.

Your prompt attention to this matter is appreciated. Should Borrower or Subsidiary
Guarantors fail to pay the Indebtedness in full we have been instructed to being collection efforts

# FENNEMORE CRAIG

Shawn Eby
March 9, 2020
Page 2

without further notice to the Borrower or Subsidiary Guarantors.  If litigation is required, Lender will seek payment of its attorneys' fees and costs in addition to all other damages it has suffered.

Sincerely,

FENNEMORE CRAIG, P.C.

Anthony W. Austin

AAUS/awa

15619281.1

I hereby attest and certify on ___6/16/2020___
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my cus-
tody.

CLERK, U.S. DISTRICT COURT
DISTRICT OF ARIZONA

By_____ Deputy